UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEANNA MCBREARTY, et al.,

                              Plaintiffs,

        - against -                                        08 CIV. 7650 (DLC)

THE VANGUARD GROUP, INC., et al.,

                              Defendants.

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS

**SIMMONSCOOPER LLC**
Greg Erthal
707 Berkshire Blvd.
East Alton, IL 62024
(618) 259-2222
gerthal@simmonscooper.com

**HANLY CONROY BIERSTEIN SHERIDAN
FISHER & HAYES LLP**
Thomas I. Sheridan, III
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6400
tsheridan@hanlyconroy.com

*Attorneys for Plaintiffs*

November 24, 2008

TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES............................................................................................ iv

PRELIMINARY STATEMENT ........................................................................................1

FACTS ........................................................................................................................5

    The Parties ..........................................................................................................5

        The Nominal Defendants .............................................................................5

        The Plaintiffs................................................................................................6

        The Defendants ............................................................................................7

    Defendants Caused the Nominal Defendants to Invest in Illegal Gambling
        Businesses in Violation of § 1955 ...........................................................10

    The Claims for Relief ........................................................................................12

    Facts of Which the Court May Take Notice .....................................................12

        PartyGaming ..............................................................................................13

        Sportingbet.................................................................................................16

        BWin ..........................................................................................................18

        NETeller......................................................................................................18

        Defendants Knew or Were Reckless in Not Knowing That the Internet
           Gambling Businesses Were Taking Bets from Gamblers in the US .........20

APPLICABLE LEGAL STANDARDS.................................................................................21

ARGUMENT ................................................................................................................22

I.    PLAINTIFFS HAVE STATED CLAIMS UNDER RICO .................................................22

    A.    The Requirements of Sections 1962(c) and 1964(c)...............................22

    B.    Many of the Elements of a RICO Claim Are Uncontested....................23

    C.    Defendants Caused the Fund to Commit RICO Predicate Acts .............23

1.   "Owns" Means "Owns", and "Finances" Means "Finances" ...................24

2.   The Complaint Sufficiently Describes the "Illegal Gambling Businesses"25

3.   Mens Rea Is Sufficiently Alleged .............................................................26

D.   Defendants Injured Plaintiffs in Their Business or Property by Reason of RICO Predicate Crimes.........................................................................27

1.   Plaintiffs Were Injured..............................................................................28

2.   Defendants' Predicate Acts Proximately Caused Plaintiffs' Injuries ........29

3.   Defendants' Predicate Acts Created a Significant Risk of Harm to Plaintiffs; No Intent to Harm Need Be Alleged........................................35

4.   Plaintiffs' Injury Did Not Result from Mere "Exposure" of a Concealed Scheme; It Resulted Because the Risk Taken by Defendants Became a Reality ......................................................................................................38

E.   The Trustees Are Liable Under RICO Notwithstanding the Funds' Declarations of Trust...............................................................................41

II.   PLAINTIFFS HAVE PROPERLY PLEADED THEIR DERIVATIVE CLAIMS, INCLUDING THE FUTILITY OF MAKING A DEMAND ON THE TRUSTEES OF THE NOMINAL DEFENDANTS .......45

A.   The Standards for Pleading Demand Futility.........................................46

B.   Trustees Have Conflicts of Interests Among Those to Whom They Owe Duties of Undivided Loyalty Because They Serve on the Boards of Vanguard and Every Other Mutual Fund Managed by Vanguard...........................47

C.   Demand is Excused Under Aronson ......................................................50

1.   The Trustees are Neither Disinterested Nor Independent Because They Face a Substantial Likelihood of Criminal and Civil Liability.................50

2.   Demand is Excused Because the Trustees' Conspiracy and Violations of RICO is Not a Valid Exercise of Business Judgment...............................56

D.   Demand Is Also Excused Under Rales .................................................56

III.   PLAINTIFFS MEET THE CONTEMPORANEOUS OWNERSHIP REQUIREMENTS .........................59

IV.   PLAINTIFFS HAVE PROPERLY PLEADED DIRECT CLAIMS IN THE ALTERNATIVE TO THEIR DERIVATIVE CLAIMS ............................................................................62

A.   Plaintiffs Have Suffered Separate and Distinct Injury..........................62

B.      If Derivative Claims Are Barred, Then Plaintiffs May Pursue Direct Claims ......63

V.      PLAINTIFFS HAVE STATED CLAIMS FOR BREACH OF FIDUCIARY DUTY AND NEGLIGENCE.65

VI.     PLAINTIFFS HAVE STATED A CLAIM FOR WASTE.................................................................66

VII.    IF THE COMPLAINT IS INSUFFICIENT, LEAVE TO AMEND SHOULD BE GRANTED.................68

CONCLUSION...............................................................................................................68

TABLE OF AUTHORITIES

Page

## Cases

*Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234 (2d Cir. 1996)......................................... 37, 39

*Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford,* 554 F. Supp. 2d 538

    (D. Del. 2008) .................................................................................................................. 42

*Agency Rent-A-Car, Inc. v. Gateway Industries, Inc.*, 1980 WL 3040 (Del. Ch. 1980).............. 67

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)....................................................................... passim

*Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003)........................................................................ 36

*Bambles USA, Inc. v. Blocker*, 731 F. Supp 643 (D. Del. 1990) ................................................ 61

*Barber v. Jefferson County Racing Ass'n, Inc*., 960 So.2d 599 (Ala. 2006)................................ 17

*Bateson v. Magna Oil Corp.*, 414 F.2d 129 (5th Cir. 1969) ....................................................... 59

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ........................................................... 21

*Belova v. Sharp*, 2008 WL 700961 (D. Or. 2008) .................................................................... 42

*Blasband v. Rales*, 971 F.2d 1034, 1046 (3rd Cir. 1992) .......................................................... 61

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ...................................................................... 46, 49

*Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131 (2008)................................. 33, 34, 65

*City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425 (2d Cir. 2008)............. 32, 35, 37, 65

*Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*, 271 F.3d 374 (2d Cir.

    2001) ......................................................................................................................... 34, 35

*Conley v. Gibson*, 355 U.S. 41 (1957) .................................................................................. 21

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984)............................................................. 47

*Delta Star, Inc. v. Patton*, 76 F. Supp.2d 617 (W.D. Pa. 1999)................................................ 67

*Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003).................................................. 37

*DeSimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007)........................................................ passim

*Fed. Deposit Ins. Corp. v. Henderson*,849 F. Supp. 495 (E.D. Tex. 1994)................................ 56

*Feldman v. Cutaia*, 2006 WL 920420 (Del. Ch. Apr. 5, 2006) ................................................. 58

*Gentile v. Rossette*, 906 A.2d 91 (Del. 2006) ........................................................................ 63

*Grobow v. Perot*, 539 A.2d 180 (Del. 1988) .......................................................................... 50

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch 2003)............................................................. 44, 52

*Hollander v. Breeze Corporations, Inc.*, 26 A.2d 507 (N.J. Ch. 1941) ...................................... 67

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992).................................. passim

*Hotel Employees & Restaurant Employees Union, Local 100 of New  Hotel Employees & Restaurant Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Department of Parks & Recreation*, 311 F.3d 534, 539 n.1 (2d Cir. 2002).............. 8

*In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d 795 (7th Cir. 2001) ............................. 57

*In re American Express Co. Shareholder Litig.*, 39 F.3d 395 (2d Cir. 1994).................. 36, 38, 39

*In re Bank of New York Derivative Litig.*, 99 Civ. 9977 (DC) and 99 Civ. 10616 (DC) (Memorandum & Order dated November 13, 2000) (Docket No. 36) .................................... 62

*In re Bank of New York*, 320 F.3d 291 (2d Cir. 2003) ................................................................ 61

*In re Baxter Intern'l, Inc. Shareholders Litig.*, 654 A.2d 1268 (Del. Ch. 1995) ................... 43, 53

*In Re CTC Communications Group, Inc.*, 2007 WL 760389 (Bankr. D. Mass. 2007)................ 43

*In re Freeport-McMoran Sulphur, Inc. Shareholder Litig.*, No. A. 16729, 2005 WL 1653923 (Del. Ch. June 30, 2005) ........................................................................................................ 47

*In re IAC/InterActiveCorp Secs. Litig.*, 478 F. Supp. 2d 574 (S.D.N.Y. 2007)........................... 49

*In re InfoUSA, Inc. Shareholders Litigation*, 2006 WL 2419661 (Del. Ch. Aug. 20, 2007)........ 58

*In re Mastercard Int'l, Inc.*, 313 F.3d 257 (5th Cir. 2002) ......................................................... 17

*In re Morgan Stanley and Van Kampen Mutual Fund Securities Litigation*, 2006 WL 1008138 (S.D.N.Y. 2006)...................................................................................................................... 28

*In re National Auto Credit, Inc. Shareholders Litigation*, 2003 WL 139768 (Del. Ch. Jan. 10, 2003) ...................................................................................................................................... 58

*In Re Nuveen Fund Litigation*, Nos. 94 C 360, 94 CV 5416, 1996 WL 347012 (N.D. Ill. June 11, 2006) ...................................................................................................................................... 58

*In Re The Brown Schools*, 368 B.R. 394 (Bankr. D. Del. 2007) ................................................ 42

*In re Tri-Star Pictures, Inc. Litigation*, 634 A.2d 319 (Del. 1993) ............................................ 63

*In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp.2d 267 (S.D.N.Y. 2006) ......................... 57

*In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275 (Del. Ch. 2003) ..................................... 49

*In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006)................................... 44, 48, 56

*In Re: Pfizer Inc. Derivative Securities Litigation*, 04 Civ. 10075 (S.D.N.Y. 2007) .................. 46

*IT Group, Inc. v. D'Aniello*, 2005 WL 3050611 (D. Del. 2005) ................................................ 43

*Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90 (1991)............................................................... 46

*Kohls v. Duthie*, 791 A.2d 772 (Del. Ch. 2000).......................................................................... 59

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ....................................................... 7, 22

*Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229

    (2d Cir. 1999) ................................................................................................................... 31

*Lapidus v. State*, 2008 WL 4742911 (N.Y.A.D. 2d Dept. 2008) ................................................. 66

*Lawson v. Krock*, 1973 WL 126660 (4th Cir. 1973) .................................................................... 60

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ...................................................... 34, 37

*Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135 (Del. 1997) .......................................... 63

*Loveman v. Lauder*, 484 F. Supp.2d 259 (S.D.N.Y. 2007) ................................................... 49, 51

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001) ..................................................................... 43

*Manson v. Stacescu*, 11 F.3d 1127 (2d Cir. 1993) ...................................................................... 63

*McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001) ........................................................................... 58

*MDS Investments, L.L.C. v. State*, 138 Idaho 456, 65 P.3d 197 (Id. 2003) ................................ 17

*Metro Communication Corp. BVI v. Advanced Mobilecomm Techn., Inc.*, 854 A.2d 121 (Del. Ch.

    2004) ............................................................................................................................... 44

*Michelson v. Duncan*, 407 A.2d 211 (Del. 1979) ....................................................................... 67

*Newkirk v. W.J. Rainey, Inc.*, 76 A.2d 121 (Del. Ch. 1950) .................................................. 59, 61

*Partners v. Berlin*, 726 A.2d 1215 (Del. 1999) ......................................................................... 42

*Patsy's Italian Restaurant, Inc. v. Banas*, 2008 WL 4146212 (E.D.N.Y. 2008) ........................ 22

*People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc.2d 852 (N.Y. Co. Sup. Ct.

    2000) ............................................................................................................................... 20

*Rabkin v. Philip A. Hunt Chemical Corporation*, 547 A.2d 963 (Del. Ch.1986) ........................ 63

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ............................................................... 46, 50, 57

*Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843 (2d Cir. 1986) ................................................. 63

*Rattner v. Bidzos*, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003) ............................................. 54

*Resolution Trust Corp. v. Hays*, Civ. A. No. SA-92-CA-0653, 1993 WL 302150 (W.D. Tex.).. 56

*Ritchie Capital Management, L.L.C. v. Coventry First L.L.C.*, 2008 WL 542596 (S.D.N.Y. Feb.

    29, 2008) ............................................................................................................... 39, 40, 41

*Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir. 1987) ................................................... 63

*Ryan v. Gifford*, 918 A.2d 341, 358 (Del. Ch. 2007) ........................................................... passim

*Saminsky v. Abbott*, 185 A.2d 765 (Del. Ch. 1961) ................................................................... 68

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ...................................................... 22, 29, 64

*Staehr v. The Hartford Fin. Servs. Group Inc.*, 2008 WL 4899445 (2d Cir. Nov. 17, 2008) .. 1, 22

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir. 1999) ................................................................................................................................. 63

*Steiner v. Meyerson*, 1995 WL 441999 (Del. Ch. July 19, 1995) ............................................... 68

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) ................................................................... 21

*U.S. v. Ables*, 167 F.3d 1021 (6th Cir. 1999) ........................................................................... 27

*U.S. v. Bridges*, 493 F.2d 918 (9th Cir. 1974) .......................................................................... 24

*U.S. v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ............................................................................... 17

*U.S. v. Mihalich*, 2006 WL 3499984 (N.D. Ohio 2006) ........................................................... 27

*U.S. v. O'Brien*, 131 F.3d 1428 (10th Cir.1997) ...................................................................... 27

*U.S. v. Tedder*, 403 F.3d 836 (7th Cir. 2005) .......................................................................... 24

*U.S. v. Torres*, 68 Fed. Appx. 807 (9th Cir. 2003) .................................................................. 27

*United States v. BetOnSports Plc*, 4:06-CR-00337CEJ (W.D. Mo.) ......................................... 14

*Waggoner v. Caruso*, 2008 WL 4274491 (Sup. Ct. N.Y. Co. 2008) ......................................... 66

*White v. Panic*, 783 A.2d 543 (Del. 2001) ................................................................................ 67

*Wood v. Baum*, 953 A.2d 136 (Del. 2008) ........................................................................... 43, 53

## Federal Statutes and Rules

15 U.S.C. § 80a-2 ....................................................................................................................... 55

18 U.S.C. § 1955 ................................................................................................................. 1, 19, 37

18 U.S.C. § 1961(1)(B) ............................................................................................................... 11

18 U.S.C. § 1962(c) ......................................................................................................... 3, 12, 22

31 U.S.C. § 5361(b) .................................................................................................................... 15

Fed. R. Civ. P. 12(b)(6) .............................................................................................................. 21

Fed. R. Civ. P. 14(a)(2) ............................................................................................................... 68

Fed. R. Civ. P. 23.1 .................................................................................................................... 59

Fed. R. Civ. P. 8(a)(2) ......................................................................................................... passim

Fed. R. Civ. P. 8(d)(2) ................................................................................................................ 12

Fed. R. Civ. P. 9(b) ...................................................................................................................... 4

Fed. R. Evid. 201(b)(2) ................................................................................................................ 8

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ..................... passim

Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.* ..................... 15

**State Statutes**

720 ILCS 5/28-1(a)(12) ........................................................................................ 17

Del. Code Ann. Tit. 12, § 3801(d ........................................................................ 55

I.C. 35-45-5-2(c) ................................................................................................... 17

LSA-R.S. 14:90.3 .................................................................................................. 17

M.C.A. 23-5-112(18)(e)-(19) ................................................................................ 17

N.R.S. 463.016425 ................................................................................................ 17

N.Y. Penal Law § 225.00 ...................................................................................... 17

O.R.S. § 167.109 ................................................................................................... 17

RCWA 9.46.240 .................................................................................................... 17

S.D.C.L. 22-25A .................................................................................................... 17

**Other Authorities**

C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*, Congressional Research

   Service (Updated February 27, 2006) ............................................................. 17

S. Samuel Arsht, *The Business Judgment Rule*, 8 Hofstra L. Rev. 93, 129 (1979) ..................... 44

**Web Sites**

http://www.sec.gov/answers/nav.htm .................................................................... 28

https://personal.vanguard.com/us/content/Home/WhyVanguard/AboutVanguardBoardDir

   ectorsContent.jsp .............................................................................................. 8

PRELIMINARY STATEMENT

Plaintiffs are investors in two Vanguard mutual funds. Defendants, who managed and advised the funds, knowingly caused the funds to invest millions of dollars of investors' money in illegal Internet gambling businesses in violation of 18 U.S.C. § 1955 ("§ 1955"). That statute provides that whoever "conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business" is guilty of a felony. The unlawful investments resulted in significant injury to Plaintiffs when US law enforcement launched a crackdown in 2006. (Verified Class Action and Derivative Complaint filed August 29, 2008 ("Complaint") ¶ 1)

