# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DEANNA MCBREARTY and MARYLYNN HARTSEL, individually, derivatively and on behalf of all others similarly situated,

        Plaintiffs,

      - against -

THE VANGUARD GROUP, INC., GEORGE U. SAUTER, DUANE F. KELLY, JOHN J. BRENNAN, CHARLES D. ELLIS, RAJIV L. GUPTA, AMY GUTMANN, JOANN HEFFERNAN HEISEN, ANDRÉ F. PEROLD, ALFRED M. RANKIN, JR., and J. LAWRENCE WILSON, ACADIAN ASSET MANAGEMENT, LLC, RONALD D. FRASHURE, JOHN R. CHISHOLM, BRIAN K. WOLAHAN, ALLIANCEBERNSTEIN LP, HENRY S. D'AURIA, SHARON E. FAY, KEVIN F. SIMMS, MARATHON ASSET MANAGEMENT, LLP, WILLIAM J. ARAH, JEREMY H. HOSKING, and NEIL M. OSTRER,

        Defendants,

      - and -

VANGUARD INTERNATIONAL EQUITY INDEX FUNDS, d/b/a VANGUARD EUROPEAN STOCK INDEX FUND, and VANGUARD HORIZON FUNDS, d/b/a VANGUARD GLOBAL EQUITY FUND

        Nominal Defendants.

CASE NO. 08 CV 7650 (DLC) (ECF)

## TRUSTEE AND FUND DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

David H. Braff  (DB-0761)
Penny Shane  (PS-0185)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone:  212-558-4000
Facsimile:  212-558-3588
Email:  braffd@sullcrom.com

December 11, 2008

*Counsel for the Trustee and Fund Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 1

I.    PLAINTIFFS HAVE NOT ALLEGED A FEDERAL RICO OR STATE LAW CLAIM AGAINST THE TRUSTEES. ........................................................................ 1

    A.    Plaintiffs Have Not Alleged the Trustees' Criminal Intent. ............................. 1

    B.    Exculpation Is Cognizable on a Motion to Dismiss, and Requires Dismissal of All Claims Against the Trustees. .......................................................... 6

    C.    Plaintiffs Improperly Ignore Elements of Their State Law Claims Against the Trustees. .............................................................................................. 7

        1.    Plaintiffs Do Not Even Attempt to Assert That They Have Pled a Claim for Improper Investment Decisions. ................................... 7

        2.    The Claim for Waste Is Not Proper. .................................................. 8

II.    PLAINTIFFS EFFECTIVELY ABANDON ALL DIRECT CLAIMS. .................... 8

    A.    Plaintiffs' Invocation of Direct RICO Claims as a Fallback Is Improper. ....... 8

    B.    Plaintiffs' State Law Claims Fail the *Tooley* Test. ...................................... 11

III.    PLAINTIFFS DO NOT EVEN ATTEMPT TO SATISFY DELAWARE STANDARDS FOR PLEADING DEMAND FUTILITY. ........................................ 12

CONCLUSION ...................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*In re Abbott Labs. Derivative S'holders Litig.*,
    325 F.3d 795 (7th Cir. 2003) ........................................................................ 5

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc.* v. *Wolford*,
    554 F. Supp. 2d 538 (D. Del. 2008)............................................................. 6

*ATSI Commc'ns., Inc.* v. *Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) .......................................................................... 4

*In re Bank of N.Y. Derivative Litig.*,
    320 F.3d 291 (2d Cir. 2003) ........................................................................ 5

*Belova* v. *Sharp*,
    No. CV 07-299, 2008 WL 700961 (D. Or. Mar. 13, 2008)......................... 6

*Boyce* v. *AIM Mgmt. Group, Inc.*,
    Civ. No. H-04-2587, 2006 WL 461324 (S.D. Tex. Sept. 29, 2006)......................... 12, 13

*In re CTC Commc'ns Group, Inc.*,
    No. 02-12873 (PJW), 2007 WL 760389 (Bankr. D. Mass. 2007).................... 6

*Daily Income Fund, Inc.* v. *Fox*,
    464 U.S. 523 (1984)....................................................................9, 10, 13, 15

*Delta Star, Inc.* v. *Patton*,
    76 F. Supp. 2d 617 (W.D. Pa. 1999)........................................................... 8

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) .......................................................................... 3

*In re Evergreen Mut. Funds Fee Litig.*,
    423 F. Supp. 2d 249 (S.D.N.Y. 2006) ....................................................... 13

*In re Goldman Sachs Mut. Funds Fee Litig.*,
    No. 04 Civ. 2567 (NRB), 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006)........................ 13

*Holmes* v. *Secs Investor Protection Corp.*,
    503 U.S. 258 (1992)................................................................................8, 10

*Iqbal* v. *Hasty*,
    490 F.3d 143 (2d Cir. 2007) ........................................................................ 4

*IT Group Inc.* v. *D'Aniello*,
    No. 02-10118, Civ. A. 04-1268-KAJ, 2005 WL 3050611 (D. Del. Nov. 15, 2005)......................... 6

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Kamen* v. *Kemper Fin. Servs., Inc.*,
    939 F.2d 458 (7th Cir. 1991) ...................................................................................... 13, 14

*Lakonia Mgmt. Ltd.* v. *Meriwether*,
    106 F. Supp. 2d 540 (S.D.N.Y. 2000) ........................................................................ 9, 10

*Manson* v. *Stacescu*,
    11 F.3d 1127 (2d Cir. 1993) ......................................................................................... 9, 10

*McCall* v. *Scott*,
    239 F.3d 808 (6th Cir. 2001) ............................................................................................. 5

*McKinney* v. *Moore*,
    No. 04 Civ. 07926 (RCC), 2007 WL 1149253 (S.D.N.Y. Apr. 16, 2007) ....................... 10

*Migdal* v. *Rowe Price-Fleming Int'l, Inc.*,
    248 F.3d 321 (4th Cir. 2001) ........................................................................................... 13

