UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Deanna McBrearty and Marylynn Hartsel, individually, derivatively and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>      -against-<br><br>The Vanguard Group, Inc., George U. Sauter, Duane F. Kelly, John J. Brennan, Charles D. Ellis, Rajiv L. Gupta, Amy Gutmann, JoAnn Heffernan Heisen, Andre F. Perold, Alfred M. Rankin, Jr., J. Lawrence Wilson, Acadian Asset Management, LLC, Ronald D. Frashure, John R. Chisholm, Brian K. Wolahan, AllianceBernstein LP, Henry S. D'Auria, Sharon E. Fay, Kevin F. Simms, Marathon Asset Management, LLP, William J. Arah, Jeremy H. Hosking, and Neil M. Ostrer,<br><br>        Defendants,<br><br>      -and-<br><br>Vanguard International Equity Index Funds, d/b/a Vanguard European Stock Index Fund, and Vanguard Horizon Funds, d/b/a Vanguard Global Equity Fund,<br><br>        Nominal Defendants. | 08 CV 7650 (DLC)<br><br>ECF Case<br><br>Electronically Filed |

## MARATHON ASSET MANAGEMENT DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(6)

Barry M. Bordetsky (BB4218)
Littman Krooks, LLP
570 Lexington Avenue, 44th Floor
New York, New York 10022
Tel: (212) 688-0008
Fax: (212) 319-7605
barry@bordetskylaw.com

Michael J. Cereseto (XXXXXX, *Admitted Pro Hac Vice*)
L. Richard Walton (XXXXXX, *Admitted Pro Hac Vice*)
BuchalterNemer, A.P.C.
1000 Wilshire Blvd, Suite 1500
Los Angeles, California 90017
Tel: (213) 891-0700
Fax: (213) 630-5774
mcereseto@buchalter.com; rwalton@buchalter.com

December 11, 2008

*Attorneys for Defendants*
*Marathon Asset Management, LLP and Neil M. Ostrer*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT..........................................................................1

ARGUMENT..............................................................................................1

I.    PLAINTIFFS' OWN FRAGMENTED ARGUMENTS AND NEWSPAPER SCRAPS
      ESTABLISH THEY CANNOT STATE A RICO VIOLATION.......................................2

      A.    Plaintiffs Cannot Establish Proximate Causation Because Their Own
            Evidence Shows the Complained-of Drop in Price Was Not Foreseeable.............2

            1.    The Marathon Defendants did not knowingly or negligently engage
                  in improper investment practices sufficient to support Plaintiffs'
                  causes of action.......................................................................2

            2.    Plaintiffs cannot demonstrate a loss caused by the acts
                  complained of...........................................................................9

      B.    Plaintiffs Have Pled No Predicate Act—Nor Can They.......................................11

      C.    Plaintiffs' Own Appeal to Public Policy Weighs Against Them ........................12

II.   PLAINTIFFS HAVE CONCEDED THEY HAVE NO COGNIZABLE DIRECT
      CAUSES OF ACTION....................................................................................14

III.  PLAINTIFFS HAVE FAILED TO ADEQUATELY PLEAD DEMAND
      FUTILITY..................................................................................................14

IV.   CONCLUSION.............................................................................................15

# TABLE OF AUTHORITIES

**Page**

Cases

*Anglo-Iberia Underwriting Management Co. v. Lodderhose,*
282 F. Supp. 2d 126 (S.D.N.Y. 2003) ....................................................................9, 10, 11

*Associated General Contractors of America v. City of Columbus,*
936 F. Supp. 1363  (S.D. Ohio 1996) ....................................................................3

*Fasolino Foods Co. Inc. v. Banca Nazionale Del Lavoro,*
761 F.Supp. 1010 (S.D.N.Y. 1991) ....................................................................3

*In re Am. Exp. Co. Shareholder Litigation,*
39 F. 3d 395 (2d Cir. 1994) ....................................................................3

*In re Enron Corp.,*
341 B.R. 141 (Bankr. S.D.N.Y. 2006)....................................................................6

*Manson v. Stacescu,*
11 F.3d 1127 (2d Cir. 1993) ....................................................................15

*Rivera-Torres v. Ortiz Velez,*
341 F.3d 86 (1st Cir. 2003)....................................................................3

*U.S. v. Ables,*
167 F. 3d 1021 (6th Cir. 1999) ....................................................................14

*U.S. v. Biasucci,*
786 F. 2d 504 (2d Cir. 1986) ....................................................................13

*U.S. v. Conley,*
859 F. Supp. 909 (W.D. Pa. 1994)....................................................................13