The Complaint alleges that Defendants each knew, or are deemed to have known, that the Internet gambling businesses were engaged in illegal gambling in the US. (Complaint ¶ 50) Despite that allegation, which must be accepted as true for purposes of Defendants' motions to dismiss, a central premise of Defendants' motions is their purported belief that they were investing in "legitimate" companies. This Court should not be misled by that unsubstantiated assertion. Plaintiffs request this Court to take judicial notice of facts in the public domain regarding the unlawful activities of these companies.[1]

Long before Defendants made the investments at issue, the United States Department of Justice ("DOJ"), the news media, state law enforcement, and even some illegal gambling businesses themselves had made it widely known that the organizations in which Defendants risked other peoples' money were illegal gambling businesses. For example, on June 11, 2003, the DOJ issued a public warning letter that "Internet gambling and offshore sportsbook

---

[1] On a motion to dismiss, the Court may take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents. *Staehr v. The Hartford Fin. Servs. Group Inc.*, 2008 WL 4899445 (2d Cir. Nov. 17, 2008).

operations that accept bets from customers in the United States violate Sections 1084, 1952, and 1955 of [Title] 18 of the United States Code, each of which is a Class E felony. Additionally, pursuant to [18 U.S.C. § 2], any person or entity who aids or abets in the commission of any of the above-listed offenses is punishable as a principal violator of those statutes." (Plaintiffs' Request for Judicial Notice, Document Number 1)[2]

The illegal gambling businesses made no secret of the legal risks they were taking. In 2005, *The New York Times* reported that, for one of the largest Internet gambling companies, the "potential illegalities aren't just a secret hidden in its business plan – they are the centerpiece of its business plan." (PRJN 2 at 1) That company, PartyGaming Plc ("PartyGaming"), warned in its June 2005 prospectus that "in many countries, including the United States, the Group's activities are considered to be illegal by relevant authorities." (PRJN 3 at 47)

The Affidavit of Defendant Neil M. Ostrer, dated October 27, 2008 ("Ostrer Aff.") confirms that he – and indeed the investment advisory industry in general – knew or should have known that these businesses were taking bets from persons in the United States. Ostrer admits that he knew that "[m]uch of PartyGaming's revenue was derived from online poker games, for which US consumers were a major market. At the same time, *most investment advisors, myself included*, was [*sic*] aware of numerous attempts by some members of the US Congress to limit online gambling." (*Id*. ¶ 7 (emphasis added))

Despite the red flags vigorously being waved by law enforcement, the news media, and the gambling companies – and despite Defendants' evidence that most investment advisors knew of the legal issues surrounding the investments – Defendants chose to risk millions of dollars of

---

[2] References to documents as to which Plaintiffs ask the Court to take judicial notice are cited by document number as "PRJN _".

their investors' money owning and financing criminal organizations. The Court may wonder why Defendants did this. *The New York Times* offered at least one explanation:

> [I]nvestment houses have taken the position that they indeed know there are legal risks involved in investing in offshore [Internet] casinos, but that the risks are outweighed by the benefits of owning shares in growing, highly profitable businesses. Those shares can give a lift to mutual funds and other types of investments sold by the investment houses, meaning bigger returns for clients.

(PRJN 4 at 1; *see also* PRJN 5 at 1) Of course, since investment advisors are compensated based on the value of the funds they manage, bigger returns for investors also mean higher compensation for Defendants.

Plaintiffs bring this action under 18 U.S.C. § 1962(c) ("§ 1962(c)"), a provision of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), to recover for the injury that they and countless other mutual fund investors suffered as a direct and foreseeable result of Defendants' illegal investments. (Complaint ¶ 5) In addition, Plaintiffs assert state common law claims for breach of fiduciary duty, negligence and waste. (Complaint ¶¶ 5, 8)

Because Defendants' unlawful conduct most directly injured the mutual funds themselves, Plaintiffs assert each of their substantive claims derivatively on behalf of the mutual funds. (Complaint ¶ 10) Although Plaintiffs prefer to prosecute this action through their derivative claims, they correctly anticipated that Defendants (who still control the funds) would seek to block any derivative recovery on behalf of the funds. This could leave the ultimate victims of the RICO conspiracy without a remedy. Accordingly, Plaintiffs also plead, in the alternative, direct claims for relief. Plaintiffs bring their direct claims both individually and as a class action on behalf of all others similarly situated. (Complaint ¶ 9) As we demonstrate in the argument below, the circumstances of this case permit both forms of action.

Because there has been no answer and no discovery, Defendants' motions to dismiss are addressed to the uncontradicted allegations of the Verified Complaint. While paying lip service to Fed. R. Civ. P. 8(a)(2) – which requires nothing more than "a short and plain statement of the claim showing that the pleader is entitled to relief" – Defendants' briefs demand the sort of particularity normally associated with Fed. R. Civ. P. 9(b). In this case, however, detailed pleading of facts is not required; and, in any event, the allegations of the Complaint far exceed the requirements of both Rule 8(a)(2) and the specific requirements for pleading demand futility under Fed. R. Civ. P. 23.1.

Defendants advance many arguments in support their motions to dismiss, but none will withstand analysis. They argue that ownership of stock of a publicly traded foreign gambling company – even one taking bets from persons in the US – cannot violate § 1955 because that statute requires active participation in the gambling business. That argument is wrong because § 1955 does not require active participation in the gambling business. Passive ownership or financing of such a business violates § 1955. Defendants say that Plaintiffs were not proximately injured in their business or property within the meaning of RICO because Defendants intended to benefit Plaintiffs, not to harm them. That argument is meritless because Plaintiffs were injured as a direct and foreseeable result of Defendants' predicate acts of racketeering, which created a substantial risk of exactly the harm that actually occurred. No independent factors account for Plaintiffs' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue. Defendants contend that Plaintiffs cannot bring their claims derivatively because they did not first ask the mutual funds' trustees to bring this action. As we demonstrate below, making a demand on the trustees would have been futile because they are far from independent with

4

respect to the subject matter of this action. Based on exculpatory provisions in the mutual funds' declarations of trust, the Trustees say they cannot be liable for the wrongs alleged in the Complaint. As a matter of public policy, no such declarations could possibly immunize the trustees from RICO liability. In any event, all of the wrongs alleged by Plaintiffs rise to the level of "willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of the office of Trustee" for which the trustees are not and cannot be exonerated. These and the other arguments raised by Defendants should be rejected, and their motions denied.

FACTS

**The Parties**

*The Nominal Defendants*

The Nominal Defendants are the mutual funds in which Plaintiffs invested and on whose behalf they seek recovery. Vanguard International Equity Index Funds is a statutory trust organized under the laws of the Delaware. An investment company registered under the Investment Company Act of 1940 ("ICA"), it offers five different "series" of shares representing five different mutual funds, one of which is known as the Vanguard European Stock Index Fund. (Complaint ¶ 15; PRJN 18) The five different mutual funds are not separate entities. The investors in all five funds hold different series of shares in the same legal entity.

Vanguard Horizon Funds is also a Delaware statutory trust and an investment company registered under the ICA. It offers four different series of shares representing four different funds, one of which is known as Vanguard Global Equity Fund. (Complaint ¶ 16; PRJN 18). As with Vanguard European, the different mutual funds are not separate entities, and the investors in the four funds hold different series of shares in the same legal entity.

5

For purposes of Defendants' motions to dismiss, the "series" structure of the Vanguard group of mutual funds is significant. Because this structure may be unfamiliar to the Court, we refer the Court to the following description:

> A mutual fund operating as a series fund may be viewed as a cluster of individual investment companies organized or administered under a single set of fundamental documents – charter, by-laws, certificate of incorporation, articles of association, or trust indenture. Typically, a series company is organized as either a corporation or a state business trust. A series fund has two or more portfolios of securities, each offering a separate series or class of stock to investors. Each portfolio generally has different investment objectives, policies, practices, and risks. The shareholders of each portfolio do not participate in the investment results of any other portfolio and must look solely to the assets of their portfolio for most purposes, including redemption, liquidation, earnings, and capital appreciation. In sum, each series of stock represents a different group of stockholders with an interest in a segregated portfolio of securities. With a few notable exceptions, the Securities and Exchange Commission and its staff have applied the provisions of the Investment Company Act of 1940 to a series fund as if the individual portfolios of that fund were separate investment companies.

Joseph R. Fleming, *Regulation of Series Investment Companies Under the Investment Company Act of 1940*, 44 Bus. Law. 1179, 1180 (1989).

### *The Plaintiffs*

Deanna McBrearty first purchased shares in Vanguard European on or about May 20, 2005 as a retirement investment. (Complaint ¶ 11) Marylynn Hartsel purchased shares in Vanguard Global prior to July 1, 2006 for investment purposes. (Complaint ¶ 13) Each Plaintiff currently holds the series of shares in which she invested, and each specifically alleges that she was a shareholder at the time of the wrongs alleged in the Complaint. (Complaint ¶¶ 2, 76, 77) The Complaint does not allege the exact date of Mrs. Hartsel's first purchase; but as Defendants know from their own records of her account, it was February 13, 2006.

***The Defendants***

Defendants are the individuals and entities responsible for causing the Nominal Defendants to make the illegal investments that caused Plaintiffs' injuries. (Complaint ¶ 4)

Defendant The Vanguard Group, Inc. ("Vanguard") is an investment management company. It serves as investment advisor to dozens of investment companies, including each of the Nominal Defendants. (Complaint ¶ 17) Vanguard provides its investment advisory services to the Nominal Defendants through a division it calls the Vanguard Quantitative Equity Group ("VQEG"). (Complaint ¶ 18) Vanguard manages approximately 36 different investment management companies, which comprise approximately 130 mutual funds, each of which is represented by a different series of shares. (PRJN 17, at 2; Declaration of Penny Shane ("Shane Decl.") Exhs. A and B)[3]

George U. Sauter is the Chief Investment Officer and Managing Director of Vanguard and oversees VQEG. He was the senior executive of Vanguard responsible for developing the investment strategy of which Plaintiffs complain. Through his position at Vanguard, Sauter also serves as the Chief Investment Officer of each of the Nominal Defendants. (Complaint ¶ 19)

Duane F. Kelly is described by Vanguard as a "principal" of Vanguard. He is the portfolio manager primarily responsible for the day-to-day management of Vanguard European. He was chiefly responsible for implementing the investment strategy complained of on behalf of Vanguard European. Through his position with Vanguard, Kelly also exercised operational or managerial oversight over the portfolio holdings of Vanguard Global. Kelly also exercised

---

[3] Both Plaintiffs and Defendants ask this Court to take judicial notice of facts contained in the SEC filings of the Nominal Defendants. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

operational or managerial responsibility for implementing the investment strategy of Vanguard Global. (Complaint ¶ 20)

John J. Brennan, Charles D. Ellis, Rajiv L. Gupta, Amy Gutmann, JoAnn Heffernan Heisen, Andre F. Perold, Alfred M. Rankin, Jr., and J. Lawrence Wilson (the "Trustees") are members of the Boards of Trustees of Nominal Defendants and the other investment companies managed by Vanguard. Each of the Trustees allowed one or more of the Nominal Defendants to invest or continue their respective investments in illegal gambling businesses. Each of the Trustees had a fiduciary duty to act in the best interests of the shareholders of each fund of which he or she served as a trustee. The trustees of mutual funds are responsible for protecting the mutual funds they serve under a unique watchdog role. (Complaint ¶ 22) In addition to his responsibilities as a trustee of each of the Nominal Defendants, defendant Brennan served as the Chairman of the Board and Chief Executive Officer of each of the Nominal Defendants. (Complaint ¶ 23)

For purposes of Defendants' motions to dismiss, three aspects of the relationship between Vanguard and the funds it manages are important. First, "Vanguard's directors generally serve as members of the board of trustees of each Vanguard fund, in addition to serving on the board of The Vanguard Group."[4] Thus, the Trustees are not only the trustees of the Nominal Defendants, they also constitute the entire board of directors of Vanguard. Second, the Trustees serve as trustees of each of the 36 investment companies. No separate group of trustees serve the

---

[4]https://personal.vanguard.com/us/content/Home/WhyVanguard/AboutVanguardBoardDirectors Content.jsp. This statement of fact published by Vanguard on its Web site meets the requirements for judicial notice under Fed. R. Evid. 201(b)(2). *See Hotel Employees & Restaurant Employees Union, Local 100 of New  Hotel Employees & Restaurant Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Department of Parks & Recreation*, 311 F.3d 534 (2d Cir. 2002).

individual mutual funds that make up each investment company (because the individual mutual funds are not separate legal entities). (Shane Decl. Exhs. A and B) Third, Vanguard's approximately 130 mutual funds each have a financial interest in Vanguard. Specifically, (i) each Vanguard fund may be called upon to invest up to 0.4% of its current net assets in Vanguard itself; and (ii) each fund may contribute an unlimited amount to Vanguard's capitalization. In this way, each of the mutual funds managed by Vanguard is entitled to participate in Vanguard's profits and losses. (PRJN 17 at 2, 4, 5, 8) This financial interrelationship between Vanguard and the mutual funds it manages is significant. With respect to the subject matter of this lawsuit, the Plaintiffs (as holders of just two of Vanguard's approximately 130 series of shares) have interests that conflict not only with Vanguard and the Trustees individually, but also with the holders of the other 128 or so Vanguard funds to which the Trustees owe fiduciary duties. This is because a recovery against Vanguard would benefit Plaintiffs at the expense of the investors in Vanguard's other funds.

Acadian Asset Management, LLC, provides investment advisory services to Vanguard Global and exercised managerial or operational oversight concerning Vanguard Global's investments during the relevant time periods. (Complaint ¶ 25) Ronald D. Frashure, John R. Chisholm and Brian K. Wolahan are portfolio managers who have advised Vanguard Global since at least 2004. Through their positions with Acadian, Frashure, Chisholm and Wolahan exercised operational or managerial oversight over the portfolio holdings of Vanguard Global and were responsible for implementing the investment strategy complained of on behalf of Vanguard Global. (Complaint ¶ 26)

Marathon Asset Management, LLP, provides investment advisory services to Vanguard Global and exercised managerial or operational oversight concerning Vanguard Global's

investments. Marathon is organized under the laws of the United Kingdom and maintains an office in Mt. Kisco, New York. (Complaint ¶ 29) William J. Arah, Jeremy H. Hosking and Neil M. Ostrer are portfolio managers who have advised Vanguard Global since at least 1995. Through their positions with Marathon, Arah, Hosking and Ostrer exercised operational or managerial oversight over the portfolio holdings of Vanguard Global, and they were responsible for implementing the investment strategy complained of in the Complaint. (Complaint ¶ 30)

According to affidavits submitted by Arah and Hosking, Ostrer was the manager responsible for investing in PartyGaming, a Gibraltar-based internet gambling company whose stock began trading on the London stock exchange in June 2005. Ostrer made the investment without the knowledge or involvement of Arah and Hosking. (Affidavit of Jeremy J. Hosking, sworn to October 27, 2008 ("Hosking Aff."); Affidavit of William J. Arah, sworn to October 27, 2008 ("Arah Aff."); Ostrer Aff. ¶¶ 4-8)). Arah and Hosking have moved to dismiss for lack of personal jurisdiction. Based on their sworn statements, Plaintiffs intend to voluntarily dismiss the Complaint as to these two defendants.[5]

## Defendants[6] Caused the Nominal Defendants to Invest in Illegal Gambling Businesses in Violation of § 1955

Each of the Nominal Defendants illegally invested in one or more entities whose primary businesses constituted illegal gambling under the laws of one or more of the United States. The market value of those investments plummeted when law enforcement officials began arresting

---

[5] Plaintiffs have voluntarily dismissed their claims against Defendants AllianceBernstein LP, Henry S. D'Auria, Sharon E. Fay, and Kevin F. Simms. Those defendants provided investment advisory services to Vanguard Global, but they provided Plaintiffs with satisfactory proof that AllianceBernstein did not have any knowledge of the illegal investments at issue.