*In re Mut. Funds Inv. Litig.*,
    384 F. Supp. 2d 873 (D. Md. 2005) ........................................................................ 4, 5, 13

*Papasan* v. *Allain*,
    478 U.S. 265 (1986) ........................................................................................................... 2

*Ryder Energy Distrib. Corp.* v. *Merrill Lynch Commodities Inc.*,
    748 F.2d 774 (2d Cir. 1984) ............................................................................................... 7

*Staples* v. *United States*,
    511 U.S. 600 (1994) ........................................................................................................... 2

*THC Holdings Corp.* v. *Chinn*,
    No. 95 CIV. 4422 (KMW), 1998 WL 50202 (S.D.N.Y. Feb. 6, 1998) .............................. 6

*In re The Brown Schools*,
    368 B.R. 394 (Bankr. D. Del. 2007) .................................................................................. 6

*United States* v. *$734,578.82 in U.S. Currency*,
    286 F.3d 641 (3rd Cir. 2002) ........................................................................................... 15

*United States* v. *O'Brien*,
    131 F.3d 1428 (10th Cir. 1997) ......................................................................................... 2

*United States* v. *Sewell*,
    252 F.3d 647 (2d Cir. 2001) ............................................................................................... 2

*In re Veeco Instruments, Inc. Secs. Litig.*,
    434 F. Supp. 2d 267 (S.D.N.Y. 2006) ............................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

*In re Verestar, Inc.,*
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ........................................................................ 6


**STATE CASES**

*Aronson* v. *Lewis,*
    473 A.2d 805 (Del. 1984) ................................................................................... 12, 14

*In re Baxter Int'l, Inc. S'holders Litig.,*
    654 A.2d 1268 (Del. Ch. 1995) .................................................................................. 5

*Braddock* v. *Zimmerman,*
    906 A.2d 776 (Del. 2006) ........................................................................................ 10

*In re Freeport-McMoran Sulphur, Inc. S'holder Litig.,*
    No. Civ. A. 16729, 2005 WL 1653923 (Del. Ch. June 30, 2005) ............................ 14

*Gentile* v. *Rossette,*
    906 A.2d 91 (Del. 2006) .......................................................................................... 11

*In re InfoUSA, Inc. S'holders Litig.,*
    953 A.2d 963 (Del. Ch. 2007) ................................................................................. 14

*Loudon* v. *Archer-Daniels-Midland Co.,*
    700 A.2d 135 (Del. 1997) ........................................................................................ 11

*Malpiede* v. *Townson,*
    780 A.2d 1075 (Del. 2001) ......................................................................................... 6

*Michelson* v. *Duncan,*
    407 A.2d 211 (Del. 1979) .......................................................................................... 8

*Rales* v. *Blasband,*
    634 A.2d 927 (Del. 1993) ........................................................................................ 12

*Spiegel* v. *Buntrock,*
    571 A.2d 767 (Del. 1990) .......................................................................................... 9

*Tooley* v. *Donaldson, Lufkin, & Jenrette, Inc.,*
    845 A.2d 1031 (Del. 2004) ...................................................................................... 11

*In re Tri-Star Pictures, Inc., Litig.,*
    634 A.2d 319 (Del. 1993) ........................................................................................ 11

*Wood* v. *Baum,*
    953 A.2d 136 (Del. 2008) .......................................................................................... 5

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES AND RULES**

15 U.S.C. § 80a-1 ................................................................................................................ 12

18 U.S.C. § 1955 ........................................................................................................ 1, 2, 7, 15

Del. Code Ann. tit. 12, § 3302 ........................................................................................... 7, 8

Del. Code Ann. tit. 12, § 3801 ......................................................................................... 12, 13

Del. Code Ann. tit. 12, § 3816 ............................................................................................. 12

Fed. R. Civ. P. 8 ................................................................................................................... 3

Fed. R. Civ. P. 11 ................................................................................................................. 3

Fed. R. Civ. P. 12 ............................................................................................................... 3, 6

Fed. R. Civ. P. 23.1 .............................................................................................................. 5

Fed. R. Civ. P. 56 ................................................................................................................. 3


**OTHER AUTHORITIES**

*In the Matter of Vanguard Group Inc.*,
    Investment Company Act Release No. 11645 (Feb. 25, 1981), 22 SEC Docket 238, 1981
    WL 36522 ...................................................................................................................... 13, 14

## PRELIMINARY STATEMENT

Plaintiffs hang their case on the unsupported proposition that buying shares in a publicly-traded corporation is "illegal" if it turns out that the corporation's business may have broken the law.  This novel assertion is plaintiffs' chief response to the Funds' and Trustees' demonstration that plaintiffs failed to allege the Trustees' intent, as required under RICO and under Delaware law that shields fiduciaries like the Trustees from claims based on unintentional acts.  (*See, e.g.*, Opp. at 43, 45, 51, 55, 57.)  Neither RICO nor state law subjects the Funds or Trustees to criminal or other liability for taking an investment risk, on advice from reputable outside investment advisers, by purchasing stock in publicly-traded companies that themselves bore some legal (and other) risks.

Plaintiffs also incorrectly rely on the mantra of alleged "illegality" to excuse their claims' many procedural defects.  For example, plaintiffs concede that their alleged loss is derived only from an alleged decline in the value of Funds in which they hold shares, so that under controlling Second Circuit precedent, plaintiffs' claims are derivative, at most.  Still, plaintiffs argue, the Court should permit their direct claims in order to prevent the alleged "RICO wrongdoing" from going "unpunished" in the event the Funds choose not to sue.  Similarly, plaintiffs argue that they can assert derivative claims, without demand or properly alleged demand futility, on the theory that any alleged "illegality" necessarily compromises the Trustees' independence in assessing plaintiffs' novel claims.  Again, however, simply alleging "illegality" does not entitle plaintiffs to assert derivative claims directly, or to escape the demand requirements applicable to those claims.