*U.S. v. Tedder,*
403 F. 3d 836 (7th Cir. 2005) ....................................................................14

Statutes

18 U.S.C. § 1341....................................................................12

18 U.S.C. § 1955....................................................................2

18 U.S.C. § 1962(a) ....................................................................12

18 U.S.C. § 1962(c) ....................................................................12, 14

18 U.S.C. § 1964(c) ....................................................................13, 14

## TABLE OF AUTHORITIES
### (continued)

Page

Fed. R. Ev. 201 ................................................................................................................3

FRCP 12(b)(6) .................................................................................................................1


<u>Rules</u>

Rule 8 ............................................................................................................................12


<u>Other Authorities</u>

Hon. David Laro & Shannon Pratt,
    BUS. VALUATION AND TAXES: PROCEDURE, LAW & PERSPECTIVE 160
    (John Wiley & Sons 2005)...................................................................5

Richard Wilson & Edmund A.C. Crouch,
    RISK BENEFIT ANALYSIS (2d ed., Harvard University Press 2001) ...........................6

Arthur Keown, et al.
    FOUNDATIONS OF FINANCE 183 (Prentice Hall 1998)...........................................12

BN 2473749v5

Defendants Marathon Asset Management, LLP ("Marathon") and Neil M. Ostrer (collectively, "Marathon Defendants") respectfully submit this reply to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Motion") pursuant to FRCP 12(b)(6).

## PRELIMINARY STATEMENT

The Marathon Defendants' Motion was based on eight deficiencies in Plaintiffs' Complaint. Nothing in Plaintiffs' Opposition negates these deficiencies. Plaintiffs ask this Court to stretch two short paragraphs of conclusory allegations into a full-blown RICO violation by a London-based entity and one of its UK-resident advisors, based upon a few trades on the London Stock Exchange of shares in a European company.

Plaintiff's "Memorandum of Law" ("Mem.")—much of which is factual argument, conjecture, citations to various news clippings, and unsupported assertions about public policy— seeks to create, by sheer fiat, alleged RICO violations to support their claims for treble damages. As will be seen, Plaintiffs' RICO claims are incurably defective for at least three reasons:

1. Plaintiffs' Opposition exposes their inability to establish the required RICO elements—in fact, their allegations are rebutted by the public policy issues they seek to evoke, and by the very exhibits they attach to their Memorandum;

2. Plaintiffs concede they lack standing to state a direct claim for violation of any law, state or Federal;

3. Plaintiffs have failed to plead the demand futility required to state derivative causes of actions.

## ARGUMENT

Despite the bootstrap arguments in their Memorandum, Plaintiffs' complaint fails three essential tests: they cannot state a RICO violation, they could not sue for one directly even if they had, and they cannot sue for anything derivatively because they have failed to make proper demand upon the Vanguard Trustees.

# I.
## PLAINTIFFS' OWN FRAGMENTED ARGUMENTS AND NEWSPAPER SCRAPS ESTABLISH THEY CANNOT STATE A RICO VIOLATION

Plaintiffs' RICO claims fail for three reasons: they fail to establish proximate causation, they allege no cognizable predicate acts, and their own policy arguments weigh against them.

A.  <u>Plaintiffs Cannot Establish Proximate Causation Because Their Own Evidence Shows the Complained-of Drop in Price Was Not Foreseeable</u>

Plaintiffs' claims of causation appear to rest on two unsupportable premises:

1.  That the Marathon Defendants improperly invested "millions of dollars of investors' money ... in violation of 18 U.S.C. § 1955," by investing in an on-line gambling stock that was publicly traded on the London Stock Exchange.  Pls.' Mem., p. 1;

2.  That  the stocks' "market value plummeted" when U.S. law enforcement officials began arresting principals of businesses that conducted on-line gambling, and that but for this "plummet," Plaintiffs would not have suffered losses.  Pls.' Mem., pp. 10-11.

These premises, repeated serially throughout their Memorandum, fail to pass the scrutiny of case law, common sense, or the public policy arguments urged repeatedly by Plaintiffs.  As such, Plaintiffs have failed to state a sustainable RICO cause of action.

1.  <u>The Marathon Defendants did not knowingly or negligently engage in improper investment practices sufficient to support Plaintiffs' causes of action</u>

The requirement of proximate cause restricts "liability to cases in which the RICO pattern or acts are a substantial factor in the sequence of responsible causation, and ... the injury is reasonably foreseeable or anticipated as a natural consequence." *In re Am. Exp. Co. Shareholder Litigation*, 39 F. 3d 395, 399 (2d Cir. 1994) (internal quotations and citations omitted).