[6] As used hereinafter, the term "Defendants" does not include the AllianceBernstein defendants who have been voluntarily dismissed, or Arah and Hosking, as to whom Plaintiffs intend to voluntarily dismiss.

principals of, and otherwise targeting for prosecution, illegal gambling businesses. That directly injured investors like Plaintiffs who had invested in the Nominal Defendants because the value of their investments in the Nominal Defendants is based on the Net Asset Value ("NAV") of each fund's portfolio. (Complaint ¶ 3) Every dollar lost by Defendants by investing in illegal gambling companies translated into a dollar reduction of the NAV. Thus, calculating Plaintiffs' damages is a matter of simple arithmetic.

By causing the Nominal Defendants to purchase stock in illegal gambling businesses, Defendants caused the funds to finance and to own part of an "illegal gambling businesses" in violation of § 1955. (Complaint ¶¶ 6, 35-39, 44-47, 53-54, 90-92, 96-99) A violation of § 1955 is a predicate crime under RICO. 18 U.S.C. § 1961(1)(B). By violating § 1955 over a significant period of time, Defendants conducted the affairs of the Nominal Defendants through a pattern of racketeering in violation of § 1962(c).

At the time Defendants caused the Nominal Defendants to purchase stock in PartyGaming and the other illegal gambling companies, such companies were "illegal gambling businesses" because they (a) violated the laws of one or more of the United States; (b) involved five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (c) had been or remained in substantially continuous operation for a period in excess of thirty days or had a gross revenue of $2,000 in any single day. (Complaint ¶ 48) Defendants each knew, or is deemed to have known, that the businesses were engaged in illegal gambling activities. (Complaint ¶ 50)

In or about 2006, federal and state law enforcement agencies began a crackdown on illegal gambling businesses. As a result, the stock prices of illegal gambling businesses, including those in which Defendants had caused the Nominal Defendants to invest, fell

11

substantially. (Complaint ¶ 51) Defendants' racketeering activities and the overt acts taken in furtherance of Defendants' racketeering conspiracy proximately caused Plaintiffs' injuries. (Complaint ¶ 52, 57-58, 93, 100, 105, 110) Plaintiffs' injuries were the foreseeable, direct and natural consequence of unlawful investments in illegal gambling businesses. (Complaint ¶ 58)

**The Claims for Relief**

Plaintiffs assert claims for violations of §1962(c), §1962(d), breach of fiduciary duty, negligence, and waste. They assert those claims both derivatively, on behalf of the Nominal Defendants, and directly, on behalf of themselves and all others similarly situated (except for the waste claim which is only asserted derivatively). The derivative and direct claims are pleaded alternatively, as permitted by Fed. R. Civ. P. 8(d)(2).

With respect to the derivative claims, no demand for relief has been made because the Trustees constitute the entire board of directors of Vanguard, a primary defendant in this action. A majority of Trustees also have disabling interests and lack independence because they are the ones guilty of the racketeering, breach of fiduciary duty, negligence and waste. Any demand would be futile because, among other things, granting such demand would be tantamount to an admission of criminal liability and substantial civil liability by the Trustees. (Complaint ¶¶ 65-75, 80)

**Facts of Which the Court May Take Notice**

The Complaint does not list by name the illegal gambling businesses in which Defendants caused the Funds to invest. As explained below, Fed. R. Civ. P. 8(a)(2) does not require Plaintiffs to descend to that level of detail. There is no possibility of unfair surprise to Defendants. In their filings with the SEC, of which they ask this Court to take judicial notice, the Nominal Defendants reported owning shares in the following illegal gambling businesses:

PartyGaming, Sportingbet Plc ("Sportingbet"), BWin Interactive Entertainment AG ("BWin"), and NETeller PLC ("NETeller"). (PRJN 18).

Defendants have asked this Court to take judicial notice of certain facts regarding the illegal gambling businesses, which, contrary to the allegations of the Complaint, they characterize as "legitimate" companies. (Vanguard Mem. at 1) Defendants also suggest – again contrary to the allegations of the Complaint – that government enforcement against illegal gambling businesses was unforeseeable because the government "changed its enforcement policies." (*Id.*) This Court should rely on the allegations of the Complaint, and not on Defendants' unsubstantiated claims of innocence. Given Defendants' protestations, however, Plaintiffs ask this Court to take judicial notice of facts that were in the public domain regarding the unlawful activities of these companies. In addition, given Defendants' assertion that amending the Complaint would be futile, the Court may also consider these as reflecting facts Plaintiff could plead if the Court deemed such detail to be required.

### *PartyGaming*

In June 2005, the largest private shareholders of PartyGaming offered approximately 23% of the company's shares in an IPO on the London Stock Exchange. (PRJN 3 at 7; 6; 7 at 1; 8) In its prospectus, PartyGaming stated that "in many countries, including the United States, the Group's activities are considered to be illegal by relevant authorities." (PRJN 3 at 14) At the same time, PartyGaming boasted that it "generates most of its revenues from customers in the US (approximately 87 per cent. in the first quarter of 2005)." (PRJN 3 at 14).

In its prospectus, PartyGaming warned:

> The US Department of Justice considers that companies offering online gaming to US residents are in violation of existing US federal laws, including (but not limited to) the Wire Act, the Illegal Gambling Business Act, the Paraphernalia Act and the Travel Act.

13

…

There are criminal and civil sanctions for breach of these federal and state prohibitions, which include the possibility of significant fines, injunctions, claims for damages and imprisonment of relevant individuals (such as directors), as well as the repayment of losses suffered by US residents.

…

In April 2004, the Group [PartyGaming] was informed by Discovery Communications, the television and media company that owns the Travel Channel, that US marshals had seized over $2 million of the Group's funds from Discovery Communications.

…

Despite the Department of Justice's stance on advertising of online gaming operations, PartyGaming continues to advertise its real money sites in the US through a number of media, including television, print and sponsorship.

(PRJN 3 at 47-48, 50)

Newspapers on both sides of the Atlantic reported that PartyGaming violated criminal laws in the US. For example, in December 20005, *The New York Times* reported that online gambling sites "are outlaw operations in the eyes of the federal government." (PRJN 4) News reports in England said substantially the same thing. (PRJN 6) The coverage was widespread. (*E.g.,* PRJN 2, 4-8, 9 at 1)

On June 1, 2006, a US grand jury indicted London-based BetOnSports Plc ("BetOnSports") – another unlawful Internet gambling business – for racketeering, mail fraud and running an illegal gambling enterprise because it was accepting wagers from US bettors in violation of US law. The indictment was filed under seal, so investors did not learn about it until July 16, 2006. *United States v. BetOnSports Plc*, 4:06-CR-00337CEJ (W.D. Mo.) (available on Pacer). The grand jury also indicted BetOnSports founder Gary Kaplan, its Chief Executive Officer David Carruthers, and twelve others. Also at that time, a federal district judge in Missouri, in a companion civil RICO action, issued a temporary restraining order against

BetOnSports enjoining it from "operating an illegal gambling business through Internet web sites and telephone services." *United States v. BetOnSports Plc*, 4:06-CV-01064 CEJ (W.D. Mo.) (available on Pacer).

Predictably, the share prices of publicly held gambling companies that had been illegally taking bets from gamblers in the US – including PartyGaming and the other unlawful gambling organizations in which Defendants invested – fell dramatically after this and other arrests of Internet gambling executives. (PJRN 10; 11; 19-22)

A further drop in share prices occurred in October 2006, shortly before the enactment of the Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.* ("UIGEA"), to which Ostrer alluded in his affidavit. (PRJN 13, 19-22) Shortly before that statute became effective, PartyGaming and many other illegal gambling businesses withdrew from the US market. (PRJN 13)

It is important to note that the UIGEA did not make any gambling activity illegal that had previously been legal. On the contrary, the statute expressly provided that "[n]o provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting or regulating gambling within the United States." 31 U.S.C. § 5361(b). Rather, the new law simply made it more difficult for existing illegal gambling businesses to operate by making it unlawful to transfer funds to or from such entities. As the BetOnSports criminal and civil RICO proceedings demonstrate, Internet gambling was illegal in the US long before October 2006.

According to Ostrer, he first began researching gambling stocks in June 2005. (Ostrer Aff. ¶ 6) As a result of what his lawyers call his "due diligence" (Marathon Jurisdiction Mem. at 4), he learned – presumably from reading the PartyGaming prospectus or the numerous news

articles concerning online gambling – that US customers were a major market for PartyGaming. (Ostrer Aff. ¶ 7) He admits that he was aware of efforts in Congress "to regulate or limit Internet gambling." (*Id*. ¶ 7) After nearly a year of research, Ostrer caused Vanguard Global to invest in PartyGaming in April 2006 (Ostrer Aff. ¶ 6), making seven trades over eight months. (*Id*. ¶ 7) Even after the announcements of the prosecution of BetOnSports and its executives in July, and the arrest of Peter Dicks of Sportingbet in September, Ostrer and the rest of the Defendants continued to invest in PartyGaming. Even after the enactment of the UIGEA in October 2006, Defendants continued to invest in PartyGaming. Defendants did not sell until December of 2006. (*Id*. ¶ 9)

When Vanguard European and Vanguard Global first invested in PartyGaming, its shares traded around $2.80 per share (not adjusted for a May 2008 reverse 1:10 stock split but converted from pound sterling (GBP) to US dollars). (PRJN 19) By the time the DOJ succeeded in forcing PartyGaming to withdraw from the US market in October 2006, PartyGaming share price had dropped roughly 80% to approximately $0.60. (PRJN 19) It is no coincidence that the 80% drop corresponds to the proportion of PartyGaming's illegal revenue from the United States at the time of withdrawal. PartyGaming's illegal revenue from the United States was approximately 87% at the time of its June 2005 initial public offering and 78% at the time that it withdrew from the US market. (PRJN 3 at 1 and 13)

### *Sportingbet*

Sportingbet first traded on the Alternative Investment Market of the London Stock Exchange ("AIM") in January 2001. (Vanguard Defendants' Request for Judicial Notice ("VRJN") Exh. C) By 2006, Sportingbet's US sportsbook operations constituted the majority of its business. Approximately 56% of its clients were US residents. Because Sportingbet's business strategy heavily targeted US customers, the number of Sportingbet's US sportsbook clients in

2006 rose almost 50% from its 2005 levels. By 2006, its illegal US operations alone generated approximately 34.5 million bets totaling over $1.8 billion. (PRJN 12 at 10)

Prior to July 17, 2006, Sportingbet's share price traded at about 400 pence per share and closed June 2006 at 393 pence (approximately $7.30 assuming an average 1.85:1 GBP to US Dollar exchange rate for June 2006). Soon after the BetOnSports prosecutions were announced, Sportingbet's share price plunged to 171 pence (approximately $3.16) per share. (PRJN 20)

Online gambling is not just illegal under federal law,[7] it is also illegal under the laws of virtually every state.[8] In September 2006, Sportingbet's Chairman, Peter Dicks, was arrested at Kennedy Airport on a Louisiana state sealed warrant on gambling-related charges. (PRJN 11) Thereafter, Sportingbet's share price, having fallen significantly in July 2006, plummeted even farther. (PRJN 20).

---

[7] Defendants cite *In re Mastercard Int'l, Inc.*, 313 F.3d 257 (5th Cir. 2002), which is irrelevant. *Mastercard* narrowly interpreted the Wire Act, 18 U.S.C. § 1084, as being limited to sports betting. The court specifically excluded any consideration of § 1955. *Id.* at 263, n. 27.

[8] All 50 states have passed anti-gambling laws. *See* C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*, Congressional Research Service (Updated February 27, 2006) at Exh. A. At least eight states have explicit prohibitions of Internet gambling. *See* 720 ILCS 5/28-1(a)(12) (Illinois); I.C. 35-45-5-2(c) (Indiana); LSA-R.S. 14:90.3 (Louisiana); M.C.A. 23-5-112(18)(e)-(19) (Montana); N.R.S. 463.016425 (Nevada); O.R.S. § 167.109 (Oregon); S.D.C.L. 22-25A (South Dakota); RCWA 9.46.240 (Washington). States with general prohibitions against gambling have generally clarified, through caselaw or attorney general opinion, that the general laws prohibit Internet gambling. *See, e.g., U.S. v. Gotti*, 459 F.3d 296 (2d Cir. 2006) (upholding conviction under §1955, court held that it is "irrelevant that Internet gambling is legal in Antigua. The act of entering the bet and transmitting the information from New York via the Internet is adequate to constitute gambling activity within New York State," *citing* N.Y. Penal Law § 225.00); *Barber v. Jefferson County Racing Ass'n, Inc.*, 960 So.2d 599 (Ala. 2006) (Internet gambling fits within definition of "slot machine" under Ala. Code § 13A-12-20); Fla. Atty. Gen. 95-70 (1995), 1995 WL 698073 (explaining that Florida does not make an exception for gambling over the Internet); *MDS Investments, L.L.C. v. State*, 138 Idaho 456, 466, 65 P.3d 197 (Id 2003) (Idaho law is broad enough to include personal computers which can be used to connect to the internet to gamble). Partygaming warned in its Prospectus that "Online gaming may violate state law and violations of state gaming laws can serve as predicate offence of liability under federal statutes. At least seven states have specifically outlined online gaming. Many other states prohibit all gaming … ." (PRJN 3 at 47)

According to Vanguard European's SEC filings, Defendants caused the fund to purchase over 150,000 shares in Sportingbet in the second quarter of 2006. Defendants *increased* their holdings of Sportingbet *after* the 2006 law enforcement crackdown to over 974,082 as of July 31, 2006. This further increased to over 1 million shares as of October 31, 2006. Vanguard Global purchased at least 68,000 shares sometime during the first quarter of 2006 and did not sell until the first quarter of 2007. (PRJN 18) On October 12, 2006, Sportingbet finally abandoned the US market. Thereafter, its share price dropped even farther, to 65 pence per share, or $1.20. (PRJN 20)

### BWin

BWin trades on the Austrian Stock Exchange. (VRJN Exh. E) Because of the law enforcement crackdown in 2006 and the passage of the UIGE, BWin took a EUR €515 million impairment charge (approximately $685 million based on a 1.32:1 €to US $ exchange rate at the end of 2006). (PRJN 16)

From May 2006 – approximately when Vanguard European first purchased shares of BWin – to October 2, 2006, when BWin bowed to DOJ pressure to stop taking illegal bets in the United States, BWin's share price dropped from over $129 to $17 (based on a 1.26:1 €to US $ exchange rate on May 2 and October 2, 2006, respectively). (PRJN 21)

According to Vanguard European's SEC filings, Defendants caused the fund to purchase over 8,700 shares in BWin in the second quarter of 2006. Defendants *increased* Vanguard European's holdings of BWin even *after* the 2006 law enforcement crackdown to over 66,562 shares by October 31, 2006. (PRJN 18 at 2, 5, 8)

### NETeller

NETeller first traded on the AIM in April 2004. (VRJN Exh. D) The company played a vital role within the illegal internet gambling industry by effecting fund transfers on which such

gambling depends. Like PartyGaming, NETeller's prospectus warned that its operations violated US federal and state laws. (PRJN 14 at 16-17) Despite that explicit warning, Defendants caused the Vanguard Global to own shares in NETeller from the end of 2005 through the law enforcement crackdown in 2006. (PRJN 18)

On January 1, 2007, the United States filed criminal charges against NETeller founder Stephen Lawrence. The Information charged him with conspiracy to violate various gambling-related laws, including § 1955:

> It was further a part and object of said conspiracy that … the defendant, and others known and unknown, unlawfully, willfully and knowingly would and did conduct, finance, manage, supervise, direct and own all and part of various illegal gambling businesses, namely internet gambling companies doing business in New York in violation of New York State Penal Law, Article 225, in violation of Title 18, United States Code, Section 1955.

Criminal Information ¶ 3, *United States v. Lawrence*, 07 Cr. 597 (S.D.N.Y.) (available on Pacer). Notably, for purposes of the present pleading motions, the criminal charging instrument – like the Complaint here – did not contain any list of the "various illegal gambling businesses." Lawrence pleaded guilty. Docket Sheet, *United States v. Lawrence*, 07 Cr. 0597 (S.D.N.Y.) (available on Pacer).