## ARGUMENT

**I.    PLAINTIFFS HAVE NOT ALLEGED A FEDERAL RICO OR STATE LAW CLAIM AGAINST THE TRUSTEES.**

### A.    Plaintiffs Have Not Alleged the Trustees' Criminal Intent.

Criminal intent is an essential element of a violation of 18 U.S.C. § 1955, and without an adequate pleading of intent, plaintiffs' RICO claims must be dismissed.  Plaintiffs assert that the mens rea element of the alleged criminal offense here may be satisfied by pleading facts showing the

investor "to have known . . . that the gambling business in which he invested was taking bets in the U.S." (Opp. at 26.) This supposed standard is not found in any case law. Rather, as plaintiffs elsewhere concede (Opp. at 27), § 1955 requires a "general criminal intent." *United States* v. *O'Brien*, 131 F.3d 1428, 1430 (10th Cir. 1997). General intent requires, at a minimum, that the accused intended the act that constitutes the alleged crime. *United States* v. *Sewell*, 252 F.3d 647 (2d Cir. 2001). As the Supreme Court has held, federal criminal statutes should not be construed to "impose criminal sanctions on a class of persons whose mental state . . . makes their actions entirely innocent." *Staples* v. *United States*, 511 U.S. 600, 614-15 (1994). The complaint meets neither the plaintiffs' unsupported standard nor the threshold of general intent.[1]

The complaint *nowhere alleges* that the Trustees intended the Funds to invest in any gambling business, let alone directed such investments with knowledge that a "gambling business in which [the Funds] invested was taking bets in the U.S." (Opp. at 26.)[2] A pleading that does not even identify the "gambling business[es]" by name necessarily fails to allege that any named defendant knew how those businesses operated.

But more importantly, the facts that the plaintiffs do allege are at odds with any inference that the Trustees directed the Funds to own shares of illegal gambling operations. For example, the complaint alleges that the Funds hired advisers, and that it was those advisers who were "responsible for developing the investment strategy complained of herein" and "implementing" that strategy. (Compl. ¶¶ 19, 20, 26, 30.) With respect to the Global Equity Fund, an actively managed fund advised by Acadian and Marathon, the Affidavit of Neil M. Ostrer, portfolio manager at

---

[1]     The Trustees and the Funds (collectively, the "Trustees") hereby join in all the arguments made in the Reply Memorandum of Points and Authorities in Support of Vanguard Defendants' Motion to Dismiss ("Vanguard Reply"), filed December 11, 2008.

[2]     The closest plaintiffs come is to say, as to all defendants, that "each knew, or is deemed to have known, that the businesses were engaged in illegal gambling activities." (Compl. ¶ 50.) This amounts to "a legal conclusion couched as a factual allegation" that a court is not "bound to accept as true." *Papasan* v. *Allain*, 478 U.S. 265, 286 (1986). Elsewhere, plaintiffs also generally assert that "[e]ach of the Defendants knowingly developed and implemented (or conspired to develop and implement) *an investment strategy* pursuant to which" the Funds purchased shares in overseas gambling businesses. (Compl. ¶ 37 (emphasis added).) Conclusory allegations such as these, alleging that all defendants did the

Marathon, establishes this allocation of responsibility for selecting the Fund's holdings.[3]  Mr. Ostrer averred that it was *he* who "decided to invest some of Vanguard's funds" in a gambling company and he *alone* who "made all of the decisions regarding" that investment.  (Affidavit of Neil M. Ostrer ¶¶ 6, 8, sworn to Oct. 27, 2008, Dkt. 54.)  This is consistent with how mutual funds operate in practice:  the advisers, not the trustees, make the portfolio investment decisions.[4]

   As for the European Stock Index Fund, plaintiffs nowhere dispute that, as its name suggests, this is an index fund.  (Trustees' Mem. at 9.)  By definition index fund management is passive, "because an index fund manager only needs to track a relatively fixed index of securities." *See* U.S. Securities and Exchange Commission, *Fast Answers—Key Topics*, "Index Funds," http://www.sec.gov/answers/indexf.htm (May 5, 2007).  This involves no active stock selection by the Trustees, or by anyone else.  The European Stock Index Fund's "strategy" was to track an index of stocks created by a third party.  The index—not the adviser and certainly not the Trustees—dictates the Fund's portfolio holdings.

   The media and other materials plaintiffs now present (but did not plead) make any inference that the Trustees intentionally caused the Funds to invest in illegal gaming companies even more implausible.  These documents show that the Global Equity Fund and European Index Fund alone held shares in 132 and 86 different companies, respectively, as of summer 2006.  (PRJN 18, at 2-3, 17-18.)  Plaintiffs assert that the Trustees serve on the boards not just of these two Funds, but also of "approximately 130 mutual funds" in the Vanguard family (Opp. at 9), each of which invests in many different securities.  In these circumstances, it is highly implausible that the Trustees knew of every

---

same thing, fail to give the notice required by Federal Rule of Civil Procedure 8.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007).

[3]   The Trustees address the Ostrer Affidavit because plaintiffs have relied upon it.  However, if considering the Affidavit would require the Court to convert this Rule 12(b)(6) motion into a Rule 56 motion, the Trustees ask the Court to exclude the Affidavit as a matter outside the pleadings.  Fed. R. Civ. P. 12(d).

[4]   Although the Trustees are alleged to have passively "allowed" the Funds to "invest or continue their respective investments in" the gambling businesses (Compl. ¶ 22), plaintiffs cannot allege in good faith and in compliance with Rule 11 that the Trustees knew—or as a matter of law were charged with knowledge of—the specific stocks in each Fund and

investment by every fund, right down to the investments in four gambling companies, and plaintiffs allege no facts that suggest this.  *See Iqbal* v. *Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (pleadings must satisfy a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*") (emphasis in original); *ATSI Commc'ns., Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("flexible plausibility" standard applies outside the antitrust context).