Here, in seeking to establish causation, Plaintiffs proffer a blizzard of news clippings and editorial opinion pieces (for which they request judicial notice) to support their contention that the

Marathon Defendants knowingly or negligently engaged in improper investment practices.[1]  In citing to these exhibits, Plaintiffs conveniently fail to mention that many of them contain language exculpatory of the very investment decisions of which Plaintiffs complain.  Indeed, their citations are replete with omissions vital to the Court in assessing the conclusions they urge.

Example 1:  Plaintiffs cite *The New York Times* for the proposition that because of a news story therein, the Marathon Defendants should have been fully aware that their subsequent purchase of certain stock investments was doomed to a price "plummet."  Pls.' "PRJN 3 at 47," filed as Document 65-2, at Page 47 of 50.  A more careful reading of that news story reveals that there was considerable uncertainty at that time as to whether U.S. laws affecting the investment would ever be enforced—or, indeed, were even enforceable.  "The company's prospectus," the *Times* article reported, ". . . reads something like a U.S. legal brief, citing American case law to support the company's position that no prosecution would ever take place."  *Id.*

The same *New York Times* piece also quoted Representative Bob Goodlatte of Virginia who opined that "the federal government had essentially given up on enforcing laws against offshore casinos."  *Id.*  Thus, far from the "red flag" Plaintiffs make it out to be, this article (like many others), revealed two sides to the issue.  Plaintiffs chose to report only one.

Example 2:  A review of the Prospectus for one of the investments, attached to Plaintiffs' Memorandum as "Document 3," reveals that it opined on the issue of legality, illegality, and the likelihood of enforcement against online gambling activities.  Except for an email received by PartyGaming from the Attorney General of Louisiana in January 2005, "[PartyGaming] has not

---

[1] Most of these requests are wholly improper and the items proffered are not amenable to judicial notice. Under Fed. R. Ev. 201, newspaper clippings may only be admitted to show that "certain facts are generally known within the court's jurisdiction", and will not be admitted where there is better evidence available, or where the underlying facts are in dispute.  *See, e.g., Fasolino Foods Co. Inc. v. Banca Nazionale Del Lavoro*, 761 F.Supp. 1010, 1019 (S.D.N.Y. 1991), *aff'd* 961 F.2d 1052 (2d. Cir. 1992); *Rivera-Torres v. Ortiz Velez*, 341 F.3d 86, 101 (1st Cir. 2003) (judicial notice may not be taken even of a law where that law is frequently not enforced; *Associated General Contractors of America v. City of Columbus*, 936 F. Supp. 1363, 1425 (S.D. Ohio 1996).  Here, Plaintiffs attempt to introduce as "fact" newspaper clippings that—if admissible at all—merely establish the "fact" that the legal status of online gambling in the US was totally unclear in early 2006.

received any notification that the Department of Justice or any other U.S. authority is currently considering bringing any further action against [PartyGaming] or the Directors <u>or that any such action is imminent</u>." Pls.' "Document 3," filed herein as Document 65-2, Page 24 of 56, (emphasis added). The same Prospectus stated that proposals in the U.S. to enact legislation to prohibit online gaming or the financing thereof "have, to date, failed to gain sufficient support to be passed by the US Congress." *Id.* The Prospectus further stated that "there is an <u>apparent unwillingness or inability on the part of relevant authorities</u> to bring actions against businesses with no physical presence in the United States." *Id.*, at "Page 30 of 56," (emphasis added).

Not only U.S. laws but international treaties were at play here—another fact which Plaintiffs' conveniently fail to mention. "In November 2004, the World Trade Organization ("WTO") found that the US was in violation of its commitments under the General Agreement on Trade in Services ("GATS") by not allowing operators of online gaming services licensed in Antigua and Barbuda to access US markets." *Id.*, at "Page 45 of 56." The Prospectus reported that this decision had been appealed, and that the Appellate Body of the WTO had found against the United States. As a result, the Prospectus stated, "It is unclear what steps the US will take following the decision of the Appellate Body of the WTO…" *Id.*

<u>Example 3</u>: The conclusions raised in the Prospectus were shared by numerous prospective investors, some of whom were major players. On June 12, 2006, *Investment Dealers' Digest,* another document cited by Plaintiffs, revealed that Merrill Lynch Asset Management, the Goldman Sachs Group, Fidelity Management, JP Morgan, and Blue Ridge Capital all invested heavily in the very stocks the Marathon Defendants purchased. Pls.' "Document 5," on file herein as "Document 65-2, Page 50 of 56". The *Digest* further opined that "it's <u>unlikely that sites hosted and managed overseas by non-US citizens would fall within the reach of US law enforcement</u>." *Id.*, at "Page 51 of 56" (emphasis added).