The government also proceeded against NETeller itself. Paragraph 14 of the Information contains substantially the same allegations regarding § 1955 as those in Paragraph 3 of the *Lawrence* Information quoted above. (PRJN 15 Exh. B at 6, ¶14) NETeller did not plead guilty; instead it admitted criminal wrongdoing and forfeited $136 million in criminal proceeds as part of a Deferred Prosecution Agreement. (PRJN 15 at 2, ¶3)

Vanguard Global's last valuation of its NETeller holdings before the first round of arrests in 2006 implied a per-share price of approximately $11. (PRJN 18) Lawrence's arrest caused a trading suspension of NETeller's shares at approximately $3.45 per share. When trading

resumed, its shares opened at $1.30 (based on a 1.96:1 GBP to US Dollar exchange rate on January 16, 2007 and July 25, 2007, respectively). (PRJN 22)

### *Defendants Knew or Were Reckless in Not Knowing That the Internet Gambling Businesses Were Taking Bets from Gamblers in the US*

As we discuss below, it is unnecessary for Plaintiffs to plead that Defendants knew the activities of the illegal gambling businesses were illegal. Rather, Plaintiffs need only plead that Defendants knew the gambling companies were taking bets from people in the US. Even if Defendants were ignorant of the criminal law consequences of taking bets from US gamblers, that would not be a defense. However, if knowledge of illegality must be pleaded, Plaintiffs can do so. The Court may take judicial notice that the following events (in addition to those cited above) were a matter of public record prior to February 2006:

- In 1997, a Missouri court held that Interactive Gaming & Communications Corp. violated state law by accepting bets through the Internet. (PRJN 9 at 2)

- Jay Cohen was convicted in February 2000 of running an internet sports book. On appeal, the Second Circuit held that Cohen and his organization, an Antiguan corporation that took bets over the Internet from gamblers in New York, violated the Wire Gambling Act, 18 U.S.C. § 1084, whenever there "was a telephone call or an internet transmission between New York and [defendant] in Antigua" that facilitated a bet or wager on a sporting event. *U.S. v. Cohen*, 260 F.3d 68 (2d Cir. 2001). (*See also* PRJN 9 at 3)

- In *People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc.2d 852 (N.Y. Co. Sup. Ct. 2000), the court held that Cohen's company engaged in illegal gambling activity in violation of New York state law.

- In October 2001, New Jersey filed suit against various online gaming entities, including Sportingbet, for violating New Jersey's gambling laws. (PRJN 9 at 4)

- In October 2001, Gold Medal Sports, an online sportsbook located in Curacao, and its principals, pleaded guilty to racketeering in a criminal case brought by the United States Attorney for the Western District of Wisconsin. (PRJN 9 at 5-7)

- In April 2002, based on pressure brought by the Attorney General of New York, PayPal, the world's largest electronic payment processor, agreed to halt financial transactions on behalf of online gambling companies such as Sportingbet, BWin and PartyGaming that were taking bets from gamblers in New York in violation of New York state law. Banks, including Citibank, also settled claims brought by the New York State Attorney General

by agreeing to halt payment processing for unlawful Internet gambling businesses. (PRJN 9 at 10; 3 at 49)

- In March 2003, the United States brought suit against PayPal in Missouri for facilitating unlawful gambling activity. In July 2005, PayPal agreed to pay the federal government $10 million in penalties. (PRJN 9 at 8-9)

- The DOJ seized millions of dollars from cable TV stations that accepted advertising money from such illegal Internet gambling businesses, including over $6 million from the Discovery Channel in April 2004. (PRJN 9 at 9; 3 at 50)

- In 2006, Sporting News agreed to pay a $7.2 million fine because it promoted unlawful gambling businesses by publishing ads for Internet gambling sites. (PRJN 9 at 8)

Given the facts that were in the public domain, Defendants – professional investment advisors, managers and trustees – knew or were reckless in not knowing that the companies in which they invested other people's money were violating state gambling laws.

### APPLICABLE LEGAL STANDARDS

Plaintiffs' claims are subject to the general pleading standards of Fed. R. Civ. P. 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Under Rule 8(a)(2), the pleading must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

A complaint attacked by a Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations. *Id.* In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Court held that under Rule 8, a complaint should allege enough factual matter to suggest that the pleader's conclusion is "plausible." This does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence to support the claim. Factual allegations need only raise a right to relief above the speculative level. *See, e.g., Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1 (2002). As we demonstrate below, the Complaint in this action goes well beyond the requirements of Rule 8(a)(2) by describing Defendants' wrongdoing in considerable detail.

When determining the sufficiency of a complaint under Rule 12(b)(6), consideration is generally limited to the factual allegations in the complaint. The Court may also rely on matters of which judicial notice may be taken. *Staehr v. The Hartford Financial Services Group Inc.*, 2008 WL 4899445 (2d Cir. Nov. 17, 2008); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Patsy's Italian Restaurant, Inc., Inc. v. Banas*, 2008 WL 4146212 (E.D.N.Y. 2008); *cf. DeSimone v. Barrows*, 924 A.2d 908, 928 and n. 59 (applying Delaware Uniform Rules of Evidence 201).

ARGUMENT

## I.   PLAINTIFFS HAVE STATED CLAIMS UNDER RICO

### A.   *The Requirements of Sections 1962(c) and 1964(c)*

Pursuant to § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" § 1962(c). Thus, to establish a RICO violation under § 1962(c), a plaintiff must allege and prove four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

In civil cases, RICO plaintiffs must also satisfy the requirements of 18 U.S.C. § 1964(c) (("§ 1964(c)"), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962" has the right to "recover threefold the damages he sustains." § 1964(c). Therefore, under § 1964(c), a civil RICO claimant must show: (1) a substantive RICO violation under § 1962; (2) injury to the plaintiff's "business or property," and (3) that such injury was "by reason of" the substantive RICO violation.

### B.    *Many of the Elements of a RICO Claim Are Uncontested*

The Complaint alleges that each Nominal Defendant is an "enterprise" that was "engaged in, or its activities affect, interstate or foreign commerce." (Complaint ¶¶ 40-43, 89) Defendants do not dispute the sufficiency of this allegation. Nor do Defendants deny that the Complaint satisfies the association requirement of § 1962(c) by its allegations that of each of the Nominal Defendants' investment advisors, sub-advisors, chief investment officers, portfolio managers, and trustees are "persons employed by or associated with the enterprise." (Complaint ¶¶ 6, 35) The Complaint alleges that each of the Defendants exercised managerial or operational control over one or both of the Nominal Defendants, *see Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993), and that they "conducted the business of" the Nominal Defendants by causing the fund to purchase the stock of illegal gambling businesses. It is undisputed that Plaintiffs have thus satisfied the "conduct" requirement. Finally, while Defendants argue that the Complaint fails to allege any RICO predicate acts, they do not argue that the Complaint fails to meet the "pattern" and "continuity" requirements. (Complaint ¶¶ 6, 37, 39, 49)

### C.    *Defendants Caused the Fund to Commit RICO Predicate Acts*

Defendants claim that the Complaint fails to allege any predicate crime because owning stock of the gambling businesses cannot violate § 1955. Under § 1955, whoever "conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business" is guilty of a felony. One who purchases stock of such a company "owns … part" of the company and "finances" the company. Thus, each time a Nominal Defendant purchased stock of an illegal gambling business, it violated § 1955. The violation continued as long as the Nominal Defendant continued to own any such stock.

1.      *"Owns" Means "Owns", and "Finances" Means "Finances"*

Citing *U.S. v. Bridges*, 493 F.2d 918, 922 (9th Cir. 1974), Defendants argue that § 1955(b)(1) should be read "narrowly," so as to exclude owning or financing *public* companies. *Bridges*, however, merely applied to § 1955(b)(1) the familiar rule that criminal statutes should be strictly construed. It had nothing to do with the scope of the words "owns" or "finances." We submit that even the strictest imaginable definition of "owns" or "finances" would include the ownership of stock of a corporation. There is no basis in the language or purpose of the statute to distinguish between illegal gambling businesses that are closely held and those whose shares are publicly traded. To the contrary, the *Bridges* court said that "the legislative history … indicates that § 1955 was aimed at *large scale* gambling businesses," 493 F.2d 921 (emphasis added), which suggests that public companies (which tend to be larger than private companies) are *more* likely, rather than less likely, to be within the scope of the legislative purpose of stamping out large-scale illegal gambling operations.

Defendants describe the public gambling companies as "legitimate." With apologies to Mrs. Gump, Plaintiffs submit that "legitimate is as legitimate does." Defendants' argument is meritless:

> [Defendant] told the jury that he thought [the Internet gambling businesses] were upstanding businesses operated in compliance with all laws. This was essentially the tax protester's defense that he just didn't think that the law, however clear, applied to his endeavors. *See Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). The district judge gave appropriate instructions to the jury, which … convicted him."

*U.S. v. Tedder*, 403 F.3d 836, 838 (7th Cir. 2005). The public record of the criminal and *quasi*-criminal proceedings against these large scale illegal gambling businesses establishes beyond any genuine dispute that these companies were not "legitimate" at the time Defendants made the investments at issue.

Defendants argue that the first five forms of conduct described in § 1955 ("conducts, finances, manages, supervises, directs") require active involvement. Therefore, according to Defendants, the sixth activity ("owns") should be construed as requiring active involvement too. Defendants' argument is based on a faulty premise. Financing and owning are both essentially passive. Thus, two of the six types of conduct do not require active involvement in the illegal gambling business. In *U.S. v. Hawes*, 529 F.2d 472, 481 (5th Cir. 1976), the court of appeals rejected virtually the same argument made by Defendants here, saying, "We are unable to agree with this strained interpretation of an 'illegal gambling business.' Even upon a strict construction of the statutory language … we find no requirement that defendants must themselves engage in the act of illegal gambling."

> 2.    *The Complaint Sufficiently Describes the "Illegal Gambling Businesses"*

Under § 1955(b)(1), "illegal gambling business" means a gambling business which—

> (i) is a violation of the law of a State or political subdivision in which it is conducted;

> (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

> (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

§ 1955(b)(1). The Complaint alleges that Defendants caused the Nominal Defendants to invest in "illegal gambling businesses" as that term is defined in § 1955(b)(1) (Complaint ¶ 37), and it specifically alleges that the illegal gambling businesses satisfy each of the three characteristics set forth in § 1955(b)(1). (Complaint ¶ 48)

Defendants object that the Complaint does not list the illegal gambling businesses by name. However, Fed. R. Civ. P. 8(a)(2) does not require Plaintiffs to descend to that level of detail. We refer the Court to the criminal Information in the NETeller case, which refers to

"various illegal gambling businesses, namely internet gambling companies … ." (PRJN 15, Ex. B ¶ 14). Like the government in that criminal case, Plaintiffs choose to describe the illegal gambling businesses by describing the characteristics that make them illegal, rather than to provide a list of names. There is no possibility of unfair surprise to Defendants. In their filings with the SEC, the Nominal Defendants have reported owing shares in PartyGaming, Sportingbet, BWin, and NETeller. (PRJN 18)

Defendants object that the Complaint fails to cite the individual state laws that the gambling businesses violated. The Complaint alleges, however, that the companies in which Defendants invested "violated the laws of one or more of the United States." (Complaint ¶ 48) No greater specificity is required by Civil Rule 8(a)(2). The Court can take judicial notice that Internet gambling is illegal in virtually every one of the United States. *See* footnote 8 above.

3.     Mens Rea *Is Sufficiently Alleged*

Defendants do not specifically deny that *mens rea* has been sufficiently alleged. Nevertheless, Plaintiffs respond to Defendants' argument that if Plaintiffs' interpretation of § 1955 is correct, that would mean that "every one of the thousands or hundreds of thousands of U.S. investors who owns even a single share of a publicly traded overseas gambling company is a criminal." (Vanguard Mem. at 1) Subject to an important qualification, Defendants are correct.

The qualification is that each investor must be shown to have known – as these Defendants knew – that the gambling business in which he invested was taking bets in the US. There is nothing the least surprising about that result. The explicit command of § 1955 is that people are not supposed to provide financial support to illegal gambling businesses by owning even "part" of such a business. One of the purposes of the law is to deprive these illegal businesses of the funding they need to flourish. If a person knows that a business is taking bets in the US, and if that person nevertheless purchases stock in such a business, the investor violates

26

§ 1955. Any other result would make it possible for illegal gambling businesses to evade the law by the simple expedient of incorporating in another country.[9]

Because the crime of conducting an illegal gambling business as defined under § 1955 is one of general intent, a defendant "cannot evade conviction under that section by establishing that he unwittingly or unknowingly" committed a gambling crime under state law. *U.S. v. Ables*, 167 F.3d 1021 (6th Cir. 1999), *citing U.S. v. O'Brien*, 131 F.3d 1428, 1430 (10th Cir.1997); *see also U.S. v. Hawes*, 529 F.2d 472, 481 (5th Cir. 1976). *Accord U.S. v. Torres*, 68 Fed. Appx. 807 (9th Cir. 2003); *U.S. v. Mihalich*, 2006 WL 3499984 (N.D. Ohio 2006)

Furthermore, if knowledge of illegality were required to be pleaded and proved, then it can be. There were numerous storm warnings before July 2006 that should reasonably have alerted any competent investment professional that investing in Internet gambling companies that took wagers from persons in the US was illegal. The only way that anyone could have thought otherwise would have been to deliberately close his eyes to the truth – which of course is the legal equivalent of knowledge.

D.     ***Defendants Injured Plaintiffs in Their Business or Property by Reason of RICO Predicate Crimes***

Plaintiffs allege that they were "injured in [their] business or property by reason of a violation of section 1962" within the meaning of § 1964(c), because Defendants' investments in illegal gambling businesses caused the value of Plaintiffs' shares in the Nominal Defendants to lose value. Defendants argue that Plaintiffs suffered no cognizable injury at all – or that the injury was so remote from the predicate acts that Plaintiffs lack standing to complain of it. Their

---

[9] In any event, there is no factual basis for Defendants' hypothetical. It is highly unlikely that individual US investors purchased shares in the unlawful Internet gambling companies because such shares were generally unavailable to the average US investor. For example, the PartyGaming Prospectus expressly prohibited US investment. (PRJN 3 at 3; 5 at 1-2)

arguments will not withstand analysis. We address first the question whether Plaintiffs have

suffered any cognizable injury. We then demonstrate that Plaintiffs' injuries were proximately

caused by Defendants' predicate crimes.

### 1.    *Plaintiffs Were Injured*

Defendants claim that they cannot understand how Plaintiffs can possibly claim to have

been injured, since the overall value of their investments in the Nominal Defendants increased

during 2006. (Trustee and Fund Mem. at 5) It is unlikely that Defendants and their sophisticated

counsel are quite so lacking in understanding as they pretend. To demonstrate why their

argument is so fundamentally flawed, it is necessary to review a few basic facts about how

mutual fund shares are valued. As the SEC explains on its Web site:[10]

> The price investors pay for mutual fund shares is the fund's approximate per share
> net asset value (NAV) plus any shareholder fees that the fund … .
>
> "Net asset value," or "NAV," of an investment company is the company's total
> assets minus its total liabilities.
>
> …
>
> An investment company calculates the NAV of a single share (or the "per share
> NAV") by dividing its NAV by the number of shares that are outstanding. For
> example, if a mutual fund has an NAV of $100 million, and investors own
> 10,000,000 of the fund's shares, the fund's per share NAV will be $10. Because
> per share NAV is based on NAV, which changes daily, and on the number of
> shares held by investors, which also changes daily, per share NAV also will
> change daily. Most mutual funds publish their per share NAVs in the daily
> newspapers.

*See also In re Morgan Stanley and Van Kampen Mutual Fund Securities Litigation*, 2006 WL

1008138, at *9 (S.D.N.Y. 2006).

Because of the way in which mutual fund shares are valued, every dollar that Defendants

lost by investing in unlawful gambling businesses translated into a dollar lost by Plaintiffs and

---

[10] http://www.sec.gov/answers/nav.htm

those on whose behalf they sue. When the share prices of the illegal gambling businesses plummeted because US law enforcement shut down the companies' unlawful revenue sources, the NAV of the Nominal Defendants declined by that precise amount on a *per*-share basis. Plaintiffs therefore suffered direct injury from the decline in value of the illegal gambling shares in an amount determinable through simple arithmetic. Plaintiffs were injured even if the total value of their mutual fund shares happened to be greater than the amount they originally paid. This is so because, if the fund had not suffered the losses relating to the unlawful investments, the NAV of the fund would have been greater by precisely the same amount as the losses.