Even if the Trustees were alleged to be responsible for making the investment decisions for the Funds, the complaint fails to allege even general criminal intent because, as plaintiffs' own submissions show, there was every reason to believe that internet gaming was legal, or, at worst, its legality was subject to question but not definitively determined.  An investor who thought he was investing in a legal gambling operator, such as MGM Mirage, Inc., would lack even general criminal intent if it turned out that the company was engaged in illegal gambling.  The Trustees had no reason to know that the operations of the non-U.S. internet gaming companies—legitimate in their home jurisdictions—would prove to be illegal in the U.S.  According to the affidavit of Mr. Ostrer, on whom plaintiffs rely, until October 2006 it was at most uncertain whether *any* of the businesses at issue were violating U.S. gambling laws.  Until then, "numerous attempts by some members of the U.S. Congress to regulate or limit online gambling . . . repeatedly failed."  (Ostrer Aff. ¶ 7.)  The law was unclear, and widely described that way.[5]

As a matter of law, none of this put the Trustees on notice that the Funds' investments in the gambling companies would be deemed illegal.  In *In re Mutual Funds Investment Litigation*, 384

_____

made the tactical decision to have the Funds invest in internet gaming companies.  That is simply not the role of investment company trustees.

[5]      *See* PRJN 2, at 3 (noting that the Fifth Circuit upheld a ruling that "the wire act 'does not prohibit Internet gambling on a game of chance'"); PRJN 5, at 2 (noting that "[i]t remains unclear whether the Wire Act applies to nonsports gambling or to the Internet" and that "it's unlikely that sites hosted and managed overseas by non-U.S. citizens would fall within the reach of U.S. law enforcement"); PRJN 9, at 2 ("The legal status of Internet gambling is uncertain.").  Gambling companies' publicly filed prospectuses and other offering materials thus disclosed potential adverse legal developments among "risk factors" (as such filings routinely do), but they never said any offeror's underlying business was unlawful.  *See* PRJN 3, at 48 (PartyGaming Plc prospectus noting that state law prohibitions on internet gambling may violate dormant

F. Supp. 2d 873, 879 (D. Md. 2005), shareholders in Delaware and Massachusetts mutual funds alleged that "because late trading and market timing were endemic in the mutual fund industry and because of the 'copious coverage' of the problem in books and articles, the trustees were on notice that the activities might be occurring in the [defendant] funds."  The court held that such articles were *not* "red flags" because they did not "evidenc[e] wrongdoing in the corporations for which [the trustees] were responsible."  *Id.* at 879-80.

   That case—like this one—is therefore distinguishable from *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003), and *McCall* v. *Scott*, 239 F.3d 808 (6th Cir. 2001), relied on by plaintiffs.  In *Abbott*, plaintiffs alleged that the board "knew of the violations of law" by company managers directly overseen by the board, on the basis of "an extensive paper trail," including FDA warning letters, SEC disclosure forms, and a *Wall Street Journal* article "about Abbott's FDA problems."  *Id.* at 800, 806, 808-09.  Similarly, in *McCall*, plaintiffs alleged that the board knew of illegal Medicare and Medicaid practices from audit information containing "unmistakable signs" of illegality, as well as a qui tam action against the company and a *New York Times* article about an investigation of the company's illegal practices.  239 F.3d at 820, 822-23.[6] Moreover, the directors in both *Abbott* and *McCall* were charged with direct oversight of the officers who allegedly violated the law, the violations allegedly were committed by the company the directors were charged with overseeing, and the directors were specifically alleged to have had actual knowledge of the alleged violations.  *Abbott*, 325 F.3d at 801-02; *McCall*, 239 F.3d at 814, 819-20.

---

commerce clause); PRJN 4, at 2 (describing legal opinion that "the government would have difficulty finding a theory of liability" for investors in overseas gambling stocks).

[6] Plaintiffs attempt to distinguish *Wood* v. *Baum*, 953 A.2d 136 (Del. 2008), and *In re Baxter International, Inc. Shareholders Litigation*, 654 A.2d 1268 (Del. Ch. 1995), where courts dismissed derivative claims against directors based on alleged illegality, on the ground that the courts in those cases found no "red flags."  (Opp. at 53.)  But as shown above, no red flags were present here either; plaintiffs identify only general newspaper articles about internet gambling.  Plaintiffs also argue that in *In re Bank of New York Derivative Litigation*, 320 F.3d 291 (2d Cir. 2003), the court "held that the directors were on notice from news reports and other publicly-available sources that the bank would be exposed to unacceptable risks because the Russian banking system was infiltrated with organized crime."  (Opp. at 61-62 n.18.)  There, the Second Circuit affirmed dismissal for failure to satisfy Federal Rule of Civil Procedure 23.1, without addressing the sufficiency of the complaint.  *Id.* at 297-99.

Plaintiffs here have alleged none of those things.  Instead, they have cited nothing more than general materials about the risk that third-party internet gambling companies might face legal challenges.

**B.     Exculpation Is Cognizable on a Motion to Dismiss, and Requires Dismissal of All Claims Against the Trustees.**

Plaintiffs argue that the Court should not dismiss the claims against the Trustees under the Funds' exculpatory provisions for less than reckless or intentional wrongdoing because (i) such provisions offer an affirmative defense that cannot be raised on a motion to dismiss; and (ii) the complaint alleges acts that cannot be exculpated.  (Opp. at 41-45.)  Neither contention has merit.

In *Malpiede* v. *Townson*, 780 A.2d 1075, 1092 (Del. 2001), the Delaware Supreme Court specifically held that exculpatory provisions can be raised on a motion to dismiss.  *See also THC Holdings Corp.* v. *Chinn*, No. 95 CIV. 4422 (KMW), 1998 WL 50202, at *8 (S.D.N.Y. Feb. 6, 1998); *In re Verestar, Inc.*, 343 B.R. 444, 473 (Bankr. S.D.N.Y. 2006).[7]  Indeed, in *IT Group Inc.* v. *D'Aniello*, No. 02-10118, Civ. A. 04-1268-KAJ, 2005 WL 3050611, at *10-11 (D. Del. Nov. 15, 2005), cited by plaintiffs, the court dismissed plaintiff's duty of care claims under Rule 12(b)(6) based on exculpatory provisions.[8]

Here, defendants move to dismiss based on exculpatory provisions that may "properly be noticed judicially by the court."  *Malpiede*, 780 A.3d at 1090.  Plaintiffs have not challenged the existence or validity of these provisions.  Thus, as in *Malpiede*, the Motion should be granted.