The same source opined that any enforcement action against the offshore gambling entities would be "a matter of the extreme Christian conservative groups pushing their morals on the rest of the country" (*Id.*, at "Page 53 of 56"), and that investors were unlikely to be "in any jeopardy by holding shares in these companies." *Id.*, at "Page 54 of 56." They pointed out that such investments are <u>passive</u>, and that liability was just as unlikely as finding an owner of AT & T shares guilty of an illegal wiretap in which the company might participate. *Id.*

None of this was cited by Plaintiffs in their Memorandum, but there is more.

<u>Example 4</u>: *BBC News,* cited by Plaintiffs as Document 6, and filed herein as "Document 65," pointed out that gaming companies "rely on the apparent unwillingness <u>or inability</u> of regulators generally to bring actions against businesses with no physical presence in the country concerned." *Id.*, at "Page 2 of 26," (emphasis added). Plaintiffs failed to reveal this portion of the news report, showing that at the time in question, there was genuine uncertainty as to the enforceability of any U.S. law prohibiting gaming, let alone enforcement thereof.

<u>Example 5</u>: The *International Herald Tribune* is cited by Plaintiffs as another of the "red flags" they imagined to be waving at the time the Marathon Defendants made their investment decision. But that same news report also reported a Fifth Circuit case in which the Court held that the Wire Act "does not prohibit Internet Gambling on a game of chance." Pls.' "Document 7" on file herein as "Document 65-3, Page 7 of 26." If Marathon Defendants should, as Plaintiffs urge, be held to constructive knowledge of every news clipping extant, this portion of the story should be considered in determining whether the Marathon Defendants were a pack of RICO criminals or simply investors seeking—as is always the case when making investments—to maximize returns for their clients while taking an acceptable level of risk. *See, e.g.,* Hon. David Laro & Shannon Pratt, BUS. VALUATION AND TAXES: PROCEDURE, LAW & PERSPECTIVE 160 (John Wiley & Sons 2005) ("The higher the risk, the higher the market's rate of expected return on investment."). Risk benefit analysis is an accepted form of investment evaluation. *See, e.g.*, Richard Wilson & Edmund A.C.

Crouch, RISK BENEFIT ANALYSIS (2d ed., Harvard University Press 2001); *See also In re Enron Corp.*, 341 B.R. 141, 164 (Bankr. S.D.N.Y. 2006).

The point herein is not to make a value judgment on the rightness or wrongness of internet gambling, but to show that at the time Marathon Defendants made their investment decision, there was an abundant difference of opinion as to whether enforcement was, or ever would become, a threat to the value of these stocks. These differences of opinion were material elements in the risk/benefit analysis the Marathon Defendants had to make in every investment vehicle they chose. Nor were they alone in that analysis. Numerous commentators, and some of the country's largest investment houses, deemed that the risk was acceptable.

Against this documented difference of opinion, Plaintiffs seek to bootstrap an argument replete with weaknesses.

First, they impliedly hold the Marathon Defendants to actual or constructive knowledge of a plethora of news clippings and other documents, some of them obscure, that Plaintiffs have assiduously assembled at their retrospective leisure in an effort to support their claims of a RICO violation. Conveniently ignoring numerous statements revealing an honest difference of opinion at the time of investment, they offer these as hyperbolic "red flags" and "storm warnings" that should have sent the Marathon Defendants scurrying—at a time when major investment houses saw these stocks as viable investment vehicles.

In so doing, Plaintiffs conveniently ignore an issue raised in their "Document 5," wherein the writer in *Investment Dealers' Digest* correctly points out that passive investors should not, as a matter of public policy, be held liable for the wrongdoing of a company in which they hold stock. Pls.' "Document 5" on file herein as "Document 65-2, Page 54 of 56." The *New York Times* piece cited by Plaintiffs includes an (uncited) opinion by an investment law attorney that "the government would have difficulty finding a theory of liability given that the investors do not control the offshore

casinos or direct their activities.  They are 'passive investors.'"  Pls.' "Document 4," on file herein as "Document 65-2, Page 48 of 50."