Defendants point to the overall positive performance of the Funds in an attempt to avoid liability, but they cannot avoid liability for their illegal investments just because their legal investments were profitable. Obviously, if they had not invested in illegal gambling, the money they lost on illegal gambling would have been invested in legal investments that – as Defendants assert – were profitable.[11]

### 2. *Defendants' Predicate Acts Proximately Caused Plaintiffs' Injuries*

The Supreme Court has addressed civil RICO's causation requirements in three key cases. We address them in the order in which they were decided.

In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), the Supreme Court explained that the damages from any injury caused under RICO must "flow from the commission of the predicate acts." 473 U.S. at 497. Thus, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the [RICO] violation." *Id*. at 496. As the Court explained, "the compensable injury necessarily is the

---

[11] If anything, the increase in the overall NAV of the funds from legal investments (a) *increases* the amount of Plaintiffs' recoverable damages and (b) demonstrates that the dramatic losses in the unlawful gambling companies cannot be attributed to general market conditions.

harm caused by [alleged] predicate acts … for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." *Id*. at 497.

Here, Plaintiffs' injury flows from the predicate acts – the ownership and financing of illegal gambling businesses. If Defendants had not caused the Nominal Defendants to own and finance the illegal gambling businesses, the Nominal Defendants would not have suffered losses when the government stepped up its enforcement activities directed against illegal Internet gambling. Those losses directly and immediately injured Plaintiffs because the value of their mutual fund shares was based on the NAV of each fund, which was updated daily. Thus, Plaintiffs' injury flowed directly from the predicate acts.

In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992), the Supreme Court focused on § 1964(c)'s requirement that the claimed injury be "by reason of" a defendant's RICO violation. While recognizing that this language could be read to allow a plaintiff to recover simply upon a showing that defendant's predicate act was the "but-for" cause of plaintiff's injury, the Court held that the language was not intended to be read so broadly. *Holmes*, 503 U.S. at 265-66. Specifically, the Court held that a plaintiff must be able to show that the violation was not only the "but-for" cause of the injury, but also the "proximate" cause, which requires some "some direct relation between the injury asserted and injurious conduct alleged." *Id*. at 268.

In *Holmes*, stock manipulation had injured broker-dealers and left them insolvent, thereby injuring customers of the broker-dealers to whom the broker dealers owed money. The parties most directly injured by the manipulation were the broker dealers. Significantly for the present case, the *Holmes* Court observed that a liquidating trustee, suing on behalf of the defunct

broker-dealers, would have been a proper plaintiff. *Id*. at 273. The indirect injuries suffered by the customers of the insolvent broker-dealers, however, were held to be too remote.

The *Holmes* Court cautioned that "the infinite variety of claims that may arise make it virtually impossible to announce a black letter rule that will dictate the result in every case." 503 U.S. at 272 n.20. *Accord Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 n.4. (2d Cir. 1999). Instead, the Court considered three factors.

First, the less direct an injury, the more difficult it becomes to determine what portion of the damages are attributable to the RICO violation as distinct from other, independent, factors. 503 U.S. at 269, 273. Second, to the extent that recovery by indirectly injured plaintiffs were permitted, courts would be forced to develop rules apportioning damages among groups of plaintiffs "to obviate the risk of multiple recoveries" *Id*. at 269. Third, the Court considered whether "the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law." *Id*.

In *Holmes*, each of those factors weighed against a finding of proximate cause. In the present case, however, all three factors militate in favor of a finding of proximate cause.

Here, there is no party more directly injured by the RICO violation than the Nominal Defendants on behalf of which Plaintiffs sue derivatively. Indeed, the *Holmes* Court noted that a liquidating trustee suing on behalf of the defunct broker-dealers would have been a proper plaintiff. *Id*. at 273. While this was *dicta*, it powerfully supports the view that Plaintiffs have standing here to bring derivative claims.

There will be no difficulty determining what portion of the damages is attributable to the RICO violation as distinct from other, independent causes. Although a decline in stock price may

in theory be attributable to a combination of several factors, the illegal gambling businesses' stock prices declined in direct response both to the commencement of the government crackdown on the illegal activity and around the time that the illegal gambling businesses announced that they would withdraw from the US market. There is no other factor that could reasonably be blamed for the dramatic, sudden, and synchronized price drops. Furthermore, because mutual fund shares are re-priced daily based on NAV, the crash in value of the gambling stocks had a direct and immediate impact on the value of the respective mutual fund series of shares owned by Plaintiffs. Determining the capital losses attributable to the predicate acts will be a matter of simple arithmetic.[12] *See City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425, 442 (2d Cir. 2008).

Furthermore, even if there were other causes that contributed to the decline – which discovery will confirm was not the case, especially considering the contemporaneous gains in the broader markets – liability may still be imposed if Defendants' predicate acts were "a substantial factor that caused the loss." *Id.,* 541 F.3d at 442-43. "A contrary rule would effectively require that a plaintiff's injury be caused by only one source, and, as this is often not the case, it would operate to insulate from liability defendants who scheme with others in violation of RICO." *Id*.

The second *Holmes* factor is not a concern here because there is no danger of double recoveries. To the extent Plaintiffs are permitted to sue derivatively, there will be no need for

---

[12] To illustrate: the capital loss from the discrete transactions that Ostrer admits responsibility for in ¶¶ 7-9 of his affidavit is simple to calculate. Defendants caused Vanguard global to purchase 607,500 shares of PartyGaming in April 2006. The average share price of PartyGaming in April 2006 was approximately $2.80 per share. When Vanguard Global divested its PartyGaming shares in December 2006, the share price was approximately $0.60. Accordingly, Ostrer's unlawful investments caused direct capital losses of $1,336,500 (607,500 x ($2.80 - $0.60)) to Vanguard Global. The NAV of the fund was reduced by that amount. Each shareholder of the Vanguard Global Fund series of shares suffered damages *pro rata* based on his or her number of shares.

them to proceed with their direct claims, and there will be no danger of double recoveries. If, on the other hand, they are for any reason not permitted to sue derivatively, and if they pursue direct claims, there will still be no danger of double recoveries because there will be no recovery on behalf of the more directly injured Nominal Defendants.[13]

The third factor – vindication of the law – would not be implicated if Plaintiffs are permitted to proceed derivatively. Alternatively, if Plaintiffs are not permitted to sue derivatively, then the third factor would militate in favor of allowing them to pursue direct claims because there would otherwise be no remedy for the wrong Plaintiffs have suffered. Where, as here, the individuals who control the Nominal Defendants have an obvious and powerful incentive to prevent the Nominal Defendants from pursuing their claims, the assumption relied on by the *Holmes* Court (*i.e.*, that the more directly injured parties can be counted on to vindicate the law) does not apply. There would therefore be a need to permit less directly injured parties to sue to vindicate the law and provide a remedy to the injured parties. So long as this can be done without double recoveries or resort to complex allocation rules to avoid double recoveries – as it easily can in this case – the third *Holmes* factor counsels that investors injured by Defendants' racketeering conduct should be allowed to pursue direct claims if they cannot pursue derivative claims.

Most recently, in *Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131 (2008), the Court held that a "plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Id.* The defendant, a potential buyer at a public auction, allegedly committed mail fraud by submitting a false certification to the

---

[13] Plaintiffs' right to proceed with directs claims is discussed more fully in Point IV below.

33

government authorities conducting the auction. As a result, the plaintiff, a competitor, was able to purchase fewer properties at auction than it otherwise would have. Although the fraudulent misrepresentations had not even been made to the plaintiff, and the plaintiff had not relied on them, the Supreme Court held that the plaintiff had alleged proximate cause. What the Supreme Court said in finding proximate cause in *Bridge* is can also be said of this case:

> here, unlike in *Holmes* and *Anza*, there are no independent factors that account for [Plaintiffs'] injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue. Indeed, [Plaintiffs and the Nominal Defendants whose interest they seek to represent] were the only parties injured by [Defendants' predicate acts].

*Bridge*, 128 S. Ct. at 2144.

It is telling that Defendants' briefs virtually ignore the three *Holmes* factors.[14] Yet the *only* correct way to analyze RICO proximate cause is by reference to those factors. In *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 284 and n.4 (2d Cir. 2006), the Second Circuit said it was "resolved to adhere to the 'proximate causation' terminology employed by the Supreme Court in *Holmes*." And in *Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*, 271 F.3d 374, 379-85 (2d Cir. 2001), the Second Circuit cited *Holmes* as "expressly warn[ing] against applying a mechanical test detached from the policy considerations associated with the proximate cause analysis at play in this case."

In *Commercial Cleaning*, the plaintiff sued the defendant for hiring illegal immigrants, a RICO predicate under 18 U.S.C. § 1324(a). The plaintiff alleged that the defendant's use of illegal labor gave it an unfair business advantage because it could undercut prices. The Second

---

[14] Defendants do argue that gamblers can be counted on to vindicate the law (Vanguard Brief at 12) – presumably by suing the defendants for investing in the illegal gambling businesses. This seems a long shot, to say the least.

Circuit found proximate cause. Damages were not speculative because the plaintiff had bid directly against the defendant. The plaintiff could potentially show "that they lost contracts directly because of the cost savings defendant realized through its scheme to employ illegal workers." 271 F.3d at 382. There was no difficulty in apportioning damages because Commercial's injury was not derivative of another party's injury. Last, there was no other identifiable class of persons who could be counted on to vindicate their injuries.

Most recently, in *City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425 (2d Cir. 2008) – a case not cited by Defendants – the Second Circuit held that the City had standing to assert mail and wire fraud-based RICO claims against out-of-state cigarette retailers. The retailers allegedly committed mail fraud by failing to file sales reports with the State. The State had an agreement with the City to share the reports so that the City could collect taxes due. As a result of the scheme to defraud, the City claimed that it lost tax revenue. Reviewing the *Holmes* factors, the court held that the City had alleged proximate cause. The court did not consider the factual difficulty of measuring indirect damages and distinguishing among distinct independent causal factors to present a problem. The injury was deemed direct, and the damages as simple as counting packs of cigarettes. There was no danger of double recoveries or any need to allocate damages. As for the third *Homes* factor, the Court said, "[a]lthough the State may also seek to sue to vindicate the law, the City should not have to rely on the State to enforce the RICO laws, where the City's injury in the form of lost taxes is no less direct than any comparable injury of the State." 541 F.3d at 444.

3.      *Defendants' Predicate Acts Created a Significant Risk of Harm to Plaintiffs; No Intent to Harm Need Be Alleged*

Defendants argue that Plaintiffs lack RICO standing because they were not the intended victims of Defendants' predicate acts but rather were their intended beneficiaries. (Vanguard

Mem. at 10-13) Contrary to Defendants' arguments, in *Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003), the Second Circuit rejected the notion that proximate cause requires an intent to harm the plaintiff: "Where a racketeering enterprise intends no specific harms to any particular individual, but causes harm by the creation of substantial risk of harm, the victim injured by the enterprises then may have RICO standing." *Id. Accord Diaz v. Gates*, 420 F.3d 897, 900-01 (9th Cir.2005) (*en banc*) (the standard of proximate cause under *Holmes* "is generous enough to include the unintended, though foreseeable, consequences of RICO predicate acts"). Even though Defendants' investments in illegal gambling businesses may have been *partly* intended to benefit Plaintiffs (they were of course *also* intended to enrich Defendants through advisory fees), Defendants' predicate crimes created a foreseeable and substantial risk that the Nominal Defendants and Plaintiffs would suffer losses when the government forced the gambling businesses to stop gambling in the US – and that is exactly what happened.

In *Baisch*, as in this case, the defendants cited *In re American Express Co. Shareholder Litig.*, 39 F.3d 395 (2d Cir. 1994), as *supposedly* establishing a rule that a plaintiff has standing only if the injury was the "preconceived purpose" or the "specifically intended consequence" of the enterprise. *Id.* at 375 n.1. As the Second Circuit has since explained, however, "*American Express* held that an injury must be the foreseeable result – not necessarily the intend result – of the racketeering enterprise." *Id.* The *Baisch* court clarified that the language in its decision in *American Express* – to the effect that the injury had been the "preconceived" purpose of the racketeering activity – was *merely quoting the plaintiff's brief in that case*, and was not intended to be a separate requirement. *Id.* at 375 n.1. Obviously, if an injury is "preconceived" it must of necessity also be "foreseeable." The test remains one of simple foreseeability.

Defendants argue that only gamblers have RICO standing to complain of the crimes alleged in the Complaint. Assuming that gamblers have been injured as a proximate result of Defendants' investments in illegal gambling businesses, that does not mean that Plaintiffs lack standing to sue for the separate and discrete injuries they suffered from the same predicate acts. In *City of New York*, the City had standing even though the State would also have been a proper plaintiff because the injury suffered by the City was separate and distinct from the injury suffered by the State. *See also Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003) (each plaintiff had suffered its own separate economic harm). Here, any injury suffered by gamblers is a separate injury – and a different type of injury – from those suffered by the Plaintiffs. Defendants' argument that gamblers have been injured cannot insulate them from liability for the injury they inflicted on Plaintiffs.

Defendants' arguments are based on a view of proximate cause that the Second Circuit has rejected. Older Second Circuit cases suggested that a RICO plaintiff might have to be within "zone of interests" of the predicate criminal statute, or a target of the predicate acts, to have standing. *See Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 239 (2d Cir. 1996). However, the Court has since explained that an injured plaintiff may have standing even if he is not within the "zone of interests" or a target. *City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425, 440 n.20 (2d Cir. 2008); *see Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 121, n.6 (2d Cir. 2003) (noting that "the reasonably foreseeable victim of a RICO enterprise will often be, unsurprisingly, the type of victim the RICO statute seeks to protect"). Thus, Plaintiffs need not allege that they are within the "zone of interests" of § 1955 or a target of the Defendants' predicate crimes. They have alleged that they were injured as the direct and foreseeable result of the predicate crimes, and that is sufficient to state a claim under RICO.

       4.       *Plaintiffs' Injury Did Not Result from Mere "Exposure" of a Concealed Scheme; It Resulted Because the Risk Taken by Defendants Became a Reality*

Defendants argue that there can be no proximate cause where "the alleged injury results from the interruption of the RICO scheme, not from the scheme itself." (Vanguard Brief at 8) In doing, so they invite this Court to do exactly what the Supreme Court and the Second Circuit have repeatedly said should not be done: apply a mechanical, bright line rule entirely divorced from the policy considerations underlying the proximate cause requirement.

In *In re American Express*, shareholders brought a RICO action against officers and directors of American Express for damages to their stock caused after a scheme to defame a competitor was uncovered. The Court held that there was no proximate cause, in part, because it was the "exposure" of the predicate acts (not the acts themselves) that ultimately caused the plaintiff's harm. *Id*. at 400. Of course, applying the three *Holmes* factors, the Court also noted that the defamed party (not the plaintiffs) was the party most directly injured, that the defamed party was in the best position to vindicate the law, and that there was a potential for duplicative recoveries if the defamed parties and the plaintiffs both recovered for the same wrong. *Id*. at 401. And of course there could have been any number of reasons why the stock price went down having nothing to do with the exposure of the scheme. It would also have been very difficult to quantify the effects of such a reputational injury to the company. Considered in context, American Express does not establish any rule barring claims where the plaintiff's injury followed "exposure" or "interruption" of a fraudulent scheme; rather, the reference to exposure was by way of explaining that plaintiffs' injury was only remotely related to the alleged predicate acts.

In *Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 236. (2d Cir. 1996), Young & Rubicam ("Y&R") paid bribe money to "consultants" who promised to pass the bribes along to a government official to secure for Y&R an advertising account with the government. The consultants kept the money. No bribes were ever paid to the official. When the scheme was uncovered, however, various parties, including the innocent government official, were indicted. *Id*. After the criminal charges were dropped against him, the government official brought a RICO suit against Y&R, claiming injuries to his reputation and to his emotional, financial, political, and social status resulting from widespread public dissemination of false information about his role in the bribery scheme. The Second Circuit affirmed the dismissal of the suit on proximate cause grounds because the official was not injured by any predicate acts of bribery, kickbacks, extortion, or fraud, but rather from "the fallout from the scheme's exposure." *Id*. at 238-39. As with *American Express*, this did not establish any rule against RICO claims involving "exposure" of secret schemes. It is simply an example of a case where the plaintiff's alleged injuries had no direct connection with the alleged predicate acts. In contrast, the injuries alleged in the Complaint do not arise from "exposure" of a secret scheme or other "reputational harms" resulting from exposure of the illegality of the investments. Rather, the injury of which Plaintiffs complain (the loss in value of their mutual fund shares) flowed directly from the loss of illicit revenue suffered by the unlawful gambling businesses when authorities stepped up enforcement of the criminal laws. That is *precisely* the risk to which Defendants exposed Plaintiffs by investing Plaintiffs' money in illegal gambling businesses.