Plaintiffs alternatively argue that by alleging RICO violations, the complaint necessarily alleges "bad faith, gross negligence, willful misfeasance, reckless disregard of duty, and violation of

---

[7]     The cases cited by plaintiffs are inapposite.  *In re CTC Commc'ns Group, Inc.*, No. 02-12873 (PJW), 2007 WL 760389, at *4-5 (Bankr. D. Mass. 2007) (factual disputes concerning exculpatory provisions prevented dismissal on Rule 12(b)(6) motion); *Belova* v. *Sharp*, No. CV 07-299, 2008 WL 700961, at *8 (D. Or. Mar. 13, 2008) (following general rule that affirmative defenses are not considered on a motion to dismiss without citing *Malpiede*); *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc.* v. *Wolford*, 554 F. Supp. 2d 538 (D. Del. 2008) (following Third Circuit, not Delaware, law); *In re The Brown Schools*, 368 B.R. 394 (Bankr. D. Del. 2007) (same).

[8]     Plaintiffs argue that the Trustees rely on cases in which plaintiffs waived their objections to consideration of exculpatory provisions.  (Opp. at 43 n.15.)  The Trustees cited those cases for the proposition that where exculpatory provisions shield trustees from liability, their disinterestedness for purposes of demand futility can only be overcome by potential liability from non-exculpated claims.  (Trustees' Mem. at 21-22.)  Plaintiffs do not dispute this point.

[the Trustees'] duty of loyalty" that cannot be exculpated by contract.  (Opp. at 43.)  This assertion

contradicts plaintiffs' own argument that violations of § 1955, the predicate RICO crime alleged here,

can be "unwitting[] or unknowing[]."  (Opp. at 27 (citation omitted).)  In any event, as set forth above

(*supra* Point I.A.), the complaint not only fails to allege any Trustee's knowledge or involvement, but

flatly contradicts it.

Allegations of "bad faith, gross negligence, willful misfeasance, reckless disregard of

duty, and violation of [the Trustees'] duty of loyalty" appear nowhere in the complaint.  While the

complaint alleges that all defendants were "reckless in failing to conduct or cause to be conducted[]

*due diligence*" (Compl. ¶ 50 (emphasis added)), it does not allege "reckless disregard of duty" here,

because (among other things) plaintiffs do not and could not allege that the Trustees had a duty to

diligence every stock in which the Funds invested.  *See Ryder Energy Distrib. Corp.* v. *Merrill Lynch*

*Commodities Inc.*, 748 F.2d 774, 781-82 (2d Cir. 1984) (no liability for due diligence failures where

there is no duty to conduct due diligence).  Even if such a duty did exist, the realization of a risk would

not mean that diligence was recklessly conducted.

**C.**  **Plaintiffs Improperly Ignore Elements of Their State Law**
**Claims Against the Trustees.**

**1.**  **Plaintiffs Do Not Even Attempt to Assert That They Have Pled a**
**Claim for Improper Investment Decisions.**

The Trustees' Memorandum argued that plaintiffs' state law claims should be dismissed

for failure to allege that the investments at issue were inappropriate under title 12, section 3302(c) of

the Delaware Code, which provides that challenges to "[t]he propriety of an investment decision" are

"to be determined" by certain factors that the complaint never mentions.  (Trustees' Mem. at 9-10.)

Plaintiffs respond, without citation, that this statute does not apply to their RICO claims because such

an application would frustrate a federal scheme.  (Opp. at 45.)  This is a strawman; defendants moved

under section 3302 against the *state law* claims, not the RICO claims.

Plaintiffs also incorrectly assert that alleged "illegality" salvages their claims here. Plaintiffs cite no authority for this proposition.  In any event, plaintiffs fail to allege illegal activity by the Trustees; rather, they allege investment decisions that allegedly caused losses.  These sorts of investment decisions fall squarely within those addressed by section 3302.

### 2.   The Claim for Waste Is Not Proper.

Plaintiffs assert that they have stated a claim for waste, because diverting corporate assets for an "improper" purpose—"to illegally purchase shares of unlawful gambling organizations"—is waste "per se."  (Opp. at 67.)  Even if there were any proper allegation that the Trustees did anything "illegal," this "waste per se" argument would fail.  Plaintiffs cite no authority for the idea that using funds for an (allegedly) "illegal" purpose is waste; to the contrary, plaintiffs' cited cases confirm the well-established principle that waste involves "a transfer for no consideration," regardless of the transfer's legality.  *Michelson* v. *Duncan*, 407 A.2d 211, 217 (Del. 1979); *see also Delta Star, Inc.* v. *Patton*, 76 F. Supp. 2d 617, 635 (W.D. Pa. 1999).  Plaintiffs allege no absence of consideration here.[9]

## II.   PLAINTIFFS EFFECTIVELY ABANDON ALL DIRECT CLAIMS.

### A.   Plaintiffs' Invocation of Direct RICO Claims as a Fallback Is Improper.

Plaintiffs concede that under binding Second Circuit precedent a shareholder "does not have standing to bring an individual action under RICO to redress injuries to the corporation in which he owns stock."  (Opp. at 63.)  They nevertheless ask this Court to permit such an action here because (i) if it does not, "RICO wrongdoing will go unpunished"; and (ii) according to plaintiffs, the factors set forth in *Holmes* v. *Securities Investor Protection Corp.*, 503 U.S. 258 (1992), show that defendants proximately caused their alleged injuries.  (Opp. at 64.)