Plaintiffs ignore the fact, illustrated in the very documents they cite, that at the time the Marathon Defendants made their investment decision, there were significant differences of opinion in the investment and legal communities as to whether U.S. laws could, or would, impair the value of the stock the Marathon Defendants purchased—hardly the basis upon which Plaintiffs can properly state a claim of negligence, let alone a knowing and intentional violation of RICO.  Worse, out of this period of conflicting legal and investment opinions, Plaintiffs seek to cobble up an alleged RICO violation that, *reductio ad absurdum*, would criminalize thousands of investors, including some of the largest brokerage houses in the nation, for the "crime" of passive investment in a publicly traded security.  Pls.' Mem., p. 26.

In their Memorandum, Plaintiffs recurrently refer to public policy.  It is worth exploring the public policy issues implicit in Plaintiffs' position. Their lawsuit would impose on the investing public the risk that the entity in which they invested might in the future be found to have violated the law—and that, as passive investors, they would be deemed criminally culpable.  Such a result would open the door to retrospective second-guessing of every investment decision made, accompanied by attempts to concoct RICO claims by disgruntled investors seeking risk-free results in an inherently risky environment.  If one is looking for red flags or storm warnings, Plaintiffs' argument qualifies.

Plaintiffs, with their own "evidence", have shown they are incapable of pleading that the Marathon Defendants negligently or intentionally made improper investments.  As such, it was not foreseeable to the Marathon Defendants that the investments complained of by Plaintiffs could or would lead to the drop in share price of which they complain.

In fact, this "evidence" presents Plaintiffs with a "heads we lose/tails they win" dilemma: to establish a RICO violation, Plaintiffs must show the Marathon Defendants knowingly committed an illegal act—but review of the evidence they proffer to show this requisite knowledge establishes

there was no way anyone could have known as of early 2006 that investments in online gaming businesses would lead to a loss as a result of government enforcement activity.

Had the Marathon Defendants, in early 2006, read everything Plaintiffs have compiled, they would have "known" that, as of 2003, Deputy Attorney General Malcolm had taken the position online gambling was illegal, and that sporadic enforcement efforts had been directed at various companies totally unrelated to European online gambling companies run by European citizens. (Plaintiffs' Exhibit 1, Document 65-2, p. 2 of 56).  Three years later in early 2006, despite the haphazard enforcement activity cited by Plaintiffs, online European gambling stocks were still increasing in value (per Plaintiffs' Exhibits 20-21, Document 65-7, pp. 2-25).[2]  Any prudent investor, reviewing the evidence proffered by Plaintiffs after three years of government inactivity towards online European gambling companies and considerable growth in the values of their stocks, could reasonably conclude that online European gambling stocks were a prudent investment.

To now second-guess that decision would impose upon investment advisors a duty of care approaching the omniscient.  Far from establishing that the Marathon Defendants were on notice that purchasing online European gambling stocks was "illegal", Plaintiffs' evidence shows the trades were based upon careful research and a reasoned business decision that weighed risk and return for investors.

Plaintiffs also fail to establish proximate causation on two other grounds: by admitting that an intervening cause, the alleged "crackdown", was the cause of their harm—not the purchase of shares; and that, as intended beneficiaries, they were not within the cognizable category of RICO victims. These arguments are more fully made in the Reply Briefs of the Vanguard Defendants and the

---

[2] Plaintiffs cite in their Opposition (p. 20) five alleged enforcement actions prior to February of 2006, but none of this activity involved Federal law enforcement action against European online gaming companies run by European citizens.  Per the Plaintiffs' own Exhibit 9 (Document 65-3, pp. 12-16), the indicted individuals were all US Citizens operating offshore gambling businesses—and many of Plaintiffs' bulleted examples are repetitive discussions of the same case.

Acadian Defendants. The Marathon Defendants join those arguments in all respects, and incorporate them herein by reference.

> 2.  Plaintiffs cannot demonstrate a loss caused by the acts complained of

Plaintiffs are fond of reiterating that, but for the Marathon Defendants' investment choices, they would not have suffered the losses complained of. See, e.g., Pls.' Mem., pp. 10, 15, 16, 17, 18, 19, 28, 2931, 32, and 40 (to name a few). This issue attains relevance only in the context of Plaintiffs' misguided reliance upon the *Holmes* factors. This issue is discussed at length by the Vanguard Defendants in their Reply Brief, which the Marathon Defendants join in all respects and incorporate herein by reference. Since Plaintiffs raise the issue under the *Holmes* factors of the directness of their injury, and the ease with which that injury may be apportioned, it is worth a moment of additional analysis.