Finally, this Court's decision in *Ritchie Capital Management, L.L.C. v. Coventry First L.L.C.*, 2008 WL 542596 (S.D.N.Y. Feb. 29, 2008), is clearly distinguishable. *Ritchie* involved the secondary market for life insurance policies. The plaintiffs contributed the bulk of the

financing that was used to purchase life insurance policies based on an analysis conducted by the defendants. After the policies were transferred to certain of the plaintiffs, two of the plaintiffs provided funds pay the monthly premiums on the policies, and the defendants arranged for those payments to be sent to the issuing life insurance companies.

The plaintiffs alleged that the defendants defrauded the insureds whose policies they purchased by bribing brokers not to act on higher bids placed by competitors. The gravamen of the complaint was that the defendants concealed their fraudulent conduct from the plaintiffs and also misrepresented an investigation of the fraud being conducted by the New York Attorney General. The plaintiffs' theory of the case was that the defendants' fraud on the life insurance policyholders led to an investigation by the Attorney General. That, in turn, lead to the public disclosure of the investigation. That, in turn, induced Moody's Investor Services to withdraw a preliminary rating on several of the policies that the plaintiffs purchased. That, in turn, decreased the salability and value of the policies. That, in turn, harmed the plaintiffs. 2008 WL 542596, at *1. This Court held that plaintiffs' theory relied on too attenuated a causal connection to confer RICO standing. The Court focused separately on each of the two sets of RICO violations alleged by the plaintiffs.

First, the defendants bribed brokers to have the selling policyholder accept the defendants' bid even when it was not the lowest bid. The Court said that rigging bids for the life insurance policies "only indirectly caused any alleged injury to the plaintiffs and therefore does not confer RICO standing on them." 2008 WL 542596, at *6. Such injury "was not 'reasonably foreseeable or anticipated as a natural consequence' of defendants' misrepresentations to policyholders" *Id.* (internal citations omitted) .

As for the predicate acts oriented toward the Plaintiffs themselves, the Court said those acts did not give rise to *any injury at all*.

> Plaintiffs' contention that they were harmed by the decrease in the policies' salability, which came as a result of Moody's withdrawing its rating has nothing to do with the alleged predicate acts of wire and mail fraud visited upon plaintiffs by defendants, which uniformly concern transmission to the plaintiffs of the contracts between the parties and information about the Attorney General's investigation. Any misrepresentations to plaintiffs were not "a substantial factor in the sequence of responsible causation" of plaintiffs' alleged injury. … Even if the alleged misrepresentations had never been made to the plaintiffs, the policies would still have lost value once the Attorney General's investigation became public.

*Id.* (citation omitted).

Thus, in *Ritchie*, the plaintiffs would have been in exactly the same position if there had been no misrepresentation to them. Here, it cannot be said that Plaintiffs would have been in the same position had there been no investment in illegal gambling. The *Ritchie* plaintiffs' attenuated injury were also due to the "disclosure of the scheme described in the predicate acts, and not the act themselves." *Id.* In contrast, Plaintiffs were injured here not because of the disclosure of Defendants' unlawful investments. Plaintiffs have suffered injury as a natural and foreseeable consequence of Defendants' causing them to own illegal gambling businesses whose principal source of revenue was shut down by law enforcement.

We urge the Court to be guided by the *Holmes* factors and to decline Defendants' invitation to apply a mechanical test untethered from the policy considerations associated with a proper proximate cause analysis.

### E.   *The Trustees Are Liable Under RICO Notwithstanding the Funds' Declarations of Trust*

The Trustees (but not the other Defendants) argue that they are immunized from RICO liability by exculpatory provisions in the Declarations of Trust of Nominal Defendants. (Trustees Mem. at 7-9) Defendants rely on provisions that permit them to "invest in … all types of

41

securities" and "stocks" issued by any corporation. (Trustees Mem. at 8) Defendants point out that, with respect to Vanguard European, their investments tracked an underlying index. Defendants therefore argue that "Plaintiffs cannot impose liability on the Trustees for doing what the declarations of trust explicitly permit, in the absence of allegedly willful misfeasance, bad faith, gross negligence, or reckless disregard of duty." (*Id.*) There are at least three independently sufficient reasons why this argument should be rejected.

First, contractual exculpation is an affirmative defense that the Trustees must plead and prove. It may therefore not be raised in the context of this motion to dismiss. In *Emerald Partners v. Berlin*, 726 A.2d 1215 (Del. 1999)*, the Delaware Supreme Court stated that "the shield from liability provided by a certificate of incorporation provision adopted pursuant to 8 Del. C. Sec. 102(b)(7) is in the nature of an affirmative defense" and "[d]efendants seeking exculpation under such a provision will normally bear the burden of establishing its elements." *Id*. at 1223-1224.

Thus, in *Belova v. Sharp*, 2008 WL 700961, *8 (D. Or. 2008), the court, applying Delaware law, determined that the plaintiff who asserted claims against the board of directors in connection with backdated stock options was excused from making a demand prior to bringing suit. The defendants argued that they were shielded from liability because of an exculpatory provision in the company's charter. The court held that "the defendants' argument constitutes an affirmative defense that will not dispose of a matter at the pleading stage." *Id.*, citing *Emerald Partners*, 726 A.2d at 1223-24. *See also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford,* 554 F. Supp. 2d 538 (D. Del. 2008) (exculpatory charter provisions in the nature of an affirmative defense); *In Re The Brown Schools*, 368 B.R. 394 (Bankr. D. Del. 2007) (exculpation clause is an affirmative defense the viability of which is not properly

considered on a motion to dismiss*); IT Group, Inc. v. D'Aniello*, 2005 WL 3050611 (D. Del. 2005). *Accord, In Re CTC Communications Group, Inc.*, 2007 WL 760389 (Bankr. D. Mass. 2007*)*. In *Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001), a case cited by defendants, the Delaware Supreme Court reinforced its ruling in *Emerald Partners* by again stating that exculpatory provisions adopted pursuant 8 Del. C. Sec. 102(b)(7) are in the nature of affirmative defenses.*.* [15]

Second, there is no such thing as a contract that can exculpate a party for liability under RICO. Any contract purporting to do so would be contrary to public policy and void. *Cf. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) ("in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy"). The Trustees are unable to cite any authority in support of their argument.

In any event, the Declarations do nothing more than exculpate the Trustees for simple negligence; they do not and, as a matter of public policy, cannot insulate the Trustees from liability for more serious wrongs. The Complaint alleges that the Trustees knowingly conspired and actually conducted the affairs of the Nominal Defendants through a pattern of racketeering. Such acts are *per se ultra vires* and therefore constitute, among other things, bad faith, gross negligence, willful misfeasance, reckless disregard of duty, and violation of Defendants' duty of loyalty. As the Delaware Court of Chancery has explained:

---

[15] Defendants' reliance on *In Re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268 (Del.Ch. 1995) and *Wood v. Baum*, 953 A.2d 136 (Del. 2008) is misplaced. It appears that the plaintiffs in those cases waived their right to object to the defendants' reliance on the exculpatory provisions in support of their motions to dismiss by simply not raising the issue.

> [by] consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused. Although directors have wide authority to take lawful action on behalf of the corporation, they have no authority knowingly to cause the corporation to become a rogue, exposing the corporation to penalties from criminal and civil regulators. Delaware corporate law has long been clear on this rather obvious notion, *i.e.*, that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully … . The knowing use of illegal means to pursue profit for the corporation is director misconduct.

*DeSimone v. Barrows*, 924 A.2d 908, 934-35 and n.89 (Del. Ch. 2007), *citing In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) ("A failure to act in good faith may be shown ... where [a] fiduciary acts with intent to violate applicable positive law."); *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch 2003) ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."); *Metro Communication Corp. BVI v. Advanced Mobilecomm Techn., Inc*., 854 A.2d 121, 131 (Del. Ch. 2004) (under Delaware law, "a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity"); S. Samuel Arsht, *The Business Judgment Rule*, 8 Hofstra L. Rev. 93, 129 (1979) ("Bad faith may preclude application of the business judgment defense where directors knowingly violate a statute or comparable expression of public policy, even if such a violation is undertaken in the corporation's best interests").

Therefore, *even if* the Declarations of Trust were interpreted expressly or by necessary implication to permit Defendants to invest in illegal gambling businesses – which they do not – Defendants would still be liable because their private contracts cannot authorize a violation of the criminal laws or the established common law prohibiting fiduciaries from running a business in an illegal fashion.

Defendants attempt to mischaracterize the Complaint as alleging mere "improper investment" claims (Trustees Mem. 9-11), as if all they were accused of was making a poor business choices. Based on this mischaracterization of Plaintiffs' RICO claims, the Trustees argue that Plaintiffs fail to allege that the investments were "too risky in light of the Funds' other holdings"; that there are no allegations that the Trustees were "reckless" or imprudent in hiring professional "investment advisers" for the Funds; that the investments were improper given the "inherent nature and expected performance of the investment portfolio," the "purposes" of the trust, other attributes of the portfolio; or that Defendants departed from the standard of care. All of these arguments are entirely beside the point. The permissibility of investing in illegal gambling businesses is not a matter of business judgment, for the same reason that it would not be a matter of business judgment for professional asset managers to invest in "Murder Inc.," or "Pablo Escobar & Associates"– despite potentially lucrative returns. Our criminal laws prohibit it, and that is the beginning and end of the analysis.

## II.    PLAINTIFFS HAVE PROPERLY PLEADED THEIR DERIVATIVE CLAIMS, INCLUDING THE FUTILITY OF MAKING A DEMAND ON THE TRUSTEES OF THE NOMINAL DEFENDANTS

Plaintiffs are excused from making a demand on the Trustees of the Nominal Defendants because the Complaint pleads, with the requisite particularity, facts that give rise to a "reasonable doubt" that the Trustees are disinterested or independent.

Because each member of the Board of Trustees of Nominal Defendants constitute the entire board of defendant Vanguard – the management company and advisor to all Nominal Defendants – there is an inherent conflict of loyalty that renders the entire board disinterested under Delaware law. Moreover, this same Board of Trustees purportedly serves on behalf of every single one of the approximately 130 mutual fund series managed by Vanguard. There is an

inherent conflict of interest between Nominal Defendants and each of the other Vanguard mutual funds because each such fund participates in the profits of Vanguard.

In addition, the Trustees conspired to, and actually did, invest in illegal gambling businesses millions of dollars that investors entrusted to them. There is, to say the least, a reasonable doubt that the Trustees possess the requisite disinterestedness or independence to properly respond to a demand. Plaintiffs also need not make a demand because the challenged transactions are *per se* violations of the directors' fiduciary duties of good faith and loyalty.

### A. *The Standards for Pleading Demand Futility*

Derivative suits are an equitable device that allow shareholders to protect corporations from misfeasance and malfeasance by faithless directors and managers. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95-96 (1991). Fed. R. Civ. P. 23.1 requires that a derivative plaintiff make a pre-suit demand on the board of directors to commence the action or state with particularity the reasons why such efforts were not made.

Under Delaware law, when directors or trustees are alleged to have participated in the challenged transactions, demand may be excused under *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Demand may also be excused under *Rales v. Blasband*, 634 A.2d 927 (Del. 1993), even if the directors or trustees are not involved in the challenged transactions. *See Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007). The Complaint satisfies both standards.

In considering demand futility, this Court should be mindful of the unique structure of mutual funds as distinguished from normal corporations. As the Supreme Court has explained:

> unlike most corporations, an investment company is typically created and managed by a pre-existing external organization known as an investment adviser … . Because the adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, *the*

> *relationship between investment advisers and mutual funds is fraught with potential conflicts of interest*.

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984) (emphasis added). This conflict situation is particularly acute in the case of Vanguard and its mutual funds.

**B.      *Trustees Have Conflicts of Interests Among Those to Whom They Owe Duties of Undivided Loyalty Because They Serve on the Boards of Vanguard and Every Other Mutual Fund Managed by Vanguard***

The Trustees constitute not only the entire Board of Trustees of each Nominal Defendant but also constitute the entire Board of Directors of Vanguard, which is a primary defendant in this action. Under Delaware law, common directors between two entities who are opposing parties in a litigation have an inherent conflict of loyalty that excuses demand. This common-sense rule is illustrated by *In re Freeport-McMoran Sulphur, Inc. Shareholder Litig.*, No. A. 16729, 2005 WL 1653923 (Del. Ch. June 30, 2005). In that case, plaintiffs were shareholders in Sulphur, Inc., which merged with an oil and gas company called MOXY. The plaintiffs complained that the merger exchange ratio was unfair to them. The court held, not surprisingly, that the "Common Directors" who sat on the boards of both Sulphur, Inc. and MOXY had conflicting loyalties and were therefore "clearly interested" directors as a matter of law. *Id.* The court reasoned that a "director is deemed interested whenever divided loyalties are present." *Id., citing Rales*, 634 A.2d at 933. Therefore, the "directors who sat on both Sulphur's and MOXY's boards … were obviously conflicted by their dual roles." *A fortiori,* the Trustees here are interested as a matter of law because they are faced with an even greater conflict than in *Freeport*. More so than in a merger, adversarial litigation presents the Trustees with an irreconcilable conflict because they cannot serve the interests of Vanguard and at the same time vindicate the interests of Nominal Defendants who are suing it. Accordingly, Plaintiffs do not

47

raise a mere "reasonable doubt" that Trustees are interested for demand futility purposes under *Aronson* and *Rales*. That fact is a certainty.

While this glaring conflict is more than sufficient by itself to establish demand futility, there are additional conflicts that further compromise the Trustees' duty of undivided loyalty with respect to the subject matter of this litigation. The Trustees are the trustees for all of the investment companies managed by Vanguard, each of which has a separate financial interest in Vanguard. A decision to vindicate the interests of shareholders of the Nominal Defendants will be directly contrary to the interests of the shareholders of all other investment companies managed by Vanguard, to which the trustees also owe a duty of undivided loyalty. Likewise, the Trustees owe a duty of loyalty to the holders of each series of shares issued by each of the Nominal Defendants, each of whom has a financial interest in Vanguard. A decision to act to vindicate the interests of holders of the two series held by Plaintiffs will be directly contrary to the interests of the holders of the 128 or so other series, to whom the trustees also owe a duty of undivided loyalty. Thus, the Trustees lack disinterest and independence because of the irreconcilable conflicts among those to whom they owe a duty of undivided loyalty with respect to the subject matter of this litigation.

Defendants argue that demand should not be excused "just because the Trustees have relationships with Vanguard" or "because of the Trustees' alleged service on other boards." (Vanguard Trustees Mem. at 20, 22 (relying on *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 354 n.18 (Del. Ch. 1998)) Defendants' arguments miss the mark.

Plaintiffs do not argue that demand would be futile "merely" because the Trustees have a relationship with Vanguard. Nor do Plaintiffs "merely" allege that demand is excused "solely" because they have multiple board memberships. Rather, demand is excused because Vanguard

has deliberately chosen to structure the financial affairs and management of itself and the mutual funds it oversees to create irreconcilable conflicts of interest with respect to the subject matter of this lawsuit. The Trustees cannot act in a manner that would benefit series shareholders like Plaintiffs without simultaneously acting in a manner that would be contrary to the interests of Vanguard itself and the holders of all other series of shares managed by Vanguard.

Defendants' reliance on the Delaware Court of Chancery decision *In re Walt Disney*, 731 A.2d 342, is misplaced. That case concerned the approval of a large severance package to a Disney executive. Unlike this case, the board action taken in *Disney* was not illegal or *per se* directorial misconduct. Moreover, the Court of Chancery's decision in *Disney* was reversed in part and remanded by the Delaware Supreme Court, which allowed the plaintiffs to amend their complaint. *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Based on the amended complaint, and the guidance of the Delaware Supreme Court, the Chancery Court ultimately excused the plaintiffs from making a demand on the Disney board. *See In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275 (Del. Ch. 2003).