---

[9]     Plaintiffs incorrectly assert that defendants did not challenge their negligence claims.  (Opp. at 66.)  The Trustees demonstrated that plaintiffs failed to allege the proximate cause element.  (Trustees' Mem. at 6 n.4.)  Plaintiffs fail to address this point.

As shown above, there is no "RICO wrongdoing" pled here, and thus none to "go unpunished." But even if a RICO violation were properly alleged, this would not differentiate plaintiffs' case from the many cases denying shareholders standing to pursue direct RICO claims, though the corporations in which they invested were not pursuing those claims. *E.g., Manson* v. *Stacescu*, 11 F.3d 1127, 1129, 1131 (2d Cir. 1993) (no direct shareholder standing to bring RICO action though corporation was "intentionally failing to pursue the derivative action filed" on its behalf); *Lakonia Mgmt. Ltd.* v. *Meriwether*, 106 F. Supp. 2d 540, 551-53 & n.20 (S.D.N.Y. 2000) (plaintiff shareholder lacked standing to pursue direct RICO claim though it also "may not pursue a derivative RICO action").

Moreover, the potential *failure* of a derivative claim is no reason to permit a direct claim. Litigants commonly assert direct claims first, and derivative claims to the extent their claims cannot be brought directly, as plaintiffs originally did here. (Compl. ¶¶ 123, 126, 129, 132, 135, 139, 142 (asserting derivative claims "only to the extent" they belong to the Funds).) Such an approach makes some sense: if shareholder claims cannot be brought directly (as plaintiffs here now concede they cannot properly be), this is usually because (as plaintiffs here now concede) they are derivative, and courts go on to consider whether the prerequisites for a derivative action have been satisfied. However, the reverse is not true; a proper corporate decision not to pursue a derivative action, or a court's conclusion that a complaint fails to state a derivative claim, has nothing to do with whether the action can be direct.

Rather, such outcomes reflect the principle that "[t]he decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation" ordinarily made by the board. *Spiegel* v. *Buntrock*, 571 A.2d 767, 773 (Del. 1990) (citation omitted).[10] Plaintiffs attempt to turn this principle on its head by asserting, contrary to their

---

[10]    *See also Daily Income Fund, Inc.* v. *Fox*, 464 U.S. 523, 530 (1984) (derivative suit represents a challenge to a board of directors' managerial power that "could, if unconstrained, undermine the basic principle of corporate governance

complaint, that they "would prefer to proceed with [derivative] claims only" but should be permitted to bring direct claims "should this Court determine . . . that Plaintiffs cannot proceed derivatively." (Opp. at 62.) As set forth below, plaintiffs' derivative claims fail because plaintiffs have not satisfied the statutory prerequisites for bringing them, not because plaintiffs' claims are direct. If a plaintiff were permitted to bring a direct claim simply because the requirements for bringing a derivative one could not be met, the demand requirement imposed by Delaware law would be rendered meaningless, and boards would never have the power to control a corporation's claims. Such a result would be contrary to fundamental principles of the Delaware corporate law applicable here. *See Braddock* v. *Zimmerman*, 906 A.2d 776, 785 (Del. 2006) (under Delaware law "the board of directors ha[s] a right and duty to control corporate litigation") (internal quotation marks and citations omitted).

Nor do plaintiffs have direct RICO standing under *Holmes*. As a threshold matter, plaintiffs are incorrect that defendants proximately caused their injuries under the three "*Holmes* factors." (Vanguard Mem. at 9-10; Vanguard Reply at 8-10.) More importantly, courts applying *Holmes* to direct RICO claims by shareholders have consistently concluded that *Holmes* bars direct RICO standing by shareholders who cannot allege an injury "separate and distinct from the injury sustained by the corporation." *Manson*, 11 F.3d at 1131-32; *McKinney* v. *Moore*, No. 04 Civ. 07926 (RCC), 2007 WL 1149253, at *4-5 (S.D.N.Y. Apr. 16, 2007); *Lakonia*, 106 F. Supp. 2d at 551-52.

Recognizing that the rule barring direct claims where the injury is to the corporation presents a fundamental obstacle to their direct claims, plaintiffs strain to characterize their injuries as separate and distinct. Thus, plaintiffs argue that they have standing to bring direct RICO claims because the Funds are statutory trusts containing assorted mutual funds with "different" interests, making the investors in each fund "essentially" minority shareholders with potential injuries "separate and distinct" from those of shareholders in other mutual funds. (Opp. at 62-63.) First, these new

that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders").

assertions do not change the dispositive fact, alleged by plaintiffs themselves, that all of plaintiffs' alleged injuries result from injuries to the Funds.  (*E.g.*, Compl. ¶ 3.)  Second, these arguments conflict with the class action allegations in the complaint, in which plaintiffs say they may assert claims for all shareholders in their respective Funds because (among other things) all were injured "in exactly the same way."  (Compl. ¶¶ 9, 85(c).)  Third, even under the cases cited by plaintiffs, if plaintiffs were a minority relative to shareholders in other mutual funds, they would not be entitled to bring direct RICO claims.  Those cases permit direct claims by minority shareholders to oppose redistributions among shareholders of voting power or stock value—because such redistributions are direct injuries to the shareholders, not the corporation.[11]  This case is not about any such redistribution, and plaintiffs allege no direct injuries.

### B.    Plaintiffs' State Law Claims Fail the *Tooley* Test.

Plaintiffs do not cite or address *Tooley* v. *Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004), the lead case on the requirements for bringing direct shareholder claims under state law.  Plaintiffs' newly asserted minority shareholder status certainly does not help them to satisfy *Tooley*, because the *Tooley* court *dismissed* direct claims by minority shareholders.  *Id*. at 1033, 1039. Furthermore, *Tooley* explicitly *rejected* the "special injury" test employed in nearly all of the minority shareholder cases upon which plaintiffs rely.  *Id*. at 1035.  Plaintiffs cite just one post-*Tooley* case, but it involved the "redistribution" of economic value and voting power from minority shareholders to the controlling shareholder, thus causing direct injuries to the minority shareholders without injuring the corporation.  *Gentile*, 906 A.2d at 93, 100.  As noted above, no such "redistribution" or direct injury occurred here.  (*See supra* Point II.A.)