It is axiomatic that one cannot cause a damage that was not suffered. *See Anglo-Iberia Underwriting Management Co. v. Lodderhose*, 282 F. Supp. 2d 126, 130 (S.D.N.Y. 2003) (speculative damages are not recoverable). Here, Plaintiffs have alleged damages that are speculative at best. Despite Plaintiffs' contention that their damages can be shown by "simple arithmetic," (Pls.' Mem., p. 32) that assertion is far from true.

A moment's reflection reveals that Plaintiffs cannot easily prove damages, or perhaps at all.

First, they are still owners of the mutual funds that they allege lost value as a result of the Marathon Defendants' actions.  Any losses complained of are purely theoretical paper losses that have not been realized. *See Anglo-Iberia*, 282 F. Supp. 2d at 130.

Second, even if the paper losses had matured into actual losses—which they have not—they are still speculative. In *Anglo-Iberia*, the plaintiffs sought to recover alleged lost commissions that, they asserted, would have been earned but for defendants' alleged wrongdoing. The Southern District dismissed such speculative damages with the following language:

> [I]t is far from clear that AI could have earned the same fees in 1996
> as in 1997, had the Astek agreement not collapsed. AI merely invites the
> Court to assume that the Astek agreement, to the exclusion of any other
> possible factor, accounts for the difference … AI's speculative assertions
> about future management fees fail to demonstrate damages with reasonable
> certainty and are thereby unrecoverable. *Id.*, at 129.

It is worth noting that, in *Anglo-Iberia,* the plaintiffs also attempted to claim a RICO violation, which the Court rejected with the following language: "RICO's damages provisions only apply to 'actual, out of pocket financial loss … Injuries that are speculative or unprovable in nature or amount are not recoverable—recovery must wait until the nature and extent of damages becomes 'clear and definite.'" *Id.* at 133 (internal citations omitted).

Had the Marathon Defendants chosen not to have invested in the stocks complained of, they would have had to choose alternate investment vehicles. What they might have chosen is pure speculation. General Motors? Ford Motor Company? AIG? WAMU? Most of these investments would have appeared attractive at the time. Each possessed the same capacity for the valuation "plummet" complained of by Plaintiffs. Since Plaintiffs are fond of requesting the Court to take judicial notice, perhaps Defendants can be pardoned for asking that the Court take judicial notice that:

1. Investment is always a risk;

2. There are no guarantees on any stock market purchase;

3. Greater returns are associated with higher risks; and

4. The investment professional must constantly balance all these factors when making investment decisions, in an effort to maximize return for his or her investors.

As a result, computing Plaintiffs' alleged losses is not a matter of "simple arithmetic." Pls.' Mem., p. 32. Indeed, the computation is neither simple nor possible as Plaintiffs would have it done.

Had the Marathon Defendants invested in alternate vehicles, it is a matter of pure speculation as to what they might have chosen, or how the stocks would have fared. Plaintiffs' losses might have met or exceeded those they claim to have suffered. The Marathon Defendants can hardly be said to have caused a loss that has not been realized and is highly speculative. *See Anglo-Iberia*, 282 F. Supp. 2d at 130.

B.  Plaintiffs Have Pled No Predicate Act—Nor Can They

Plaintiffs' Complaint is fundamentally flawed, in that it cannot establish any "pattern" of "racketeering activity" by the Marathon Defendants. Plaintiffs concede that the alleged activity was the purchase of the shares in a European online gambling business, and then attempt to lump in with that activity the loss in value experienced at a later date as a result of no wrongdoing by the Marathon Defendants. As is more fully discussed by the Vanguard Defendants and Acadian Defendants in their Reply Briefs (which the Marathon Defendants join and incorporate herein by reference), "finances" and "owns" are complex terms not amenable to the self-serving and unsupported interpretation given them by the Plaintiffs.

It is trite to observe that purchases and sales of stock on secondary markets such as the London Stock Exchange do not constitute financing of a business, since the business itself receives no revenue from such trades by its owners. Arthur Keown, et al. FOUNDATIONS OF FINANCE 183 (Prentice Hall 1998). All of this might explain why Congress decided, in 18 U.S.C. § 1962(a), to exclude "a purchase of securities on the open market for purposes of investment" from RICO's coverage.

It is also worth noting that all of the mail fraud cases cited by Plaintiffs in at attempt to bolster their arguments are wholly inapposite to the securities issues present in this case. Mail fraud requires a showing of: (1) a "scheme or artifice to defraud", (2) by the use of the U.S. Mails, 18 U.S.C. § 1341—a totally different factual burden than that required by section 1955.