Defendants' reliance on *Loveman v. Lauder*, 484 F. Supp. 2d 259 (S.D.N.Y. 2007), and *In re IAC/InterActiveCorp Secs. Litig.*, 478 F. Supp. 2d 574 (S.D.N.Y. 2007), is also misplaced. In both of these cases, the plaintiffs claimed demand futility because of familial, financial or business relationships between and among board members and controlling shareholders. Here, on the other hand, Plaintiffs demonstrate a conflict of interest based upon the structural framework of Vanguard and its funds, and not upon the relationship among the Trustees.

Finally, Defendants argue that Plaintiffs fail to explain why the Trustees should be reluctant to sue the funds' outside investment advisors. (Trustees Mem. 19.) The Complaint provides the answer: such a suit would create a substantial likelihood that Trustees would also be

held personally and criminally liable, particularly since Plaintiffs allege a conspiracy in which *all* Defendants were involved. (Complaint, ¶¶ 6, 7, 37, 55); *see Ryan*, 918 A.2d at 356, n.38.

### C.    *Demand is Excused Under* Aronson

Where, as here, the directors or trustees are alleged to have participated in the challenged transactions, demand is excused when "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. Meeting either prong excuses demand on the board. *Ryan,* 918 A.2d at 352. The Complaint in this case satisfies both prongs.

#### 1.    *The Trustees are Neither Disinterested Nor Independent Because They Face a Substantial Likelihood of Criminal and Civil Liability*

Defendants rely on the Delaware Chancery Court's recent opinion in *Ryan v. Gifford*, 918 A.2d 341, in arguing that Plaintiffs have failed to raise a "reasonable doubt" of board disinterestedness or independence. (Trustees Mem. at 18, 22) To the contrary, *Ryan* demonstrates why demand is excused in this case.

The *Ryan* plaintiff filed a derivative action on behalf of Maxim Integrated Products, Inc. The plaintiff alleged that the members of Maxim's compensation committee, which included three members of the six then current members of Maxim's board of directors, approved back-dated options for Maxim's chairman and CEO. The court held that the challenged conduct satisfied *Aronson*.[16] In particular, the Trustees had "a disabling interest for pre-suit demand purposes when 'the potential for liability is not a mere threat but instead may rise to a substantial likelihood.'" *Ryan*, 918 A.2d at 355.

---

[16] The court also held that *Rales* was satisfied, as we discuss below.

The court noted that because backdating options violated the express grant of power provided under a shareholder-approved compensation plan, a "director who approves the backdating of options faces at the very *least* a substantial likelihood of liability." 918 A.2d at 355. *See also Sanders v. Wang*, 1999 WL 1044880 (Del. Ch. Nov. 10, 1999).

The facts alleged in the Complaint raise an even more compelling case for demand futility. Instead of mere violation of a shareholder compensation plan, Plaintiffs here allege that the Trustees were members of a RICO conspiracy.

Defendants argue that "demand is not excused whenever Trustees might have to sue themselves" or by "allegations about potential exposure to civil and criminal liability." (Trustees Mem. At 19-21.) Defendants, however, have distorted the narrow holdings of particular cases and seek to turn them into sweeping generalizations that are contrary to Delaware law.

The standard for demand futility under the first prong of *Aronson* is satisfied if the facts as alleged give rise to a "reasonable doubt" that the board is disinterested or independent. *Aronson*, 473 A.2d at 814. As explained by the Delaware Supreme Court in both *Aronson*, 473 A.2d at 816 and *Rales*, 634 A.2d 927 at 936, "[i]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influence."

Few things are stronger "extraneous" considerations than avoiding a personal criminal conviction or being personally liable for large sums of money because of wrongdoing. Indeed, in holding that demand was excused, the *Ryan* court specifically noted that "[w]ere the board to pursue a derivative suit, it might unearth facts that would subject directors to further civil and criminal liability." 918 A.2d at 356, n.38; *see also Loveman,* 484 F. Supp.2d at 271 ("[w]ere the directors… presented with a demand that they seek contribution or indemnification from

themselves, they might well be regarded as self interested and unable to pass appropriately on the demand"). The threat of unearthing additional facts that could expose the Trustees to criminal and civil liability is particularly strong in this case. We note that arguably less culpable third-parties – including, for example, The Discovery Channel – have been subject to large asset seizures by the DOJ merely for taking advertising money from the gambling companies in which Defendants invested. (PRJN 9 at 9; 3 at 50) And, of course, the Trustees cannot be indemnified for their personal financial liability under RICO, since that would be contrary to public policy.

Defendants' strained reading of the cases conveniently disregards the critical words "mere" and "standing alone" in the language they quote from *Aronson.* The *Aronson* court cautioned that the "*mere* threat of personal liability … *standing alone*," is insufficient to excuse demand. 473 A.2d at 815 (emphasis added). The court's purpose was to avoid the "virtually automatic" incantation of director liability to make an end-run around demand requirements. 473 A.2d at 814 Instead, the court sought to approach demand issues "in a more balanced way." *Id. See also Rales,* 634 A.2d at 934 and 937 (declining to impose a stringent standard for demand futility that would have required plaintiffs demonstrate 'reasonable probability of success on the merits' because such a strict standard was deemed unnecessary to "deter strike suits"); *Ryan,* 918 A.2d at 352 (demand requirement is used to "curb a myriad of individual shareholders bringing potentially frivolous lawsuits" and to prevent "strike suits"); *and Guttman* 823 A.2d at 500 ("if the demand excusal test is too stringent, then stockholders may suffer as a class because the deterrence effects of meritorious derivative suits on faithless conduct may be too weak"). This case, however, is the antithesis of a strike suit.

The cases on which Defendants rely confirm that Delaware courts generally decline to excuse demand only when they determine that a plaintiff's substantive claims seem implausible

or obviously lacking in merit. For example, in declining to excuse demand in *Aronson*, the court specifically commented that the complaint, as drafted, "may not even state a cause of action." 473 A.2d at 817.

Defendants rely heavily on *Wood v. Baum*, 953 A.2d 136 (Del. 2008). The *Wood* court, however, began its analysis by emphasizing: "plaintiff has not pled with particularity any claim based on fraudulent conduct. The Complaint does not even purport to state a cause of action for fraud." 953 A.2d at 141. The claims in *Wood* were premised on accounting irregularities about which the board possessed no knowledge. Therefore, the "Court of Chancery correctly concluded that there were no cognizable 'red flags' from which it could be inferred that the defendants knew that [an accounting standard under] FAS 115 was being improperly applied." *Id.* at 143. Defendants' illegal conduct in the present case, however, is very different. The Complaint alleges a knowing conspiracy. Those allegations are strongly corroborated not only by facts in the public domain of which this Court may take judicial notice, but also by the sworn affidavit of defendant Ostrer. Trustees either knew or were reckless in not knowing that the illegal gambling businesses were taking bets from persons in the US.

Defendants' reliance on *In re Baxter Intern'l, Inc. Shareholders Litig.*, 654 A.2d 1268 (Del. Ch. 1995), is likewise misplaced. In that case, the court declined to excuse demand where the plaintiff accused the board of failing to oversee and stop lower-level employees from overcharging the Veterans Administration. Thee court specifically found no "red flags" that would have alerted the board to wrongdoing. 654 A.2d at 1271. The court not only doubted the strength of the plaintiff's claim, but also viewed the board's failure of oversight as not arising to the level of seriousness that should excuse demand.

*Seminaris v. Landa,* 662 A.2d 1350 (Del. Ch. 1995), also relied upon by Defendants, is similarly unavailing. Defendants argue that the holding in *Seminaris* establishes that the threat of liability in related actions can never excuse demand. That is a gross misinterpretation of *Seminaris*, which concerned claims that the defendant directors released misleading and inaccurate information regarding the corporation. 662 A.2d at 1351. Crucial to the *Seminaris* court's decision was that "plaintiff virtually concede[d] that the threat of personal liability … was not substantial enough to render the directors interested." *Id.* at 1355. It is hardly surprising, therefore, that the court held that the threat of liability in other, related actions could not remedy this deficiency as they could have no "greater impact" than the claims directly asserted in the derivative action. *Id.* The court also noted that any threat of spillover liability was mitigated by the directors "seeking to stay" the derivative lawsuit until the completion of the related cases, thereby obviating any extraneous influences on the board's decision in responding to a demand. *Id.* None of these factors is present here.

Similarly, *Rattner v. Bidzos*, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003), does not support Defendants' theory that potential liability in a separate action cannot excuse demand. Rather, the *Rattner* court merely pointed out that plaintiffs left "the court to guess at which of the individual defendants, indeed if any of the Director defendants are defendants in the federal securities class action lawsuits." *Id.*, at 14.

Defendants suggest that they face no material prospect of criminal prosecution because the "crackdown" happened two years ago and was not directed at them. It is irrelevant that the Defendants have not yet been the subject of government criminal or civil proceedings. The question is whether the prosecution of this litigation could expose them to a risk of such proceedings. While it is probably more common for civil litigation to follow in on the heels of

criminal prosecutions, it is hardly unusual for criminal prosecutions to be based on evidence developed in the course of civil litigation. For example, the criminal convictions of executives of Purdue Pharma with respect to OxyContin was based on evidence that had been developed by plaintiffs' counsel in earlier personal injury litigation (the same lawyers representing Plaintiffs in the present case). The evidence that the civil lawyers had developed was later subpoenaed by federal prosecutors. *See* A. Frankel, *Pain All Around:  The OxyContin Civil Suits Were a Bust*, American Lawyer, Vol. 29, No. 7 (July 2007). Moreover, even if the risk of prosecution were relatively small, the consequences if it occurs are sufficiently severe that even a small possibility could be expected to influence Defendants' decision whether to pursue civil litigation. In this respect, it should be emphasized that the issue is not whether Defendants would in fact be prosecuted. Rather, the issue is whether the possibility that the Trustees might face criminal charges could affect their judgment in deciding whether to pursue this civil litigation. To find that demand would be futile, this Court need only conclude that Defendants would prefer not even to start down a road that could eventually lead them to prison rather than gamble that they would not be prosecuted.

Finally, Defendants misconstrue Del. Code Ann. Tit. 12, § 3801(d) and argue that the Trustees should be considered disinterested and independent for the purpose of excusing demand. That section incorporates the definition of "interested person" set forth in Section 2(a)(19)(A) of the Investment Company Act of 1940, 15 U.S.C. § 80a-2. The definition of "interested" directors is intended in these statutes to determine compliance with certain regulations, such as the required composition of boards of directors for investment companies. *See, e.g.*, 15 U.S.C. § 80a-10. Section 3801(d) has nothing to do with the question whether directors who face a substantial likelihood of liability should be considered interested for

purposes of demand futility. Defendants cite no authority for the proposition that § 3801 changes the analysis under *Aronson* or *Rales*.

The Trustees are neither disinterested nor independent because the substantial likelihood of criminal and civil liability they face creates a strong "extraneous" influence that would so effectively "sterilize their discretion" so that "they cannot be considered proper persons to conduct litigation on behalf of the corporation." *Aronson*, 473 A.2d at 814. Therefore, demand is excused.

> 2.   *Demand is Excused Because the Trustees' Conspiracy and Violations of RICO is Not a Valid Exercise of Business Judgment*

As a matter of law, the Trustees of the Nominal Defendants could not possibly have exercised proper business judgment in participating in a RICO conspiracy or approving the unlawful investments alleged in the Complaint. *DeSimone v. Barrows*, 924 A.2d 908, 934-35 and n.89 (Del. Ch. 2007), *citing In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). *See also Resolution Trust Corp. v. Hays*, Civ. A. No. SA-92-CA-0653, 1993 WL 302150, *5 (W.D. Tex.); c*f. Fed. Deposit Ins. Corp. v. Henderson*, 849 F. Supp. 495, 498 (E.D. Tex. 1994) (stating that to find adverse domination, plaintiffs can show that directors engaged in wrongful conduct, which includes "engaging in illegal activity"). *See generally*, cases cited at pages 45-46 above.

## D.   *Demand Is Also Excused Under* **Rales**

In *Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993), the Delaware Supreme Court held that where the subject of a derivative suit is not a business decision of the board, plaintiffs seeking to establish demand futility must plead particularized facts that create a "reasonable doubt" that a majority of the directors are disinterested or independent. In establishing this standard, the *Rales* court rejected defendants' proposal that the Supreme Court create a rule that

a plaintiff "must demonstrate a reasonable probability of success on the merits." Instead, the court held a less stringent standard requiring only that the "underlying claims have some merit." *Rales,* 634 A.2d at 934, *citing Aronson*, 473 A.2d at 811-12. The court reasoned that "a more stringent test" would not be necessary to "deter strike suits." 927 A.2d at 934 and 937. The more demanding standard, the court concluded, would be an unwarranted impediment to beneficial derivative actions.

In *Ryan v. Gifford*, 918 A.2d 341, 355-56, the Delaware Chancery Court held that backdating options, even assuming no board action, was "so egregious on its face that board approval cannot meet the test of business judgment." Therefore, demand was excused under *Rales. Id.* Likewise, here, the Trustees' violations of RICO are so egregious on their face that board approval cannot meet the test of business judgment.

Moreover, where, as here, corporations are accused of violating laws, courts generally excuse demand. For example, in *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267 (S.D.N.Y. 2006), the court excused the plaintiffs from making a demand where the board failed to exercise appropriate attention to the company's noncompliance with federal export control statutes. The court reasoned that the directors would be subjected to a substantial likelihood of liability, which created a reasonable doubt that they were disinterested. Similarly, *In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d 795 (7th Cir. 2001), the Seventh Circuit reversed the district court's refusal to excuse demand when the directors' failure to halt a continuing pattern of noncompliance with Federal Drug Administration regulations created a substantial likelihood of liability. Applying Delaware law, the court noted that, like here, news reports has raised red flag warnings concerning the company's regulatory violations.

In *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001), the Sixth Circuit reversed the district court's dismissal of the complaint for failure to allege demand futility. In reversing, the court held that the plaintiffs raised a reasonable doubt of board disinterestedness by alleging that the company's senior management devised schemes to improperly increase revenue and profit by violating Medicare and Medicaid laws. *In re Nuveen Fund Litig.,* Nos. 94 C 360 and 94 CV 5416, 1996 WL 347012 (N.D. Ill. June 11, 2006), likewise held that the mutual fund plaintiffs were excused from making a demand under *Rales.* Plaintiffs asserted claims against the fund's investment advisors and board of directors, claiming that the price structure of a rights offering violated the fund's articles of incorporation and were therefore *ultra vires*. The defendants argued that the plaintiffs' primary claims were directed against investment advisors who failed to inform the board of certain legal deficiencies in the rights offering. Nevertheless, the court held that making a demand on the board would have been futile because the directors breached their fiduciary duties to the fund by failing to note legal deficiencies in the price structure. This created a substantial likelihood of liability for them.

Delaware cases confirm that the Delaware courts will generally excuse demand when they are satisfied that the underlying claims in a derivative action have merit. *See, e.g.*, *In re InfoUSA, Inc. Shareholders Litigation*, 2006 WL 2419661, at *23 (Del. Ch. Aug. 20, 2007) (majority of directors were interested in considering a demand because they were likely to face personal liability for serving on the board while the company issued material misrepresentations to the SEC); *Feldman v. Cutaia*, 2006 WL 920420, at *1–2 (Del. Ch. Apr. 5, 2006) (demand excused where repurchase caused capital impairment in violation of Delaware law); *In re National Auto Credit, Inc. Shareholders Litigation,* 2003 WL 139768 (Del. Ch. Jan. 10, 2003) (demand futile where directors engaged in a *quid pro quo* exchange of favorable votes for

increased director fees); *Kohls v. Duthie*, 791 A.2d 772 (Del. Ch. 2000) (demand excused where the largest holder of common stock sold shares to the company's president at a discount without first offering the opportunity to the corporation).

### III.    PLAINTIFFS MEET THE CONTEMPORANEOUS OWNERSHIP REQUIREMENTS

Federal Rule of Civil Procedure 23.1 requires a derivative plaintiff to "allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains." The point, of course, is to bar professional plaintiffs who purchase stock of a corporation for the purpose of bringing a lawsuit complaining of wrongdoing that occurred before the plaintiff became a shareholder. *Bateson v. Magna Oil Corp.*, 414 F.2d 129, 130 (5th Cir. 1969); *see also Newkirk v. W.J. Rainey, Inc.*, 76 A.2d 121, 123 (Del. Ch. 1950). Defendants do not dispute that McBrearty's claims satisfy the contemporaneous ownership rule, but they question Hartsel's contemporaneous ownership. (Vanguard Trustees Memorandum, 23-24.)