---

[11]      *See In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 332 (Del. 1993), *limited on other grounds, Loudon* v. *Archer-Daniels-Midland Co.*, 700 A.2d 135, 142 (Del. 1997) (minority shareholders suffered direct and  "unique" harm when new stock issuance diluted their voting power and shifted "total voting control" to majority shareholder); *Gentile* v. *Rossette*, 906 A.2d 91, 100 (Del. 2006) (minority shareholders suffered "separate harm" from the corporation when CEO/controlling stock owner "redistribut[ed] to the controlling shareholder . . . a portion of the economic value and voting power embodied in the minority interest").

**III.    PLAINTIFFS DO NOT EVEN ATTEMPT TO SATISFY DELAWARE STANDARDS FOR PLEADING DEMAND FUTILITY.**

The complaint fails to raise any doubt that the Trustees are independent and disinterested under either *Rales* or *Aronson*.  Under either of these demand futility tests, a plaintiff suing derivatively on behalf of a statutory trust may show demand futility by "set[ting] forth with particularity," Del. Code Ann. tit. 12, § 3816(c), "particularized factual allegations" creating a reasonable doubt that the board is "independent and disinterested."  *Rales* v. *Blasband*, 634 A.2d 927, 934 (Del. 1993); *see Aronson* v. *Lewis*, 473 A.2d 805, 814 (Del. 1984).[12]

As set forth in the Trustees' Memorandum, Delaware defines by statute whether a trustee of a statutory trust registered as an investment company is "independent and disinterested," and, if so, the trustee is independent and disinterested "for all purposes."  Del. Code Ann. tit. 12, § 3801(d).  By statute an "[i]ndependent trustee" is one "who is not an 'interested person' . . . of the statutory trust" under the federal Investment Company Act of 1940 ("ICA"), 15 U.S.C. §§ 80a-1 et seq. (2000).  Del. Code Ann. tit. 12, § 3801(d).

Plaintiffs respond to this point by asserting, without citation, that "[s]ection 3801(d) has nothing to do with the question whether directors who face a substantial likelihood of liability should be considered interested for purposes of demand futility."  (Opp. at 55-56.)  This assertion ignores the statute's text, which expressly encompasses "all purposes."  Del. Code Ann. tit. 12, § 3801(d).  Accordingly, courts have held that under Delaware law, "[t]he answer to . . . whether there is reasonable doubt as to the [trustees of a statutory trust's] independence and disinterest[] is supplied by" section 3801, meaning that a trustee is "'*deemed* to be independent and disinterested for all purposes'"—including demand futility—if he or she is not an "interested person" under the ICA.  *Boyce* v. *AIM Mgmt. Group, Inc.*, Civ. No. H-04-2587, 2006 WL 461324, at *5 (S.D. Tex. Sept. 29,

---

[12]    A plaintiff could alternatively allege demand futility under *Aronson* by alleging with particularity a reason to doubt that a "challenged transaction" was "the product of a valid exercise of business judgment."  473 A.2d at 814. Plaintiffs have failed to identify any alleged "transaction" or decision by the Trustees, and the *Aronson* test therefore does not apply.  473 A.2d at 814; Trustees' Mem. at 22-23.

2006) (quoting Del. Code Ann. tit. 12, § 3801(d)) (emphasis in original); *see In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567 (NRB), 2006 WL 126772, at *11 (S.D.N.Y. Jan. 17, 2006).  Indeed, "there can be no question that the statute[] appl[ies] in the demand futility context." *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d at 879.

The Delaware statute reflects a reasoned policy determination regarding the characteristics and organization of investment companies generally.  As plaintiffs point out, investment companies are often organized with interlocking trusteeships, in structures closely regulated by the SEC.  *Daily Income Fund*, 464 U.S. at 536; Opp. at 46-47.  Sitting on multiple boards of funds in a family of mutual funds is "the prevailing practice in the industry."  *Migdal* v. *Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 330 (4th Cir. 2001).  Delaware therefore sensibly pegs its determination of mutual fund trustee independence not to rules established for corporate boards, but to federal laws and SEC regulations specifically tailored to investment companies.  Plaintiffs have not even attempted to plead or argue that any Trustee is an "interested person" under the ICA.[13]

State and federal regulatory regimes governing mutual funds aside, the complaint would also fail to raise any doubt that the Trustees are independent and disinterested under general corporate law principles.

Under Delaware law, "allegations that [mutual fund] Trustees were members of multiple Boards is . . . insufficient to establish futility."  *In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249, 263 (S.D.N.Y. 2006); *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d at 879 n.11 ("[S]ervice on multiple boards at a high salary is insufficient to render a trustee interested and not independent."); *see also Kamen* v. *Kemper Fin. Servs., Inc.*, 939 F.2d 458, 460 (7th Cir. 1991)

---

[13]     Plaintiffs assert only in their brief that an independence issue arises out of the Trustees' service on Vanguard's Board of Directors and as trustees of every other fund in the Vanguard family.  (Opp. at 8-9.)  The SEC—the agency responsible for the registration and regulation of Vanguard and the Vanguard Funds—specifically considered this issue, including the common board that Vanguard and all the funds share, in a contested hearing early in Vanguard's legal existence.  *In the Matter of Vanguard Group Inc.*, Investment Company Act Release No. 11645 (Feb. 25, 1981), 22 SEC Docket 238, 1981 WL 36522.  The Commission identified the many benefits that the Funds derive from common

(demand futility not alleged with particularity under Maryland law though plaintiffs alleged that directors served on boards of multiple funds in family). The single (unpublished) case cited by plaintiffs for the proposition that demand is excused where boards are interlocking did not concern mutual funds. *In re Freeport-McMoran Sulphur, Inc. S'holder Litig.*, No. Civ. A. 16729, 2005 WL 1653923 (Del. Ch. June 30, 2005).