As to section 1955, the Marathon Defendants return to a point made in their moving papers that the Plaintiffs have failed to rebut:  Plaintiffs have failed to specify in their Complaint what "illegal" gambling business was conducted, where, and which state laws were violated, as required by section 1955 and Fed. R. Civ. Pro. 8.  This failure is acknowledged in their Opposition, where they rattle off a litany of alleged state gambling statutes (Pls. Mem., p. 17 fn. 8), but still fail to allege which—if any—they believe were violated by the European online gambling business at issue.

C.    Plaintiffs' Own Appeal to Public Policy Weighs Against Them

Plaintiffs base their RICO claim on the assumption that they "were injured as a direct and foreseeable result of Defendants' predicate acts of racketeering."  (Pls.' Mem., p. 4).  They claim that purchase of publicly traded stocks is "a predicate crime under RICO."  Pls.' Mem., p. 11.  But their attempt to bootstrap a civil RICO claim into the treble damages they desire runs afoul of the very statutes they cite.  A RICO violation is defined in 18 U.S.C. § 1962(c), which requires Plaintiffs to prove four distinct elements:

(1)    Conduct

(2)    Of an enterprise

(3)    Through a pattern

(4)    Of racketeering activity.

As has been seen, Plaintiffs' attempt to establish that the Marathon Defendants engaged in the four requisite RICO elements is itself flawed by the documents for which they have requested judicial notice.  Their attempt to properly plead a RICO violation fails for a variety of reasons:

(a)    The Second Circuit Court of Appeals has stated that the *mens rea* necessary for RICO liability is derived from the scienter requirement contained in the predicate offense.  *U.S. v. Biasucci*, 786 F. 2d 504, 512 (2d Cir. 1986).  The statute at issue here requires a general criminal intent, or a voluntary and intentional action which the statute makes unlawful.  *U.S. v. Conley*, 859 F. Supp. 909, 929 (W.D. Pa. 1994).

Plaintiffs' own documents, proffered for the purpose of establishing the validity of their complaint, reveal that at the time of the investments, there was no clarity at all as to whether the purchase of these publicly traded securities was, or would become, an actionable violation of U.S. law. Indeed, Plaintiffs' documents reveal an honest difference of opinion in both the investment and legal communities as to these issues. As such, there was no criminal intent, general or otherwise, on the part of the Marathon Defendants. Nor could Plaintiffs plead such intent, as shown by their own Opposition and the Exhibits attached thereto.

(b)     Even if a RICO claim could be established, Plaintiffs' complaint runs afoul of section 1964(c)'s requirement that a civil RICO plaintiff must show injury to his or her property, and that the injury was by reason of the RICO violation. 18 U.S.C. § 1964(c). This section confronts Plaintiffs with two hurdles, neither one of which they have demonstrated the ability to overcome. First, they must establish intentional wrongdoing, which their Memorandum fails to do. Second, even if they could establish a RICO violation, they must demonstrate actual damages flowing therefrom—which they have also failed to do. Thus, their complaint is fatally defective and should be dismissed.

In an attempt to circumnavigate this reef, Plaintiffs cite *U.S. v. Tedder*, 403 F. 3d 836 (7th Cir. 2005). The *Tedder* court, however, does not discuss the issue of whether a passive investor in a publicly traded company should be held liable for the company's wrongs. Accordingly, Plaintiffs' use of *Tedder* does not support their position and only serves to confuse the analysis of the issues at bar.

In a further attempt to avoid the public policy absurdity that their Complaint seeks to create—wherein thousands of passive investors could be criminalized by their purchase of publicly traded stocks—Plaintiffs improperly cite *U.S. v. Ables,* 167 F. 3d 1021 (6th Cir. 1999) for the proposition that the Marathon Defendants "committed a gambling crime." Pls.' Mem., p. 27, on file herein as "Document 64, Page 36 of 77." The facts in *Ables* are inapposite. In *Ables*, the defendants

helped establish and then ran an actual gambling operation. *Id.* at 1032, 1034-35.  Unlike the facts in the case at bar, the defendants in *Ables* were <u>actively</u> involved in the gambling activities at issue in their case.  *Id.*  The passive investing involved herein is wholly dissimilar to the active involvement in gambling at issue in *Ables,* because there is a complete lack of operational involvement in any gambling activities in the instant action.

As has been shown herein, Plaintiffs cannot demonstrate injury, much less quantify it.  They have therefore failed to plead a proper claim under 18 U.S.C. sections 1962(c) and 1964(c).