The decision in *Bateson*, 414 F.2d 129, is instructive. The plaintiff sold his stock in a corporation but subsequently reacquired shares for the purpose of bringing a derivative suit against the directors for fraud, mismanagement, conspiracy and breach of fiduciary duty. Those claims related to five transactions where the plaintiff alleged that the defendant directors borrowed money from the company on an open account; used corporate assets to purchase an airplane for mainly personal reasons; paid themselves excessive salaries; mortgaged corporate property to secure personal debt; and mismanaged the corporation's gas and oil properties. *Id.* at 129. The trial court dismissed on ground that the "contemporaneous ownership" requirement under Fed. R. Civ. P. 23.1 had not been met. The Fifth Circuit reversed.

The court noted that although some of the transactions about which the plaintiff complained had commenced prior to the reacquisition of shares, the "wrongs [had] not completely occurred and been terminated prior to plaintiffs' acquisition of stock" and therefore

constituted continuing wrongs at the time the plaintiff reacquired his shares. *Id.* at 130 (internal citations omitted). Because the shares were acquired during a continuous wrong, the plaintiff met the contemporaneous ownership requirement of Fed. R. Civ. P. 23.1, and the district court erred in dismissing the lawsuit. *See also  Lawson v. Krock*, 1973 WL 126660, at *1 (4th Cir. 1973) (modifying district court judgment to allow for previously excluded derivative claims occurring before the plaintiff acquired shares because the scheme involved a continuing wrong).

Here, the Complaint expressly alleges that "[e]ach Plaintiff was a shareholder of the respective Vanguard Fund in which he or she invested at the time of the transactions of which he or she complains." (Complaint ¶ 76) Thus, the Complaint satisfies the contemporaneous ownership rule. Hartsel also alleges that she purchased prior to July 1, 2006. (Complaint ¶ 13) Defendants rely on the July 1 date to argue that contemporaneous ownership is not sufficiently alleged. Defendants are mistaken. The Nominal Defendants' SEC filings show that they owned illegal gambling stocks *throughout* 2006. Thus, there was a continuing violation of § 1955 throughout 2006. The Court may take judicial notice that the drop in the stock prices of the illegal gambling businesses occurred no earlier than July 16, 2006. (PRJN 19-22) Thus, giving the Complaint the narrowest possible reading, Hartsel was a shareholder at a time when Defendants were violating § 1955 and *at least* two weeks before the earliest injury of which she complains. Hartsel may not have owned her shares at the time of Defendants' first illegal purchase of shares, but that has nothing to do with the sufficiency of the Complaint. Hartsel alleges a violation of RICO. A violation of RICO is, by statutory definition, a continuing wrong.

Hartsel satisfies the contemporaneous ownership rule because she owned shares during the continuing period of wrongdoing.[17]

The contemporaneous ownership rule is "liberally construed in cases where the primary purpose of eliminating the abuses associated with derivative suits will not be frustrated." *Bambles USA, Inc. v. Blocker*, 731 F. Supp 643, 649 (D. Del. 1990); *see Blasband v. Rales*, 971 F.2d 1034, 1046 (3rd Cir. 1992). Here, there is no possibility of abuse because Hartsel purchased her shares before the losses began.

The cases upon which Defendants rely are clearly distinguishable. In *Newkirk v. W.J. Rainey, Inc*., 76 A.2d 121, 123-24 (Del. Ch. 1950), the court held that the plaintiff did not satisfy the contemporaneous ownership requirement where the plaintiffs did not purchase their shares until October 1947 and the alleged wrongs took place from June 1944 through December 1945. Significantly, the court acknowledged that Delaware law recognizes that the contemporaneous ownership rule is satisfied if a plaintiff holds shares during a period of continuing wrong.

Similarly, in *In re Bank of New York*, 320 F.3d 291 (2d Cir. 2003), "the crux of the Complaint objects to conduct that occurred well before the [plaintiffs] purchased their stock." *Id.* at 299. The Court's decision strongly implies that the contemporaneous ownership requirement would be satisfied if the plaintiffs purchased before "*most* of the alleged wrongdoing" occurred. *Id.* at 299 (emphasis added).[18] Here, most of the unlawful investments and virtually all the

---

[17] Defendants made the lion's share of their illegal investments – over 90% based on the number of shares purchased – between March and July 2006. Defendants made their first illegal investment for the fund that plaintiff McBrearty owned sometime during the second quarter of 2006. Defendants made their first investment for the fund that plaintiff Hartsel owned sometime during the third quarter of 2005 (although the vast majority of unlawful investments for this fund also occurred during the second quarter of 2006). (PRJN 18)

[18] Plaintiffs note that Judge Chin ruled in *Bank of New York* that the plaintiffs were excused from making a demand on the board of directors. Plaintiffs alleged that the directors of the bank wrongfully permitted the bank to aggressively expand its correspondent banking business in

financial loss of which Hartsel complains occurred *after* she purchased her stock. *DeSimone v. Barrows*, 924 A.2d 908, 924-27 (Del. Ch. 2007), is distinguishable on the same basis.

In any event, as Defendants know from their own account records, Hartsel has owned her shares in Vanguard Global since approximately February 13, 2006. This is prior to roughly 91% of the illegal purchases of which she complains. (PRJN 18).[19]

### IV.    PLAINTIFFS HAVE PROPERLY PLEADED DIRECT CLAIMS IN THE ALTERNATIVE TO THEIR DERIVATIVE CLAIMS

Plaintiffs have pleaded each of their substantive claims derivatively on behalf of the Nominal Defendants, and Plaintiffs would prefer to proceed with derivate claims only. However, should this Court determine, at any time prior to final judgment, that Plaintiffs cannot proceed derivatively, Plaintiffs must be allowed to proceed against Defendants based on their direct claims.

### A.    *Plaintiffs Have Suffered Separate and Distinct Injury*

Shareholders have been allowed to bring independent RICO actions where they suffer injuries that are separate and distinct from the injury sustained by the corporation. *Ceribelli v. Elghanayan*, 990 F.2d 62, 63 (2d Cir. 1993) (shareholder who was fraudulently induced into purchasing shares of the cooperative could bring an individual suit for harms to the corporation).

Because of the structure of the Vanguard "series" funds, Plaintiffs are essentially a minority class of shareholders of the Nominal Defendants. The injury suffered by the holders of

---

Russia, entangling the bank with organized crime and money laundering. The court, applying New York law, held that the directors were on notice from news reports and other publicly-available sources that the bank would be exposed to unacceptable risks because the Russian banking system was infiltrated with organized crime. *In re Bank of New York Derivative Litig.*, 99 Civ. 9977 (DC) and 99 Civ. 10616 (DC) (Memorandum & Order dated November 13, 2000) (Docket No. 36), at 4-5.

the two series of shares held by Plaintiffs was not inflicted on holders of the other seven series of shares issued by the Nominal Defendants. Plaintiffs' interests are thus different from the interests of the holders of other series of shares. Courts have held that such antagonistic interests support direct, as opposed to derivative, claims. *Cf. Gentile v. Rossette*, 906 A.2d 91 (Del. 2006) (plaintiffs were not required to bring a derivative action but could assert direct claim because harm to plaintiff shareholders resulted in corresponding benefit to other shareholders); *In re Tri-Star Pictures, Inc. Litigation*, 634 A.2d 319 (Del. 1993), *limited on other grounds*, *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 142 (direct injury pleaded where minority shareholders suffered injury not felt by majority shareholder); *Rabkin v. Philip A. Hunt Chemical Corporation*, 547 A.2d 963 (Del. Ch.1986) (claims were direct when plaintiff shareholders claimed an injury not suffered by all shareholders).

> **B.** **_If Derivative Claims Are Barred, Then Plaintiffs May Pursue Direct Claims_**

Plaintiffs recognize that a shareholder generally does not have standing to bring an individual action under RICO to redress injuries to the corporation in which he owns stock. *Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir. 1993); *accord Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 29 (1st Cir. 1987); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 933-934 (3d Cir. 1999).[20]

---

[19] Even if this Court were to decide that Hartsel has not adequately pleaded contemporaneous ownership, she should be allowed leave to amend to cure any deficiency by stating with greater specificity the date on which she first purchased her shares.

[20] While this Court is, of course, bound by Second Circuit precedent, Plaintiffs respectfully preserve for future appellate review, if necessary, the argument that *Manson* and *Rand* were wrongly decided.

In those cases, however, the plaintiffs were not seeking to proceed both directly and derivatively, the rights of a separate class of shareholders was not involved, and the courts could fairly assume that the rights of the plaintiffs would be adequately protected by direct actions by the corporations involved or derivative actions on behalf of the corporations. The courts in those cases did not, therefore, consider the situation that could arise here, in which Plaintiffs seek to proceed derivatively but are prevented from doing so by defendants seeking to avoid liability for themselves and for others to whom they own a duty of undivided loyalty. If Plaintiffs are prevented from pursuing redress for their injuries either derivatively or directly, then RICO wrongdoing will go unpunished and RICO harm will go uncompensated. That cannot be the right result. Consistent with Congress' "express admonition that RICO is to be liberally construed to effectuate its remedial purposes," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985) (citations and quotation marks omitted), this Court should apply the proximate cause requirement in such a way that plaintiffs proximately injured by acts of racketeering are not left without any remedy, especially where a more directly injured party is dominated and controlled by those accused of violating RICO. A straightforward application of the governing *Holmes* factors leads to the proper result.

At first blush, the first *Holmes* factor may appear to weigh against allowing direct claims because the Nominal Defendants were more directly injured than Plaintiffs. But on closer analysis, it is clear that the primary concern of the first *Homes* factor is that the less direct an injury, the more difficult it becomes to determine what portion of the damages are attributable to the RICO violation, as distinct from other, independent, factors. 503 U.S. at 269, 273. Here, while Plaintiffs are one step farther removed from the RICO violation than the Nominal Defendants, because Plaintiffs' interest in the Nominal Defendants is based on the NAV of the

64

Nominal Defendants, and because the NAV is recalculated on a daily basis, calculating the harm suffered by Plaintiffs individually is also a matter of simple arithmetic, *see City of New York*, 541 F.3d at 442 (City allowed to sue even though State was also a directly injured party), and "there are no independent factors that account for [Plaintiffs'] injury." *Bridge*, 128 S. Ct. at 2144.

If for any reason derivative claims may not be pursued, the second *Holmes* factor will weigh in favor of allowing direct claims to proceed, because there will be no danger of double recoveries.

Finally, if plaintiffs are prevented from pursuing derivative claims, the third *Holmes* factor – whether a more directly injured party can be "counted on to vindicate the law" – would weigh overwhelmingly in favor of allowing Plaintiffs to proceed directly. Where, as here, the racketeers who control the Nominal Defendants have obvious and powerful incentives to prevent the Nominal Defendants from pursuing their RICO claims, and where, as here, the rights that Plaintiffs seek to vindicate are adverse to those of the other series shareholders, the assumption relied on by the *Holmes* Court (*i.e.*, that the more directly injured party could be "counted on to vindicate the law") plainly does not apply, and there is a need to permit suits by less directly injured parties to vindicate the law and afford a remedy to the parties who suffered the ultimate injury. As long as this can be done without double recoveries or resort to complex allocation rules to avoid double recoveries, the third *Holmes* factor militates in favor of allowing investors injured by Defendants' racketeering conduct to pursue direct claims. A contrary rule would operate to insulate from liability defendants who scheme with others in violation of RICO.

## V.    PLAINTIFFS HAVE STATED CLAIMS FOR BREACH OF FIDUCIARY DUTY AND NEGLIGENCE

The elements of a claim for breach of fiduciary duty are (i) the existence of a fiduciary duty, (ii) a breach of that duty, and (iii) injury caused by the breach. *Waggoner v. Caruso*, 2008

WL 4274491 (Sup. Ct. N.Y. Co. 2008). Defendants do not dispute that the Complaint alleges each of those elements. Nor do Defendants dispute that Plaintiffs have alleged each of the necessary elements of a claim for negligence: (i) the existence of a duty of care, (ii) a breach of that duty, (iii) proximately resulting in injury. *Lapidus v. State*, 2008 WL 4742911 (N.Y. A.D., 2d Dep't 2008). Rather, Defendants argue that they cannot be held liable for breaching their fiduciary duties or their negligence because of the exculpatory provisions of the Declarations of Trust. As we demonstrate above, the exculpatory provisions on which Defendants rely are in the nature of an affirmative defense that they must plead and prove, not a basis for dismissing the Complaint; indeed, the Court may not even consider those provisions on a motion addressed to the sufficiency of the Complaint.

In any event, the conduct alleged in the Complaint meets the standards set forth in the Declarations. By investing in illegal activities, Defendants breached their fiduciary duty to the Nominal Defendants and Plaintiffs. The knowing use of illegal means to pursue profit for the corporation is a *per se* breach of fiduciary duty and would be in the nature of the type of "willful misfeasance, bad faith, gross negligence and reckless disregard of duties" that make all Defendants liable, including the Trustees, notwithstanding the exculpatory clause of the Declarations of Trust. *See DeSimone v. Barrows*, 924 A.2d 908, 934-35 and n.89 (Del. Ch. 2007) (it is "utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully"). Accordingly, the exculpatory clauses will not afford Defendants a complete defense.

## VI.    PLAINTIFFS HAVE STATED A CLAIM FOR WASTE

Defendants allege that the Complaint does not allege waste because there are no allegations that the Funds "received no consideration at all" for their investments, or even that they paid too much. (Vanguard Trustees Mem. at 11-12)

Plaintiffs adequately plead waste because using trust assets to illegally purchase shares of unlawful gambling organizations constitutes a waste of assets. In *Michelson v. Duncan*, 407 A.2d 211 (Del. 1979), the Supreme Court of Delaware stated that "[t]he essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes." *Id.* at 217. Thus, *Delta Star, Inc. v. Patton*, 76 F. Supp.2d 617 (W.D. Pa. 1999), the court, applying Delaware law, found that the corporate plaintiff's former president committed corporate waste by awarding himself salary increases and bonuses that bore no reasonable relationship to his services or contributions to the financial performance of the company. If using corporate funds to pay an underperforming executive constitutes waste, so to does the investment and subsequent loss of trust assets in criminal organizations.

Similarly, in *Hollander v. Breeze Corporations, Inc.*, 26 A.2d 507 (N.J. Ch. 1941), shareholders brought a derivative action alleging that directors of the corporation were liable to them for permitting corporate funds to be withdrawn by the corporation's president without supporting documentation. The president used corporate assets for personal travel, entertainment and incidentals. The court found the directors had committed waste of corporate funds, mismanagement and dereliction of duty. *Cf. Agency Rent-A-Car, Inc. v. Gateway Industries, Inc.*, 1980 WL 3040 (Del. Ch. 1980) (plaintiff alleged evidence of corporate waste and mismanagement so as to be permitted to make inspection of corporate records where the president of the defendant used corporate credit cards for personal reasons).

Defendants' reliance on *White v. Panic*, 783 A.2d 543 (Del. 2001), is incorrect. In that case, corporate assets were not used for an *ultra vires* purpose. The court merely declined to "weigh the 'adequacy' of consideration" for a lawful corporate transaction, *id.* at 554. Here, Plaintiffs do not ask this Court to "second guess" the business judgment of Defendants. Use of

corporate proceeds in violation of federal and state criminal laws requires no such balancing and is *per se ultra vires* and outside the realm of business judgment. For similar reasons, *Steiner v. Meyerson*, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995); *Saminsky v. Abbott*, 185 A.2d 765, 771 (Del. Ch. 1961), are inapposite.

## VII.   IF THE COMPLAINT IS INSUFFICIENT, LEAVE TO AMEND SHOULD BE GRANTED

If the Complaint is in any way insufficient, Plaintiffs request that they be afforded an opportunity to amend to cure any deficiency pursuant to Fed. R. Civ. P. 14(a)(2).

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.

Dated: November 24, 2008

/S/_____
Thomas I. Sheridan, III
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6404
tsheridan@hanlyconroy.com

- and -

Greg Erthal
SIMMONSCOOPER LLC
707 Berkshire Blvd.
East Alton, Illinois 62024
(618) 259-2222
gerthal@simmonscooper.com

*Attorneys for Plaintiffs*