Plaintiffs also have not alleged dependence or interestedness due to a "substantial likelihood" of criminal or civil liability. *Aronson*, 473 A.2d at 815. Plaintiffs ask this Court to rule that any time a plaintiff alleges criminal activity—no matter how farfetched the allegation—demand should be excused, because the consequences of criminal prosecution are so dire that even the remotest risk of such prosecution could affect a director's judgment. (Opp. at 55, 57.) This simply is not the law in Delaware. Interestedness may be found in "rare" and "egregious" cases where "a substantial likelihood of . . . liability . . . exists." *Aronson*, 473 A.2d at 815.

Here, plaintiffs have pled, at most, nothing more than a remote chance that the Trustees could ever face criminal prosecution for the Funds' investments. Plaintiffs point to no prosecutions of investors in publicly-traded gambling companies, but cite instead to cases where gambling companies themselves faced threats, or where, in other settings, directors allegedly engaged in activities that subjected them to criminal liability under well-settled law. (*Supra* Point I.A.); *see also, e.g., In re InfoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990-91 (Del. Ch. 2007) (directors violated securities laws by issuing Form 10-Ks containing information contradicted by report previously shown to directors); *In re Veeco Instruments, Inc. Secs. Litig.*, 434 F. Supp. 2d 267, 277-78 (S.D.N.Y. 2006) (directors ignored accounting problems after reporting them in a Form 10-K and ignored violations of export control laws after issuing audit report revealing violations).[14]

_____

management, and concluded that "there is *no conflict* of interest arising from the fact that the Funds directors also serve as directors of [Vanguard's wholly-owned, mutual fund distributor]." *Id.* (emphasis added).

[14]    The only "authority" plaintiffs cite for the proposition that a substantial likelihood of criminal liability could exist here is a newspaper article about forfeiture by the Discovery Channel of advertising monies received from internet gambling companies. (Opp. at 52; PRJN 9, at 9.) This hearsay article provides no information about whether the

Plaintiffs ultimately imply that the Court should invent a new standard, where demand is excused when "the underlying claims in a derivative action have merit" and not excused when the "substantive claims seem implausible or obviously lacking in merit."  (Opp. at 52, 58.)  This would do serious mischief to the demand process, putting courts ahead of the corporation in initially assessing the merits and identifying the corporate interests.  *See Daily Income Fund*, 464 U.S. at 531 ("the rules governing derivative suits reflect the basic policy that whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors") (internal quotations and alterations omitted).  Even if first impressions of "merit" should drive the inquiry, however, demand could not be excused here because, unlike in the cases cited by plaintiffs (Opp. at 58), the claims against the Trustees have none.

## **CONCLUSION**

For the foregoing reasons, the Trustee and Fund Defendants respectfully request that the Court dismiss this action in its entirety with prejudice and without leave to amend.

Dated:   December 11, 2008
New York, New York

 s/ David H. Braff
David H. Braff  (DB-0761)
Penny Shane  (PS-0185)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone:  212-558-4000
Facsimile:  212-558-3588
Email:  braffd@sullcrom.com

*Counsel for the Trustee and Fund Defendants*

---

Discovery Channel was guilty of anything.  *See United States* v. *$734,578.82 in U.S. Currency*, 286 F.3d 641, 649 (3rd Cir. 2002) ("involvement of the claimant is simply immaterial" to government's right to forfeiture under 18 U.S.C. § 1955(d)).

## CERTIFICATE OF SERVICE

I certify that on December 11, 2008, copies of the foregoing Trustee and Fund

Defendants' Reply Memorandum of Law, were served on the following, via ECF on those counsel

registered to receive Notices of Electronic Filing and via first class mail on other counsel:

Thomas I. Sheridan III
HANLY CONROY BIERSTEIN SHERIDAN
  FISHER & HAYES LLP
112 Madison Avenue
New York, NY 10016-7416
Tel:  (212) 784-6400
Fax:  (212) 784-6420
Email: tsheridan@hanlyconroy.com
*Attorneys for Plaintiffs*

Kenneth J. Brennan
SIMMONS, COOPER, L.L.C.
707 Berkshire Boulevard
East Alton, IL 62024
Tel.:  (618) 259-2222
Fax:  (618) 259-2251
Email: kbrennan@simmonscooper.com
*Attorneys for Plaintiffs*

Harry A. Olivar, Jr.
QUINN EMANUEL URQUHART OLIVER &
  HEDGES, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel.:  (213) 443-3000
Fax:  (213) 443-3100
Email: harryolivar@quinnemanuel.com
*Attorneys for Defendants The Vanguard Group,
  Inc., George U. Sauter, and Duane F. Kelly*

Kirk G. Hanson
Brandon White
FOLEY HOAG LLP
Seaport Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2600
Tel.:  (617) 832-1000
Fax:  (617) 832-7000
Email: khanson@foleyhoag.com
  bfwhite@foleyhoag.com
*Attorneys for Defendants Acadian Asset
  Management, LLC, Ronald D. Frashure, John
  R. Chisholm, and Brian K. Wolahan*

Barry M. Bordetsky
LITTMAN KROOKS LLP
570 Lexington Avenue, 44th Floor
New York, New York 10022
Tel.:  (212) 688-0008
Fax:  (212) 319-7605
Email:  barry@bordetskylaw.com
*Attorneys for Defendants Marathon Asset
  Management LLP, William J. Arah,
  Jeremy H. Hosking, and Neil M. Ostrer*

L. Richard Walton
Michael Cereseto
BUCHALTER NEMER, P.C.
1000 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90017
Tel.:  (213) 891-0700
Fax:  (213) 630-5764
Email:  rwalton@buchalter.com
   mcereseto@buchalter.com
*Attorneys for Defendants Marathon Asset*
  *Management LLP, William J. Arah,*
  *Jeremy H. Hosking, and Neil M. Ostrer*


   s/ Amanda Davidoff
Amanda Davidoff (AD-2735)