As a result, their belabored discussion of the *Holmes* factors fails to overcome the basic foundational flaws in their Complaint.  It is worth noting, however, that in concluding their discussion of *Holmes,* they again invoke the need to incorporate public policy considerations as a benchmark in this case.  The Marathon Defendants heartily agree: the results advocated by Plaintiffs would, if adopted, create a public policy nightmare that would imperil sound investment practices.

## II.
## PLAINTIFFS HAVE CONCEDED THEY HAVE NO COGNIZABLE DIRECT CAUSES OF ACTION

Plaintiffs concede they lack standing to sue the Marathon Defendants directly (Opp. at 63), and then kill several trees arguing why they should not.  Nothing in their argument distinguishes the controlling holding of *Manson v. Stacescu,* 11 F.3d 1127, 1129, 1131 (2d Cir. 1993), and the Marathon Defendants join in all respects and fully incorporate herein the excellent discussion of this point by the Trustees in their Reply Brief.

## III.
## PLAINTIFFS HAVE FAILED TO ADEQUATELY PLEAD DEMAND FUTILITY

Having conceded that they cannot state a direct cause of action, Plaintiffs attempt to save their RICO case—and this Court's jurisdiction—with a wild flurry of accusations directed at the Funds' Trustees.  The Trustees capably respond on this point in their Reply Brief, and the Marathon Defendants wholeheartedly join in their arguments that the Plaintiffs failed to make appropriate

demand upon the Trustees of the Funds, and further failed to plead demand futility, and incorporate those arguments herein by reference.

## IV.
## CONCLUSION

For the reasons stated above, Plaintiffs have failed to state a claim, and the Marathon Defendants respectfully submit that the Complaint be dismissed with prejudice and without leave to amend as to the RICO and all other causes of action.[3]

DATED: December  11, 2008

BUCHALTER NEMER
A Professional Corporation
MICHAEL J. CERESETO
L. RICHARD WALTON


By: _____ /s/   *Michael J. Cereseto* _____
        MICHAEL J. CERESETO
        Attorneys for Defendants
Marathon Asset Management, LLP and
        Neil M. Ostrer

---

[3] The Marathon Defendants do not address the common law causes of action in Plaintiffs' Complaint, since the Court should decline to exercise jurisdiction over those causes of action without the RICO claims.  The common law causes of action are discussed more fully in the Trustees' Reply Brief, and the Marathon Defendants join in that discussion and incorporate it fully herein by reference.

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2008 I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which sent notification of such filing to the following

counsels of record:

Kenneth J. Brennan
**SIMMONS, COOPER, LLC.**
707 Berkshire Boulevard
East Alton, IL 62024
Telephone:  (618) 259-2222
Facsimile:   (618) 259-2251
Email: kbrennan@simmonscooper.com

Thomas I. Sheridan, III
**HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES, LLP**
112 Madison Avenue
New York, NY 10016
Telephone:  (212) 784-6400
Facsimile:   (212) 784-6400
Email: tsheridan@hanlyconroy.com;
         abierstein@hanlyconroy.com;
         jlucena@hanlyconroy.com

*Attorneys for Plaintiffs DEANNA McBREATY and MARYLYNN HARTSEL*

Kirk G. Hanson
Brandon F. White
**FOLEY HOAG LLP**
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
Telephone:  (617)-832-3036
Facsimile:   (617)-832-7000
Email: khanson@foleyhoag.com; bfwhite@foleyhoag.com
         *Attorneys for Defendants ACADIAN ASSET MANAGEMENT, LLC,*
         *RONALD D. FRASHURE, JOHN R. CHISHOLM AND BRIAN K. WOLAHAN*

Harry A. Olivar, Jr.
**QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP**
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100
Email: harryolivar@quinnemanuel.com
         *Attorneys for Defendants THE VANGUARD GROUP, INC.,*
         *GEORGE U. SAUTER, and DUANE F. KELLY*

///

///

David Braff
Penny Shane
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
Email:  braffd@sullcrom.com; shanep@sullcrom.com
        *Attorneys for Defendants JOHN J. BRENNAN, CHARLES D. ELLIS,
RAJIV L. GUPTA, AMY GUTMANN, JoANN HEFFERNAN HEISEN, ANDRE F. PEROLD,
ALFRED M. RANKIN, JR., and J. LAWRENCE WILSON*


        /s/      *Michael J. Cereseto*
MICHAEL J. CERESETO, ESQ.
BUCHALTER NEMER
A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA  90017-2457
Telephone:  (213) 891-0700
Facsimile:  (213) 630-5665